## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| DELAWARE RIVERKEEPER NETWORK,<br>925 Canal Street, Suite 3701<br>Bristol, PA 19007 | ) ) ) ) | |
| and | ) ) | |
| MAYA VAN ROSSUM, Delaware<br>Riverkeeper,<br>925 Canal Street, Suite 3701<br>Bristol, PA 19007 | ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | **CASE NO. 16-416** |
| v. | ) ) | |
| FEDERAL ENERGY REGULATORY<br>COMMISSION,<br>888 First Street, N.E.<br>Washington, D.C. 20426 | ) ) ) ) ) | |
| and | ) ) | |
| NORMAN C. BAY, TONY CLARK, COLETTE<br>HONORABLE, and CHERYL A. LAFLEUR,<br>in their official capacities<br>as Commissioners of the Federal Energy<br>Regulatory Commission,<br>888 First Street, N.E.<br>Washington, D.C. 20426 | ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

TO THE HONORABLE COURT:

The Delaware Riverkeeper Network, and Maya K. van Rossum, the Delaware Riverkeeper, by and through their undersigned counsel, allege as follows:

## I.     INTRODUCTION

*"Could an umpire call balls and strikes objectively if he were paid for the strikes he called?" – Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1026 (9th Cir. 2009) (John T. Noonan, J., concurring).

1)     This case challenges the review and approval process of the Federal Energy Regulatory Commission's ("Commission") natural gas pipeline program, and the PennEast Pipeline Project ("Project") specifically, as being infected by structural bias, which violates the Due Process rights of the Delaware Riverkeeper Network, the Delaware Riverkeeper, and its members (collectively, "Plaintiffs").

2)     The Commission's structural bias arises out of the Commission's funding mechanism, under which the Commission's entire natural gas pipeline program is funded by the private companies that it is tasked with regulating.

3)     The funding mechanism for the Commission's natural gas pipeline program is codified in the Omnibus Budget Reconciliation Act of 1986 (the "Budget Act"), which creates a perverse incentive structure for the Commission to be biased in favor of the pipeline companies that it regulates. *See* 42 U.S.C. § 7178(a)(1).

4)     The Commission's funding mechanism, in full, states, "the Federal Energy Regulatory Commission shall, using the provisions of this section and authority

2

provided by other laws, assess and collect fees and annual charges in any fiscal year in amounts equal to all of the costs incurred by the Commission in that fiscal year." 42 U.S.C. § 7178(a)(1) (the "funding mechanism").

5)      For the natural gas pipeline program, the Commission annually compares the amount of gas each company transports to the total amount transported by all jurisdictional gas pipeline companies, then calculates and imposes a proportional volumetric charge on each company. *See* 18.C.F.R. § 382.202.

6)      Therefore, the Commission's natural gas pipeline program budget is not funded by a traditional Congressional appropriation, but instead by the private companies that it regulates.

7)      The natural gas pipeline program comprises roughly twenty percent of the Commission's overall budget. *See Congressional Performance Budget Request: Fiscal Year 2016*, Chairman Cheryl A LaFleur, at iii (the Commission estimates for Fiscal Year 2015 that the natural gas industry will fund 19.16 percent of its total budget).

8)      Therefore, the Commission cannot fairly preside over the review and approval process of proposed jurisdictional natural gas pipeline projects because the revenue collected from the private companies that it is supposed to oversee comprises a substantial portion of the Commission's overall budget, and the entirety of its natural gas program budget. *See Esso Standard Oil Co. v. Cotto*, 389

F.3d 212, 219 (1st Cir. 2004) (finding "structural bias" because the agency "benefit[ed] financially" from its own proceeding where the revenue collected by the agency flowed "to the [agency]'s budget").

9)      This fatally flawed financial structure violates the Constitutional Due Process rights of individuals pursuant to the Fifth Amendment.

10)     Due Process requires that an adjudicative agency, such as the Commission, be neutral in its decision-making process, with even the appearance of bias rendering the process unconstitutional. *See In re Murchison*, 349 U.S. 133, 136 (1955); *see also Brown v. Vance*, 637 F.2d 272, 284 (5th Cir. 1981).

11)     Due Process stands violated when a decision-maker faces "a **possible temptation** to the average man as a judge . . . which might lead him not to hold the balance nice, clear and true." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927) (emphasis added).

12)     Because the Commission is responsible for approving natural gas pipeline project applications to generate all of its budgetary income for the natural gas pipeline program, the Commission faces the impermissible "possible temptation" to be biased toward approving jurisdictional natural gas pipeline projects, such as the PennEast Project, and favoring pipeline company interests regardless of the legitimacy of the opposition of, or justifiable need for, the project proposals.

13)    In addition to the unconstitutional incentive structure created by the Commission's funding mechanism, the Commission's Due Process harm is facilitated and compounded by a corrosive concentration of power, whereby: 1) the Commission automatically provides natural gas pipeline project applicants with the power of eminent domain when the Commission approves a project; and 2) the Commission has the authority to preempt any and all state and local regulations regarding the siting, construction, and operation of Commission jurisdictional natural gas facilities.

14)    Therefore, when the Commission approves a natural gas pipeline project, the project applicant immediately has the right to condemn land for the project, and to ignore all state and local zoning and regulatory protections.

15)    The Commission's funding mechanism combined with its overly broad regulatory power compels the Commission to be a business partner with, rather than a dispassionate regulator of, the industry it is tasked with overseeing.

16)    The appearance of structural bias is further evinced by Commission actions that demonstrate actual bias.

17)    For example, since the funding mechanism was put in place: the Commission has approved 100 percent of the pipeline projects that it has voted on; the Commission has never issued civil penalty to a pipeline company for a violation of the environmental terms of its Certification; the Commission has never

issued an Environmental Assessment finding potential significant impacts for a pipeline project necessitating further environmental review; the Commission has never granted a rehearing request to a non-industry party; the Commission has adopted biased policy objectives in favor of pipeline companies;   and the Commission has left unfunded a Congressionally authorized Office designed to assist non-industry parties in participating in the Commission's administrative process.

18)    Plaintiffs ask the Court to find that the Commission's review and approval process for the natural gas program and the PennEast Pipeline Project is unconstitutional because it violates Plaintiffs' Due Process rights.

## II.    JURISDICTION AND VENUE

19)    This action arises under the Fifth Amendment to the Constitution of the United States. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971); *see also Davis v. Passman*, 442 U.S. 228 (1979) (finding that the Due Process Clause of the Fifth Amendment created a right of action for damages under the Civil Rights Act).

20)    Plaintiffs seek a declaratory judgment under the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202, and appropriate injunctive relief.

21)    While Congress may freely choose the court in which judicial review may occur, *City of Rochester v. Bond*, 603 F.2d 927, 931 (D.C. Cir. 1979), if it makes

6

no specific choice, then an aggrieved person may pursue constitutional claims in federal district court pursuant to federal question jurisdiction. *See Five Flags Pipe Line Co. v. Dep.'t of Transp.*, 854 F.2d 1438, 1439 (D.C. Cir. 1999); *see also* 28 U.S.C. § 1331.

22)   This Court has already determined that the Budget Act does not specify "the court in which judicial review . . . initially may be had." *Id*. at 1440.

23)   As such, jurisdiction in this Court is appropriate. *See NO Gas Pipeline v. FERC*, 756 F.3d 764, 768-9 (D.C. Cir. 2014).

24)   Venue is proper in this judicial district and in this Court pursuant to 28 U.S.C. § 1391(e)(1)(A) because Defendant Federal Energy Regulatory Commission is an agency of the United States, and resides in this judicial district.

### III.   PARTIES

### Plaintiffs

25)   The Delaware Riverkeeper Network ("DRN") is a non-profit organization established in 1988 to protect and restore the Delaware River, its associated watershed, tributaries, and habitats.

26)   This area includes 13,539 square miles, draining parts of New Jersey, New York, Pennsylvania and Delaware, and it is within this region that a portion of the Project's construction activity are proposed to take place.

27) The Upper Delaware River is a federally designated "Scenic and Recreational River" administered by the National Park Service. The National Wild and Scenic Rivers System also includes large portions of the Lower Delaware and the Delaware Water Gap.

28) The Lower, Middle, and Upper Delaware River have high water quality and are subject to Delaware River Basin Commission Special Protection Waters Designation.

29) The Basin and River are home to a number of federal and state listed endangered and threatened species including, but not limited to, the dwarf wedgemussel, Indiana bat, bog turtle, Atlantic sturgeon, shortnose sturgeon, loggerhead and Kemp's ridley sea turtles, and Northeastern bulrush.

30) Over 200 species of migratory birds have been identified within the drainage area of the Upper Delaware River, including the largest wintering population of bald eagles within the Northeastern United States.

31) The federally endangered shortnose and Atlantic sturgeon are present in the Delaware River.

32) The ecologically, recreationally, and economically important American Shad population migrates up through the nontidal portions of the Delaware River to spawn. American Shad populations in the Delaware River are currently at depressed numbers.

33)     The Delaware River and Delaware Bay are also home to dozens of species of commercially and recreationally important fish and shellfish species.

34)     In its efforts to protect and restore the watershed, DRN organizes and implements stream, wetland, and habitat restorations; a volunteer monitoring program; educational programs; environmental advocacy initiatives; recreational activities; and environmental law enforcement efforts throughout the entire Delaware River Basin and the basin states.

35)     DRN is a membership organization headquartered in Bristol, Pennsylvania, with more than 16,000 members with interests in the health and welfare of the Delaware River and its watershed.

36)     DRN began its advocacy efforts to protect the Basin from the adverse impacts of natural gas and pipeline infrastructure development in March of 2008.

37)     DRN has actively worked since that time to bring the environmental impacts of natural gas and pipeline infrastructure development to the public's attention through action alerts, press outreach, public appearances, public statements, and editorials.

38)     DRN has also advocated for and has funded expert scientific studies on the impact of natural gas and pipeline infrastructure development.

39)     In 2014, DRN successfully litigated a case against the Commission where the United States Court of Appeals for the District of Columbia found that the

Commission violated the National Environmental Policy Act ("NEPA") with regard to its issuance of a series of Certificates of Convenience and Public Necessity for several interconnected and interdependent natural gas pipeline projects. *See Delaware Riverkeeper Network, et al. v. Fed. Energy Regulatory Comm'n*, 753 F.3d 1304 (D.C. Cir. 2014).

40)    DRN is therefore deeply familiar with the impacts to human health, the environment, and property rights as a result of pipeline construction activity, as well as the biased process the Commission has utilized to approve pipeline projects.

41)    DRN brings this action on behalf of the organization as part of the pursuit of its organizational mission, and on behalf its impacted members, the board, and staff.

42)    Maya K. van Rossum came to work for the Delaware Riverkeeper Network as the organization's Executive Director in 1994.

43)    In 1996, she was appointed Delaware Riverkeeper and leader of the Delaware Riverkeeper Network.

44)    Ms. van Rossum is also a member of the Delaware Riverkeeper Network and supportive financial donor.

45)    Maya van Rossum as the Delaware Riverkeeper regularly visits the Delaware River and Delaware Estuary, including the areas affected by pipelines

10

and has taken family, friends, DRN members, and other interested people onto the Delaware River and its tributaries to educate them and to share with them the aesthetic beauty of the river.

46)    DRN's members live, own property, recreate, and work throughout the watershed, which includes areas affected by Commission-jurisdiction pipeline projects, and have had their aesthetic, recreational, and property interests harmed as a result of construction and operational activity.

47)    DRN and its members value the aesthetic qualities of their property and public parks; enjoying the scenery, wildlife, recreation opportunities, and undeveloped nature.

48)    DRN's members own property that has been, and/or in the future will be, adversely impacted by Commission-jurisdictional pipeline construction and operational activities; impacts which include physical damage to real estate as a result of Commission-jurisdictional pipeline construction activity, and encroachment of construction debris upon their homes and property.

49)    DRN's members who live within the blast radius of proposed or existing Commission-jurisdictional pipelines are concerned about the increased risk of bodily and/or property harm as a result of pipeline accidents or explosions.

50)    DRN's members own property that has been, or will be, subject to eminent domain proceedings for Commission-jurisdictional pipeline projects.

51)    DRN's members' bargaining position with pipeline companies for easement agreements has been, and is currently being, compromised as a result of the pressure and threat of eminent domain proceedings.

52)    DRN's members recreate in public parks that have been adversely impacted, and will be adversely impacted in the future, as a result of environmental degradation of aesthetic and recreational values by Commission-jurisdictional pipeline construction and operation.

53)    The Commission's actions have violated DRN's right to timely judicial review of Commission certifications.

54)    The legal violations alleged in this complaint therefore cause direct injury to the aesthetic, conservation, economic, recreational, scientific, educational, wildlife preservation, and property interests of the organization and its members.

55)    DRN and its members' aesthetic, conservation, economic, recreational, scientific, educational, wildlife preservation, and property interests have been, are being, and will continue to be adversely and irreparably injured by the Commission's actions unless the relief sought here is granted.

56)    These actual injuries are traceable to the Commission's actions and would be redressed by the requested relief.

**<u>Defendants</u>**

57)     Defendant Federal Energy Regulatory Commission is an independent federal agency charged with issuing Certificates of Convenience and Public Necessity pursuant to the Natural Gas Act for jurisdictional natural gas pipeline projects.

58)     The Commission is the lead agency for the purposes of environmental review of natural gas pipeline projects pursuant to NEPA.

59)     The Commission is headquartered in Washington, D.C.

60)     The Commission is composed of up to five commissioners who are appointed by the President of the United States with the advice and consent of the Senate.

61)     Commissioners serve five-year terms and have an equal vote on regulatory matters.

62)     The current Commissioners are: Norman Bay, Tony Clark, Colette Honorable, and Cheryl LaFleur.

## IV.   STATEMENT OF FACTS

### A.     General Background and History of the Commission and Its Funding Mechanism

63)     The Commission is an independent regulatory agency within the U.S. Department of Energy.

64)     The Commission's statutory authority centers on major aspects of wholesale electric, hydroelectric, natural gas, and oil pipeline industries.

65)   The Commission was created through the Department of Energy Organization Act on October 1, 1977.

66)   As authorized by statute – specifically, the Omnibus Budget Reconciliation Act of 1986 – the Commission recovers the full cost of its natural gas pipeline program through annual charges and filing fees assessed on the industry it regulates. *See* 42 U.S.C. § 7178(a)(1).

67)   This revenue is deposited into the Treasury as a direct offset to its appropriation, resulting in no net appropriation. *See* 42 U.S.C. § 7178(f).

68)   The Commission consists of up to five commissioners who are appointed by the President of the United States.

69)   The Commission's role in regulating the natural gas industry is largely defined by the Natural Gas Act of 1938.

70)   Under Section 3 of the Natural Gas Act, the Commission reviews the siting, construction, and operation of facilities to import and export natural gas.

71)   Under Section 7 of the Natural Gas Act, the Commission issues Certificates of Public Convenience and Necessity for the construction and operation of interstate natural gas pipelines and storage facilities.

72)   As required by NEPA, the Commission is also tasked with preparing the environmental review documents for proposed natural gas facilities.

73)    The Commission is therefore responsible for the generation and review of Environmental Assessments and/or Environmental Impact Statements related to proposed jurisdictional projects, including natural gas pipeline projects.

74)    Additionally, the Commission is required to conduct compliance inspections of the natural gas pipelines and storage facilities during construction and operation.

75)    For a proposed Commission jurisdictional natural gas project, Commission staff review a project applicant's submissions and make a recommendation to the Commissioners.

76)    The Commissioners then vote on whether to approve a project application or deny the application with each Commissioner providing one vote.

77)    Commission approval requires a majority vote in favor of the application for the project.

78)    The Commission was not always funded by the industry that it regulates.

79)    Prior to 1987 the Commission did not have the authority to assess charges on regulated companies for the work performed by the Commission in regulating natural gas pipelines.

80)    In 1982 the Commission itself began requesting legislation to authorize it to assess annual charges on the companies subject to its regulation to cover its budget, which was ultimately granted in the Omnibus Budget Reconciliation Act of 1986.

81)    In the context of the Commission's natural gas pipeline program, the Commission covers all its costs – and cost increases – by assessing charges on pipeline operators. *See* 18 C.F.R. § 382.201-03.

82)    The agency levies fees, known as Annual Charges Unit Charge on natural gas companies, who pay a volumetric charge based on how much gas they transmit via Commission-approved pipelines. *See* 42 U.S.C. § 7178(a); 18 C.F.R. § 382.202.

83)    The Commission historically relies on natural gas project approvals to provide about twenty percent of its overall budget. *See Congressional Performance Budget Request: Fiscal Year 2016*, Chairman Cheryl A LaFleur, at iii.

84)    For example, for the natural gas program in 2014 there were 42,439,281,812 dekatherms of gas transported in the Commission's jurisdictional pipeline system, which provides a budget of $59,836,000. *See Congressional Performance Budget Request: Fiscal Year 2016*, Chairman Cheryl A LaFleur, at iii.

85)    Absent the Commission's collection of charges, the Commission would not be able to reimburse its appropriation to the Treasury Department as required by law.

86)    According to the Commission, it "is required to collect not only all its direct costs but also all of its indirect expenses such as hearing costs and indirect personnel costs." *Revision of Annual Charges Assessed to Public Utilities*, Order

No. 641, FERC Stats. & Regs. ¶ 31,109, at 31,841 n. 4, 65 Fed. Reg. 65,757, 65,757 (Nov. 2, 2000).

### B.   The Proposed PennEast Pipeline Project

87)    On September 24, 2015, pursuant to Section 7(c) of the Natural Gas Act, PennEast Pipeline Company filed an application with the Commission for a Certificate of Public Convenience and Necessity ("Certificate") pursuant to Part 157, Subpart A of the Commission's regulations, which would authorize PennEast to site, construct, own, and operate a new natural gas pipeline system, including pipeline facilities, a compressor station, metering and regulating stations, and appurtenant facilities in Pennsylvania and New Jersey.

88)    PennEast requested that the Commission complete its review of the proposed Project and issue the Certificate by August 1, 2016.

89)    The PennEast Project is a 114 mile 36-inch diameter new greenfield pipeline that is proposed to provide up to 990,000 dekatherms per day of natural gas transportation capacity to the market on a year-round basis.

90)    The Project would cut through Luzerne, Carbon, Northampton, and Bucks Counties in Pennsylvania and Hunterdon and Mercer Counties in New Jersey.

91)    As proposed, the Project will disturb over 2,400 acres of land, convert over 400 acres of forested land to open land, cross 234 waterbodies, and impact over seventy-four acres of wetlands.

92)    On September 28, 2015, Plaintiffs filed a Motion to Intervene in the

Commission's review process opposing the Project. *See* Delaware Riverkeeper

Network Motion to Intervene, No. CP15-558, September 28, 2015 (Accession No.

20150928-5168); Maya van Rossum Motion to Intervene, No. CP15-558,

September 28, 2015 (Accession No. 20150928-5192).

93)    No answer in opposition was filed within fifteen days of Plaintiffs'

submissions. As such, Plaintiffs' Motions to Intervene were automatically granted.

*See* 18 CFR § 385.214 (c)(2).

> **C.    The Commission's Reliance on the Regulated Industry to Fund its
> Entire Pipeline Program Budget Creates a Constitutionally Fatal
> Structural Bias**

94)    Rather than continue to be subjected to a process fatally infected by

constitutionally intolerable bias, Plaintiffs come to this Court seeking declaratory

and injunctive relief to stop an unconstitutionally biased proceeding. *See MCS*

*Health Mgt. Options, Inc. v. Mellado Lopez*, 2015 WL 1212215, at *18 (D. Puerto

Rico, March 17, 2015) (finding that "[t]o require plaintiff to continue before a

biased    adjudicator    would    effectively    deprive    it    of    its    property

without due process of law and irreparable injury will thus follow").

95)    As a uniquely self-financing independent executive agency reliant on the

private pipeline companies it regulates to supply twenty percent of its overall

budget and all of its natural gas pipeline project budget, the Commission and its

Commissioners are unconstitutionally biased adjudicators of natural gas pipeline project Certification requests.

96)    The Commission's faulty financial structure violates the Constitution in several related ways.

97)    First, because the Commission is responsible for approving natural gas pipeline project applications to cover its entire pipeline program budget, the Commission faces the impermissible "possible temptation" to be biased toward approving jurisdictional projects – such as the PennEast Project – and favor industry interests regardless of the legitimacy of the opposition to project proposals.

98)    This "possible temptation" alone is enough for Plaintiffs to prevail on its claims.

99)    Additionally, the finite lifespan of pipeline projects and the increasing fixed costs of the Commission dictate that the Commission ultimately **must** approve proposed jurisdictional projects; therefore, the Commission has no choice but to act in an overtly biased manner and approve new projects, regardless of their merit, to ensure the continued existence of the Commission's expanding bureaucracy.

100)  Beyond the appearance of bias, the Commission's actual bias is demonstrated in a variety of ways, including its 100 percent approval rate for projects, its failure to enforce its Certifications, its obstruction of timely judicial

review of its decisions, its unlawful environmental review process, its biased policy objectives, its effort to keep an Office defunded that was designated to help the public engage in the Commission's review and approval process, and its "revolving door" with the private industry.

### i.    The Possible Temptation Doctrine

101)   Due Process requires fair adjudicative proceedings before neutral and detached decision-makers. *Ward v. Village of Monroeville*, 409 U.S. 57, 59-60 (1972); *see also Beauchamp v. De Abadia,* 779 F.2d 773, 776 (1st Cir. 1985) ("An impartial decision maker is, of course, a fundamental component of due process").

102)   While the Constitution clearly mandates that adjudicative proceedings be free of actual bias, *see In re Murchison*, 349 U.S. at 136, the Constitution also forbids the mere **appearance** of bias in adjudications. *Id. at 136* ("[O]ur system of law has always endeavored to prevent even the probability of unfairness"); *see also Exxon v. Heinz,* 32 F.3d 1399, 1403 (9th Cir. 1994) ("[T]he Constitution is concerned not only with actual bias but also with 'the appearance of justice'"); *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246-7 (D.C. Cir. 1971) ("With regard to judicial decisionmaking, whether by court or agency, the appearance of bias or pressure may be no less objectionable than the reality"); *Offut v. United States*, 348 U.S. 11, 14 (1954) (placing as paramount the appearance of justice in adjudications); *Richmond Newspapers, Inc. v. Virginia*,

448 U.S. 555, 594 (1980) (Brennan, J., concurring) ("For a civilization founded upon principles of ordered liberty to survive and flourish, its members must share the conviction that they are governed equitably"); *Sirias v. Sec'y, Dep't of Corr.*, 2015 WL 5440336, at *5 (M.D. Fl. Sept. 15, 2015) ("Due process assures every litigant, civil or criminal, of a trial by an impartial court, free of bias or the appearance of bias").

103)  The principle of neutrality "preserves both the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done.'" *Marshall v. Jerrico*, 446 U.S. at 242 (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring)).

104)  Studies have shown that the perception of procedural fairness is critically related to the presence of a "demonstrably independent decisionmaker." J. Marshaw, C. Goetz, F. Goodman, W. Schwartz, P. Verkuil & M. Carrow, *Social Security Hearings and Appeals*, at XXIV (1978); *see also* Paul R. Verkuil, *A Study of Informal Adjudication Procedures*, 43 U. Chi. L. Rev. 739, 751 (1976).

105)  Due Process stands violated when a decision-maker faces "a possible temptation to the average man as a judge . . . which might lead him not to hold the balance nice, clear and true." *Tumey*, 273 U.S. at 532.

106)   This objective inquiry considers all "circumstances and relationships" that might push an adjudicator to be biased. *See Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 880 (2009).

107)   The adjudicator's stake in the relevant proceedings need not be "direct or positive" to violate Due Process. *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (holding unconstitutional the "possible temptation" to rule based on the possible*,* attenuated elimination of economic competition); *see also Lucky Dogs LLC v. City of Santa Rosa*, 913 F.Supp. 2d 853, 860 (N.D. Cal. 2012) (declaring unconstitutional an adjudicator that was financially reliant on a particular party becoming a "repeat player" before it, as the adjudicator faced the "possible temptation" to rule for the party, and create an atmosphere more likely to induce the party to return.)

108)   There are two different types of pecuniary interests which elicit procedural Due Process concerns.

109)   First, courts have recognized bias where individual decision makers stand to gain personal financial benefits from their decisions. *See Tumey*, 273 U.S. at 523.

110)   Second, courts have recognized the appearance of bias where the decision making body has an institutional financial interest that may lead it to make biased decisions. *See Ward*, 409 U.S. at 60.

111)    This latter category is labeled "institutional" or "structural" bias, and is the type of bias present in the instant matter. *See Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*, 114 F.3d 840, 844 (9th Cir. 1997).

112) The "possible temptation" standard "applies with equal force to… administrative [agencies]." *Gibson*, 411 U.S. at 579; *see also Sierra Forest Legacy v. Rey*, 577 F.3d at 1024 (Noonan, J., concurring) (9th Cir. 2009) (applying the "possible temptation" doctrine to agencies is an "elementary" extension).

113)    Agencies may not operate pursuant to a "dual status as judge and a party interested in the outcome of the proceedings." *United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 699 (7th Cir. 1982); *see also Gibson*, 411 U.S. 564.

114)    When an agency adjudicates, Due Process is offended when "the decision-maker, because of [its] institutional responsibilities, would have so strong a motive to rule in a way that would aid the institution." *Alpha Epsilon Phi Tau*, 114 F.3d at 844 (internal quotation omitted).

115)    When an agency may use its adjudicative powers to supply more than *de minimus* funds for its budget, it cannot afford Due Process. *United Church*, 689 F.2d at 699; *see also Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136, 146 (1st Cir. 2008) (noting that an agency with a budget dependent upon fines it issues

faces a "possible temptation" that is "intensifie[d]" by the size of the fine relative to the agency's budget).

### ii. The Commission's Funding Mechanism Violates the Possible Temptation Doctrine

116) The constitutional issue here specifically arises where the Commission's funding structure intersects with its adjudicative responsibilities pursuant to the Natural Gas Act.

117) Given that the Commission's natural gas pipeline program is **entirely** reliant on the private companies that seek approvals from the Commission, the Commission cannot fairly or constitutionally preside over the review and approval process of those natural gas pipeline project proposals. *See* 42 U.S.C. § 7178(a)(1); *see also Alpha Epsilon Phi Tau*, 114 F.3d at 844; *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d at 146; *United Church*, 689 F.2d at 699.

118) A natural gas pipeline applicant is required to submit a request to the Commission for a Certificate of Public Convenience and Necessity. *See* 15 U.S.C. § 717f(c)(1)(A).

119) When a certificate application is filed for a natural gas pipeline project the Commission's regulations dictate that "the Commission will approve an application for a certificate **only if the public benefits from the project outweigh any adverse effects**." Statement of Policy, No. PL99-3-000, 88 FERC ¶ 61,227, at 28 (September 15, 1999) (emphasis added).

120)   Therefore, the Commission has a duty to perform a delicate balancing test to determine whether or not to issue a Certificate. *Id.*

121)   As part of the Commission's analysis, Commission staff review the project proposal as a whole – which includes an environmental analysis pursuant to NEPA – and make a recommendation to the Commissioners, who then vote on whether to issue or deny the Certificate of Public Convenience and Necessity. *Id.*

122)   When the Commission issues the Certificate it then collects money annually from the project applicant for as long as the pipeline remains in use as an interstate natural gas pipeline, which can extend twenty years, forty years, or longer. *See* 42 U.S.C. § 7178(a)(1).

123)   The Commission cannot fairly perform a balancing test and administer the review and approval process regarding the necessity of a natural gas pipeline project where the private companies that are seeking approvals from the Commission finance the Commission's natural gas pipeline program budget. *See Congressional Performance Budget Request: Fiscal Year 2016*, Chairman Cheryl A LaFleur, at iii.

124)   The Commission is therefore reliant upon the willingness and ability of natural gas pipeline companies to build, operate, and pay fees on natural gas pipeline projects, and faces an unconstitutional "possible temptation" to engage in a mutually lucrative profit-sharing scheme with those companies, to ensure the

companies continue to generate income while also providing revenue to sustain and grow the agency.

125)  In other words, when the Commission issues a Certificate for a natural gas pipeline project, it effectively puts money into the pockets of the private companies that build the projects, and then the Commission receives a long-term commitment to receive a portion of that money back to cover its pipeline program budget.

126)  The more pipeline projects that the Commission approves, the more "product" the Commission can tap for funding.

127)  This conflicting interest renders the Commission incapable of holding "the balance nice, clear and true." *Tumey*, 273 U.S. at 532.

128)  The necessary breakup of the Minerals Management Service ("Service") provides an instructive example of how an organizational conflict of interest compromises the decision making capacity of an agency.

129)  Similar to the Commission, the Service was tasked with issuing licenses and permits to private companies, while at the same time relying on the collection of fees from those same private companies for a portion of its discretionary budget. *See* NATIONAL COMMISSION ON THE BP DEEPWATER HORIZON SPILL & OFFSHORE DRILLING, DEEP WATER: THE GULF OIL DISASTER AND THE FUTURE OF DRILLING, Report to the President, 65 (2011), at 67, *available*

*at*,        https://www.gpo.gov/fdsys/pkg/GPO-OILCOMMISSION/pdf/GPO-OILCOMMISSION.pdf ("Report to the President").

130)   The result of these conflicting responsibilities was that "the same agency became responsible for regulatory oversight of offshore drilling - and for collecting revenue from that drilling." *Id*. at 65.

131)   Because safety and environmental concerns were subordinate to revenue collection and generation of user fees, the Service was ill-equipped to "adequately address the risks generated by the offshore industry's new technologies and exploration, development, and production activities, including industrial expansion into deeper waters." *Id*. at 68.

132)   The Commission is similarly flawed.

133)   The Ninth Circuit has already identified that agencies suffer from unconstitutional "impaired partiality" where the agency's financial interests intersect with its adjudicative powers. *See, e.g., Sierra Forest Legacy*, 577 F.3d 1015.

134)   In *Sierra Forest Legacy*, the agency generated revenue via salvage timber sales, which helped sustain and grow the agency's bureaucracy. *Id*.

135)   The Court was concerned with the agency's ability to remain unbiased in its adjudicative decisions regarding whether or not to approve salvage timber sales, and specifically questioned,  "[c]an an agency [with a] . . . strong financial interest

27

in the outcome proceed objectively? Could an umpire call balls and strikes objectively if he were paid for the strikes he called?" *Id*.

136) Answering that question, the Court strongly indicated that the agency was too tempted by self-interest to afford constitutional Due Process: "[i]nvoking the federal law, [Petitioners were] entitled to seek [their] application by an agency which was without an interest of its own in a result contrary to the law…**In the instant case, the decision-makers are influenced by the monetary reward to their agency**." *Id*. (emphasis added).

137) The same principle applies to the Commissioners and their adjudicative powers over the projects they oversee, such as the PennEast Pipeline Project. However, in contrast to *Rey* and the Minerals Management Service, where only a portion of those agencies' budgets were funded by the private companies it was tasked with regulating, the Commission's **entire natural gas pipeline program** relies on the continuing approval of project proposals that come before it.

138) This is particularly important considering that the natural gas pipeline program accounts for a substantial portion of the Commission's overall budget.

139) The PennEast Pipeline Project is currently under review by the Commission, and when the Commission – in keeping with its past practice – inevitably approves the Project, the PennEast Pipeline company will provide funds directly for the Commission for at least the next fifteen years, potentially significantly longer if

contracts are renewed. *See* Application of PennEast Pipeline Company, LLC for Certificate of Public Convenience and Necessity and Related Authorizations under CP15-558, No. CP15-558, September 24, 2015 (Accession No. 20150925-5028), at 32-33 ("Project's shippers have committed to fifteen-year contract terms").

140)   The clear interest of the Commission in the outcome of its review process creates a constitutionally-unacceptable structural bias, or at least the appearance of bias, which is manifested here with the review of the PennEast Pipeline Project.

### iii.   The Commission is Compelled to Approve Pipeline Projects

141)   Beyond the impermissible possible temptation to approve pipeline project proposals, which is all that is necessary to grant Plaintiffs' the relief requested, the Commission is also subject to a compulsion to approve pipeline projects.

142)   As discussed above, the Commission relies on the natural gas pipeline program to generate roughly twenty percent of its entire budget via user fees collected from existing natural gas pipeline project operators.

143)   However, natural gas pipelines have a finite life-span, and will eventually need to be replaced and/or removed.

144)   For example, the PennEast pipeline company estimates that its proposed large-scale natural gas pipeline will have an expected useful life span of roughly forty years. *See* Application of PennEast Pipeline Company, LLC for Certificate of Public Convenience and Necessity and Related Authorizations under CP15-558,

No. CP15-558, September 24, 2015 (Accession No. 20150925-5028), at 33 ("The sponsoring owners have taken on further investment risk due to PennEast's proposed 2.75 percent aggregate depreciation rate, **which approximates a Project useful life of forty years for pipeline . . . facilities**) (emphasis added).

145)   Therefore, the Commission is compelled to approve new natural gas pipeline projects, or risk losing twenty percent of its budget.

146)   Furthermore, the Commission's fixed budgetary needs naturally increase over time, thus necessitating new approvals to compensate for the additional costs of operation.

147)   For example, if the Commission stopped approving natural gas pipeline projects the Commission's budget will still naturally increase for at least two reasons: 1) increasing external overhead costs (e.g. rent, insurance premiums, maintenance, depreciation of assets, salaries, benefit payouts etc.), and 2) inflation. *Id*.

148)   It is indisputable that the Commission's fixed costs of operation naturally increase over time. *See, e.g., FERC Congressional Budget Request: Fiscal Year 2016*, Chairman Cheryl LaFleur, at v (denoting various agency rising fixed expenses).

149)   Without approving new projects the Commission can only generate revenue to cover such naturally rising costs by increasing the annual charge it levies on the industry.

150)   However, the Commission can raise those fees only so much; at some point pipeline companies will not be able to pay the amount required to be raised by the Commission. This is particularly true if no new pipelines are added while others are put out of service as they reach the end of their useful life-span.

151)   If the Commission were to deny a natural gas pipeline project proposal, an action it has never taken since the funding mechanism was instituted, it would also deny itself a secure long-term revenue stream for its naturally increasing budget.

152)   If nothing else, the Commission is at least unconstitutionally "tempted" to foster a pro-industry atmosphere in favor of project approvals so that the Commission's revenue stream can continue to grow proportional to its costs of operation.

### iv.    The Commission is Insulated from Congressional Budgetary Oversight

153)   The Commission's funding mechanism provides a degree of insulation from our democratically elected Congress that no other independent federal agency enjoys, thus exacerbating the Commission's "possible temptation."

154)   Therefore, congressional oversight does not and cannot remedy the constitutional infirmity here.

31

155)   As long as the budget appropriation proposed by the Commission is fully reimbursed to the Treasury Department, Congress has no incentive to question the size or growth of the Commission's budget request.

156)   Evidence of this lack of incentive to constrain the Commission's budget is demonstrated by reviewing the congressional appropriation to the Commission over the last ten years.

157)   Indeed, over the last decade the Commission has seen its annual budget grow by an astonishing fifty-one percent, rocketing from sub-$200-Million in 2004 to a more than $300-Million in 2014.   *Compare FERC Congressional Budget Request: Fiscal Year 2004*, Chairman Pat Wood III, at 1 (requesting $199,400,000), *with FERC Congressional Budget Request: Fiscal Year 2014*, Chairman Jon Wellinghof, at 2 (requesting $302,600,000).

158)   The Commission's budget has grown by more than double the rate of its parent government agency, the Department of Energy, which grew roughly twenty-two percent during the same time period. *Compare Department of Energy Congressional Budget Request: Fiscal Year 2004*, Office of Management, Budget and Evaluation/CFO at 11 (requesting $23,280,028,000), *with Department of Energy Congressional Budget Request: Fiscal Year 2014*, Office of Management, Budget and Evaluation/CFO at 11 (requesting $28,415,657,000).

159)   Because private companies finance the Commission, funds appropriated to the Commission are not reallocated from competing federal agencies.

160)   With no opportunity cost resulting from allocating scarce public funds, Congress has no incentive to deny the Commission's ever increasing budget requests.

161)   Therefore, Congress is simply not required to weigh the costs of increasing income taxes, federal deficits, or cuts in other deferral budgets against the benefits associated with allocating funds to the Commission.

162)   This calculation is the fulcrum by which all other areas of government examine spending, but this consideration is completely absent with regard to the Commission as a result of its unconstitutional funding mechanism.

163)   Ultimately, the Commission's ability to approve projects to justify its budget request makes it effectively immune from Congressional budgetary oversight.

164)   The Commission therefore operates outside of Congressional budgetary control, as the agency has the near-unilateral ability to spend what it wants, so long as it recovers all of its costs from the private companies it regulates.

165)   An impermissible "possible temptation" thus develops; as long as the Commission can raise it, the Commission can spend it – setting up the Commission's bias to approve pipelines to feed its ever-growing budget.

166)  The Commission's unique independence from Congressional oversight therefore further aggravates the Due Process violation.

### v.      The Commission is Insulated from Executive Oversight

167)  Not only is the Commission inoculated against Congressional oversight as a self-funded agency, but the Commission is also simultaneously insulated from the oversight of the executive branch as a result of the limitation of the President's removal power of Commissioners.

168)  The "for-cause" limitation on the removal of the Federal Energy Regulatory Commission's Commissioners only allows the removal of Commissioners under a very narrow set of circumstances, i.e. ". . . inefficiency, neglect of duty, or malfeasance in office." 42 U.S.C. § 7171(b)(1).

169)  Therefore, only under extraordinary circumstances may the President exercise any degree of oversight over the agency once a Commissioner has been appointed.

170)  The Commission's unique independence from the oversight of both the executive and legislative branches of government therefore leaves the Commission especially vulnerable to the undue influence of the exact same companies that fund its budget.

171)   This is particularly true because the Commission itself operates without the scrutiny of any type of regulatory oversight or regulatory board, i.e. a watchdog responsible for overseeing regulatory quality.

172)   As discussed below, the framework for such an oversight board exists; however, unsurprisingly the Commission has never requested funds for the board.

173)   No other independent federal agency is equally free from congressional, executive, and internal oversight.

174)   Further, no such agency is also simultaneously fully funded by the private companies it is supposed to regulate.

### vi.   The Commission Manifests its Possible Temptation in Actual Bias

175)   While the appearance of bias is sufficient to grant Plaintiffs the relief they seek, the Commission's "possible temptations" also frequently manifest themselves in impermissible **actual bias** in agency adjudications – or, at least, in highly questionable and irregular agency behavior indicative of structural bias.

176)   When an agency carries out administrative proceedings that are "flawed and unfair," it "offends the most basic principles of due process." *MCS Health Mgmt. Options*, 2015 WL 1212215, at *18; *see also Lamboy–Ortiz v. Ortiz–Velez,* 630 F.3d 228, 240-41 (1st Cir. 2010) (citing *Esso Standard Oil. Co. v. Lopez– Freytes,* 522 F.3d 136, 145–8 (1st Cir. 2008) ("an action for depravation of due process may be brought upon bias infecting administrative proceedings")).

35

177) The Commission's actual bias is demonstrated in a variety of ways, including its 100 percent approval rate for projects, its universal failure to enforce the terms and conditions of Certifications, its abuse of regulations to block timely judicial review of agency decisions, its improper environmental review process, its biased policy objectives, its deliberate effort to keep an Office defunded that was designed to help the public navigate the Commission's review and approval process, and the Commission's "revolving door" with the companies it regulates.

### a. The Commission has a 100 percent approval rate for pipeline applications

178) Proof of the Commission's bias lies in the historical record of companies seeking approval of projects before the Commission.

179) Since the funding mechanism was put in place, the Commission has **never** denied an application for a natural gas pipeline project that was submitted for vote to the Commissioners.

180) Upon information and belief, no other federal agency has deployed a 100 percent approval rate for project applicants seeking authorization or certification from the agency.

### b. The Commission has demonstrated a pervasive failure to enforce the terms and conditions of its Certificates on pipeline projects

181) Beyond the universal and highly conspicuous favoritism towards pipeline companies reflected in its approval rates, the Commission also routinely commits

36

egregious acts of partiality and bias with regard to project applicant compliance with the terms and conditions of the Commission's Certificates.

182)  For example, when the Commission issues an approval of a pipeline project, it includes a requirement that the pipeline company abide by the terms and conditions of the approval with regard to environmental protection during construction activities.

183)  The Commission mandates that pipeline companies provide status reports updating the Commission on construction activity detailing any environmental problem areas or instances of non-compliance.

184)  The Commission is then authorized to issue civil penalties for circumstances where violations are identified.

185)   However, since the funding mechanism was put in place, the Commission has **never** issued a civil penalty for violations related to construction, maintenance, or operational misconduct for any pipeline project despite noncompliance events.

186)  A prototypical example of the Commission's inexplicable failure to issue civil penalties involves the construction of Tennessee Gas Pipe Line Company's ("Tennessee") 300 Line Upgrade Project (Commission No. CP09-444).

187)  By the end of project construction the Commission had recorded forty-three instances of silt laden water entering resources/depositing sediment off of the right-of-way; fifteen instances of failures to properly install erosion controls or use

required "best management practices" to adequately protect resources; nine instances of failures to properly install/maintain erosion controls resulting in impacts to resources; six instances of erosion/disturbance resulting from stormwater discharges off of the right-of-way; and at least two instances of in-stream work conducted during fishery restriction, among many others. *See 300 Line Project Quarterly Status Report*, December 23, 2015, Docket No. CP09-444 (Accession No. 20151223-5181).

188)  The Pennsylvania Department of Environmental Protection found that these clear violations were sufficiently serious to secure an $800,000 settlement from Tennessee for the harm it caused to the environment.

189)  However, the Commission not only failed to issue any civil penalties relating to numerous recorded violations, the Commission did not even issue a stop-work order to attempt to remedy the causes of the violations before allowing the pipeline company to proceed with other construction activity.

190)  This is not an isolated incident, but rather exemplifies the Commission's standard operating procedure.

### c.  The Commission's actions block timely judicial review of agency decisions

191)  An additional example of the Commission's bias toward industry relates to the Commission's arbitrary treatment of requests for rehearing.

192)   To obtain judicial review of a Commission Certificate an aggrieved party must first submit a request for rehearing. *See* 15 U.S.C. § 717r(b).

193)   The Commission then must "act" on the request before an aggrieved party may initiate a lawsuit in the appropriate Circuit Court. *Id*.

194)   However, the Commission habitually "acts" upon the requests for rehearing by issuing orders granting the request for rehearing solely for the purposes of "further consideration." *See* 18 C.F.R. § 385.713(f).

195)   The Commission's regulations leave the time period to make a decision undefined, and therefore, unlimited. *Id*.

196)   Therefore, the length of the "tolling orders" issued, in practice, are indefinite. *Id*.

197)   This places aggrieved parties in an untenable state of administrative limbo, as an order on a request for rehearing is a condition precedent to seek judicial review of an initial Commission order such as the Certificate Order approving a pipeline project. *See* 15 U.S.C. § 717r(b); *see also* Petition for Writ of Mandamus, *In re Stop the Pipeline*, No. 15-926 (2d Cir. March 27, 2014).

198)   While the request for rehearing is pending before the Commission, the Commission routinely issues notices to proceed with various phases of construction activity, and also initiates condemnation actions against landowners.

*See, e.g.*, *Tennessee Gas Pipeline Co., LLC*, 142 FERC ¶ 61025, at *3, *7 (Jan. 11, 2013).

199)   The Delaware Riverkeeper Network and its members have been the victim of the Commission's biased practice of issuing tolling orders.

200)   For example, the Delaware Riverkeeper Network submitted a rehearing request to the Commission in January of 2015 citing several ways in which the Commission violated the Clean Water Act and NEPA when it issued a Certificate for Transcontinental Pipeline Company's Leidy Southeastern Pipeline Project. *See* Rehearing Request of Delaware Riverkeeper Network, No. CP13-551 (Accession No. 20150116-5100), January 16, 2015.

201)   It has now been over a year since the Delaware Riverkeeper Network submitted its rehearing request, and during that time the Commission has issued at least twenty different Letter Orders allowing the Transcontinental to proceed with various forms of construction activity, but has not made a final ruling on the request for rehearing. *See* Commission Letter Orders, No. CP13-551 (Accession Nos.   20150130-3009**,**   20150205-3003,   20150226-3032,   20150309-3026, 20150325-3068,  20150331-3040,  20150409-3018,  20150421-3005,  20150428- 3040,   20150507-3061,   20150519-3003,   20150521-3026,   20150612-3025, 20150713-3015,   20150723-3033, 20151016-3023, 20151125-3014, 20151214- 3036, 20151230-3019, 20151231-3004).

202)   Indeed, the Commission has approved tree-felling, grading, trenching, blasting, and has actually authorized numerous portions of the pipeline project to become fully operational; and yet the Commission has failed to issue a decision on Plaintiffs' rehearing request, thereby blocking any effective judicial review of the pipeline project. *Id*.

203)   Such non-action by the Commission is, by itself, a gross deprivation of Due Process, as it robs the public of its opportunity to respond, explain, or defend itself from the unlawful actions of the Commission. *See Gorman v. University of Rhode Island,* 837 F.2d 7, 12 (1st Cir. 1988) ("Few principles of law, applicable as well to the administrative process, are as fundamental or well established as a party is not to suffer . . . without an opportunity of being heard") (internal citation omitted).

204)   The Commission therefore deliberately creates administrative inertia that is difficult, if not impossible, to stop once initiated, even if an aggrieved party's viewpoints are eventually vindicated in court. *See e.g.*, *Delaware Riverkeeper Network*, 753 F.3d 1304 (D.C. Cir. 2014) (After being subjected to a tolling order that prevented litigation from being filed, the Delaware Riverkeeper Network and other petitioners successfully argued that the Commission violated the mandates of NEPA, but only secured the legal judgment after the pipeline project at issue had been fully constructed and was in operation).

205)   This is not an isolated incident; rather it reflects the Commission's standard operating procedure. Upon information and belief, the Commission has utilized this practice in **every single pipeline project docket** where a non-industry aggrieved party has submitted a request for rehearing.

206)   The Commission's steamrolling of aggrieved parties' rights is clear evidence of the Commission's bias in allowing proposed pipeline projects to be constructed and operated before timely judicial review, thus allowing the Commission to more easily add to its bottom line.

207)   Furthermore, upon information and belief, since the funding mechanism was put in place the Commission has **never granted a request for rehearing to a non-industry party**.

208)   Instead, the Commission uses the indefinite "tolling order" delay to bullet-proof its initial order so that its likelihood of successfully defending a legal challenge to a proposed project in Circuit Court is significantly increased.

209)   The Commission's standard practice here is, itself, a further deprivation of Due Process, and at least an example of agency bias.

    **d.   The Commission unlawfully pre-determines the environmental review process pursuant to the National Environmental Policy Act for natural gas pipeline project applications**

210)  A third way in which the Commission demonstrates its favoritism to the industry that it regulates involves the way in which the Commission conducts environmental reviews of proposed projects pursuant to NEPA.

211)  Before the Commission can approve a project, it must satisfy the requirements of NEPA by identifying and evaluating the environmental impacts of the proposed action.

212)  This means that the Commission is required to prepare an Environmental Assessment and, if significant impacts are found, to then prepare a more comprehensive Environmental Impact Statement. *See* 40 C.F.R. § 1501.4.

213)  However, the Commission does not follow the procedure as described in NEPA's governing regulations.

214)  Instead, the Commission "eyeballs" a project applicant's initial request, and subsequently categorizes the project to receive either an Environmental Assessment or an Environmental Impact Statement.

215)  While the Environmental Assessment was specifically designed to be the vehicle to determine when an Environmental Impact Statement is necessary, the Commission has **never** issued an Environmental Assessment that found possible significant impacts, or even unknown impacts, which would then require a full Environmental Impact Statement.

216)  For example, in response to concerns raised by Senator Elizabeth Warren regarding the Atlantic Bridge Project, the Commission issued a response stating that "[t]he Commission staff will issue an environmental assessment (EA) to meet our responsibilities under the National Environmental Policy Act." Letter to Senator Warren, No. CP16-9 (Accession No. 20160216-0009), February 12, 2016.

217)  In other words, the Commission abjectly stated its belief that once it issues an Environmental Assessment, the Commission has fully met its NEPA responsibilities. This is simply not how NEPA operates.

218)  Such truncated environmental review procedures save the industry both time and money, but shortchange those aggrieved parties who are impacted by construction activity that is allowed to proceed absent the appropriate level of environmental scrutiny.

### e. The Commission's natural gas pipeline policy objective is overtly biased in favor of project applicants

219)  The Commission's policy regarding the certification of new interstate pipeline facilities inappropriately relies on project applicants to provide all the information about public benefits and costs of the proposed project. *See* Statement of Policy, No. PL99-3-000, 88 FERC ¶ 61,227, at 26-28 (September 15, 1999).

220)  The Commission's overtly biased policy objective "is for the applicant to develop **whatever record is necessary** . . . **for the Commission to be able to find**

**that the benefits to the public from the project outweigh the adverse impact on the relevant interests.**" *Id.* at 26 (emphasis added)

221)   The Commission therefore encourages and incentivizes project applicants to be generous in counting and disclosing potential benefits and overly parsimonious in counting the costs of its proposal.

222)   It is this incomplete and biased record that the Commission relies on to make its determination of whether to issue a Certificate.

223)   Under these circumstances, the Commission's biased policy objective renders it highly unlikely that the Commission will find that a project's actual costs are greater than the proposed public benefits, a conclusion that is reflected by the fact that the Commission has never rejected a pipeline proposal.

### f. The Commission has failed to request funds for an Office that was established to assist non-industry parties in participating in the Commission's review and approval process

224)   Congress established an Office of Public Participation ("Office") at the Commission as part of the 1978 Public Utility Regulatory Policies Act. *See* 16 U.S.C. § 825q–1.

225)   By creating this Office, Congress recognized that effectively participating in Commission proceedings is especially challenging for individuals, homeowners associations, non-profit organizations, local government bodies, and consumer protection organizations because the highly technical nature of Commission

dockets require significant specialized and costly resources often unavailable to non-industry related parties. Among the Office's responsibilities is to help "coordinate assistance to the public" on Commission dockets, and the Office may "provide compensation for reasonable attorney's fees, expert witness fees, and other costs of intervening" for the public. 16 U.S.C. § 825q-1(b) (1-2).

226) The Office is important because repeat industry parties enjoy vast advantages in navigating the Commission's review and approval process in comparison to the public.

227) However, the Commission has inexcusably **never** requested or allocated any funds for this Office since the Commission's funding mechanism was put in place, even though fully funding the office would constitute less than 1.8 percent of the Commission's budget.

228) As such, this Office exists only on paper, and the public has never received the opportunity of assistance it would provide to impacted individuals, families, communities, and organizations faced with the significant impacts of a pipeline project and faced with the high complexity and cost of properly reviewing and potentially challenging a project when the need arises.

229) The Commission's failure to fund the Office of Public Participation reflects the Commission's lack of institutional interest in cultivating a balanced, fair, and impartial review and approval process for natural gas pipeline projects.

230)   These examples of agency bias demonstrate that the Commission has succumbed to its "possible temptation" to favor project applicants in nearly all facets of the review and approval process.

231)   It is not that these examples show that the Commission **sometimes** favors private companies; rather, these examples show that the Commission favors private companies at **every opportunity** and has done so since the Commission's funding mechanism was put into place.

232)   All of these marks of actual bias flow directly from one primary source, the Commission's funding mechanism, which compels the Commission to be a business partner with, rather than a dispassionate regulator of, the pipeline industry it is tasked with overseeing.

233)   Even if the Court finds that these examples do not rise to the level of actual bias, they certainly at least demonstrate a constitutionally intolerable appearance of bias. *See e.g., MCS Health Mgmt. Options*, 2015 WL 1212215, at *16-7 (finding actual bias where "the administrative process ha[d] been marked by inconsistencies and general unfairness").

### g. The Commission has developed a "revolving door" between itself and the private companies it purportedly regulates

234)   There is a "revolving door" between employees that leave the Commission who then immediately take positions promoting industry interests.

235)  A recent report examining Commission job negotiations and stock holdings found that "[e]mployees at the Federal Energy Regulatory Commission have deep ties to the industry they regulate." Kevin Bogardus and Hannah Northey, *Employees Negotiate for Industry Jobs Under Agency's Eye*, GREENWIRE, *available at*, http://www.eenews.net/stories/1060016380.

236)  An evaluation of Commission employment records for 2014 shows an agency riddled with examples of Commission staff "seeking employment with grid operators, law firms and utilities that the agency has jurisdiction over and often meets with as it sets new orders and rules," and that Commission employees frequently "held stock in or remain part of pension plans from companies that can be affected by the agency's work." *Id.*

237)  For example, the former Deputy Director of the Commission's Office of Energy Policy and Innovation, Mason Emnett, left the Commission after almost eight years to take a position as a senior attorney for NextEra Energy Incorporated, and now serves as a Senior Attorney of Federal Regulatory Affairs. *Id.*

238)  Additionally, in January 2015 Teresina Stasko, a former Commission attorney working in the Enforcement Division, recused herself from decisions involving the North American Electric Reliability Corporation, where she was seeking employment. Ms. Stasko is now the Senior Counsel and Manager of Enforcement Actions at that company. *Id.*

48

239)  Another recent high profile example of the Commission's "revolving door" is that of former Commissioner Philip Moeller, who left the Commission in May of 2015 and immediately joined the Edison Electric Institute – a trade association that represents over 270 private energy industry suppliers and related organizations – to direct the association's retail energy services, energy delivery, and regulatory outreach programs. *Phil Moeller Joins EEI as Senior Vice President*, PR Newswire, Jan. 6, 2016, *available at*, http://www.prnewswire.com/news-releases/phil-moeller-joins-eei-as-senior-vice-president-300200725.html.

240)  Indeed, the revolving door at the Commission has spun so easily and frequently that the line between the regulators and the regulated community has become progressively meaningless.

   **D.    The Commission's Unconstitutional Structural Bias is Enabled and Facilitated by the Commission's Improper Concentration of Power Through Eminent Domain Authority and the Power to Preempt all Local and State Laws**

241)  The Commission's inherent structural bias towards private pipeline companies is compounded and enabled by a concentration of power that: 1) allows the Commission to automatically provide a project applicant with the power of eminent domain when the Commission issues Certificates of Public Convenience and Necessity, *see* 15 U.S.C. § 717f(h); and 2) gives the Commission the authority to preempt all state and local regulations regarding the siting, construction, and

operation of Commission jurisdictional natural gas facilities. *See* 15 U.S.C. § 717f(c)(1)(A).

242)   The Commission's structural bias in favor of private companies, combined with its unique power to literally reach into the backyards of everyday people, flagrantly violates Due Process.

243)   The Commission's eminent domain powers are codified in 15 U.S.C. § 717f(h), which states that the holder of a Certificate of Public Convenience and Necessity is empowered to "exercise of the right of eminent domain in the district court of the United States for the district in which such property may be located, or in the State courts." 15 U.S.C. § 717f(h).

244)   Therefore, when the Commission issues its final decision on a natural gas pipeline project, it simultaneously also confers to the project applicant the power of eminent domain to wield whenever, and however, the project applicant sees fit. *See Millennium Pipeline Co., L.L.C. v. Certain Permanent & Temp. Easements*, 777 F. Supp. 2d 475, 481 (W.D.N.Y. 2011) (holding that a court's "role in proceedings involving FERC certificates is circumscribed by statute . . ."); *USG Pipeline Co. v. 1.74 Acres in Marion Cnty., Tenn.*, 1 F. Supp. 2d 816, 821 (E.D. Tenn. 1998) (holding that the court's role is simply to evaluate the scope of the Certificate and to order condemnation of property as authorized in the Certificate).

245) Therefore, an agency whose decision making capacity is fundamentally compromised by structural bias also has the unfettered authority to provide the power of eminent domain for every single natural gas pipeline project it approves.

246) Such authority bypasses the traditional avenue for securing eminent domain rights through a federal or state judicial proceeding, and robs the public of a fair and unbiased adjudication of their rights.

247) Indeed, those holding a Certificate do not even need to negotiate with landowners in "good faith" prior to initiating eminent domain lawsuits to take property for a project. *See E. Tenn. Natural Gas, LLC v. 1.28 Acres in Smyth Cnty.*, 2006 WL 1133874, at *29 (W.D. Va. Apr. 26, 2006) ("nothing in the [Natural Gas Act] or Federal Rule of Civil Procedure 71A requires the condemnor to negotiate in good faith. All that the Act requires is a showing that the plaintiff has been unable to acquire the property by contract or has been unable to agree with the owner of the property as to the compensation to be paid").

248) In other words, a Certificate holder can attempt to strong-arm a landowner into signing an overbroad and unfair agreement in bad faith, and if this effort fails, the Natural Gas Act empowers the project applicant to immediately initiate an eminent domain proceeding.

249) In addition to its ability to provide the power of eminent domain to the private parties that fund its budget, the Commission also frees its applicants from

complying with any state or local laws governing the siting, construction, or operation of jurisdictional pipeline projects.

250) The Commission's preemptive authority is derived from 15 U.S.C. § 717f(c)(1)(A), which states that project applicants who "undertake the construction or extension of any [interstate natural gas ]facilities" must obtain a Certificate of Public Convenience and Necessity, from the Commission. *See also N. Natural Gas Co. v. Iowa Utilities Bd.*, 377 F.3d 817, 821 (8th Cir. 2004) ("The [Natural Gas Act] specifically provides that the Commission will oversee the construction and maintenance of natural gas pipelines through the issuance of certificates of public convenience and necessity. *See* 15 U.S.C. § 717f(c). The Commission has the authority to regulate the construction, extension, operation, and acquisition of natural gas facilities, *see id.* § 717f(c)(1)(A), and does so through its extensive and detailed regulations concerning applications for certificates. *See generally* 18 C.F.R. Part 157, Subpart A).

251) After receiving a Certificate from the Commission a project applicant can therefore ignore all State and local laws that would otherwise apply to any other type of private company seeking to construct industrial infrastructure projects.

252) Therefore, residents and landowners who made decisions to purchase land or property relying on the existing zoning or regulatory framework for that particular area lose those protections to private companies that have been empowered by a

compromised federal agency. *See e.g.*, *Gunpowder Riverkeeper v. F.E.R.C.*, No. 14-1062, July 31, 2014, Standing Materials in Support of Opening Brief of Gunpowder Riverkeeper, Affidavit of Susan and Frank Tedeschi ("The proximity of the pipeline to the well however, i.e. within 19' of the pipeline, is not acceptable to Harford County and the County has indicated they will not approve a property plat with the well and pipeline so close. Columbia requested a reprieve from the Order which FERC granted. **FERC's disregard of Local requirements has placed us in a position where Columbia may proceed with construction while we could be left with an unapproved property plat, non-compliant with Country requirements**") (emphasis added).

253)  The Commission's overly broad and corrosive concentration of power ultimately further enables the Commission's actual and perceived structural bias.

254)  To the extent this power is curtailed, constrained, or otherwise removed it could mitigate the Commission's inherent structural bias.

255)  In *United Retail & Wholesale Emps. Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, the Third Circuit held that its task was to determine whether the Multiemployer Pension Plan Amendments Act of 1980 incorporated decision-maker bias, and if so, whether it provided sufficient measures to eliminate the bias. *See United Retail & Wholesale Emps. Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.*, 787 F.2d 128 (3d

Cir. 1986) *abrogated in part by*, *Concrete Pipe & Prods, of Cal, Inc. v. Constr. Laborers Pension Trust for S. Cal.,* 508 U.S. 602 (1993) (finding no Due Process violation because the decision making administrator of the agency was acting in a enforcement role rather than in an adjudicatory role).

256) The Third Circuit reasoned that the Multiemployer Pension Plan Amendments Act created inherent structural bias, which was enabled and compounded by a further statutory presumption that on review the agency's "tainted verdict" was correct. *Id*. at 141.

257) Concluding that these provisions violated Due Process, the Third Circuit held that the least intrusive means of preserving the Multiemployer Pension Plan Amendments Act's constitutionality would be to let the decision making powers stand, but eliminate the statutory presumption of correctness. *Id*. at 142.

258) Absent the statutory presumption, the Court determined that the Multiemployer Pension Plan Amendments Act "[w]ould meet the constitutional requirement of providing an impartial decisionmaker." *Id*. at 143.

259) Here, absent the Commission's preemptive authority over all local and state laws, local and state governments could alleviate biased Commission decision making by holding private companies accountable to protective local and state environmental and zoning regulations.

260)  Similarly, if the Commission's authority to automatically confer the power of eminent domain with each Certificate was removed or reduced, aggrieved parties could resolve conflicts before a fair and unbiased court in a traditional eminent domain proceeding.

261)  Thus, in addition to declaring the Commission's funding mechanism unconstitutional, the Court could mitigate the constitutional violation by removing or reducing the Commission's other powers, thereby providing the public a more fair opportunity to challenge or otherwise confront the Commission's biased decisions, returning some sense of justice in accordance with "the deep-rooted demands of fair play enshrined in the Constitution." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. at 161 (Frankfurter, J., concurring).

## V.    CAUSE OF ACTION

### Violation of Plaintiffs' Due Process Rights Under the Fifth Amendment

262)  The other allegations of the Complaint are herein incorporated by reference.

263)  Defendants, acting under color of law, are subjecting Plaintiffs to an administrative process that is tainted with structural bias, or the appearance of bias, as well as actual bias in violation of Plaintiffs' rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

264)  The statutory scheme and the Commission's regulations as applied within the natural gas pipeline program violate Plaintiffs' Due Process rights.

265)  As described above, the Commission is subject to an impermissible temptation to be biased in favor of the private companies, such as PennEast, that seek Certificates of Convenience and Public Necessity because the Commission's entire natural gas pipeline program budget is funded by the same private companies.

266)  This intersection of the Commission's adjudicative responsibilities in approving new pipeline projects with the fact that the Commission's pipeline program budget is entirely funded by those very projects subject it to the temptation of impermissible structural bias.

267)  Not only is there an impermissible temptation for bias, which is all that is necessary to grant Plaintiffs' requested relief, the Commission has acted in a biased manner because it is fundamentally compelled to approve natural gas pipeline Certificates of Convenience and Public Necessity.

268)  The finite lifespan of natural gas pipelines and the Commission's naturally rising long-term costs compel the Commission to approve new projects to secure its pipeline program budget.

269)  Evidence of the Commission's actual bias can be derived from the Commission's 100 percent approval rate of pipeline projects, its universal failure to enforce the terms and conditions of its Certificates of Convenience and Public Necessity, the deliberate obfuscation of timely judicial review of Commission

decisions, its review of environmental impacts, its biased policy objectives, the failure of the Commission to fund an existing office that would provide support to communities and individuals who are impacted by the Commission's decisions, and the "revolving door" between the agency and the private industry.

270)   In addition to being an example of actual agency bias, the Commission's actions to prevent timely judicial review of natural gas pipeline Certifications is also a separate and distinct deprivation of Plaintiffs' Due Process rights.

271)   By failing to take action on aggrieved parties' rehearing requests prior to authorizing construction activity, the Commission robs those parties of their right to have their day in court prior to construction proceeding on the project they seek to challenge.

272)   These violations of Plaintiffs' rights are enabled by the improper corrosive concentration of power in the Commission regarding its authority to confer eminent domain powers for natural gas pipeline projects that it approves.

273)   Therefore, an agency infected by structural bias in favor of approving pipeline projects can automatically provide the power of eminent domain for a private company, such as PennEast, to take land previously owned by Plaintiffs and use it to advance their private purposes.

274)   Here, DRN's members' land, and public parks and recreational areas, are threatened by eminent domain by the PennEast Pipeline project.

275)  Such power wielded by a structurally biased adjudicator violates Plaintiffs' Due Process rights to be heard before a fair and unbiased adjudicator before their property is taken.

276)  The violation of Due Process is also enabled by the Commission's unfettered ability to preempt all state and local laws regarding the siting, construction, and maintenance of natural gas pipeline projects.

277)  When it grants pipeline project Certificates, the Commission can completely ignore all local and state laws that Plaintiffs typically rely upon to protect their property rights.

278)  DRN's members explicitly rely on local and state regulatory laws to preserve and protect both the character and value of the properties that they own along the proposed PennEast Project's right-of-way.

279)  DRN and its members' aesthetic, conservation, economic, recreational, scientific, educational, wildlife preservation, and property interests have been, are being, and will continue to be adversely and irreparably injured by the Commission's actions unless the relief sought here is granted.

280)  The Commission's power to ignore these long established regulatory regimes when approving pipeline projects, while simultaneously being tainted by structural bias in favor of approving those projects, directly infringes upon the Due Process rights of the Plaintiffs.

281)   Moreover, the Commission's unlawfully biased proceedings have forced Plaintiffs to incur substantial and excessive costs and, if allowed to continue, would further put Plaintiffs at risk of additional injury in the form of deprivation of property without Due Process.

282)   Defendants' violations will cause irreparable injury unless enjoined, as the mere subjection to an unconstitutionally biased process is itself an injury that can be prevented only by an immediate injunction.

283)   Plaintiffs have no adequate remedy at law to prevent Defendants from proceeding with this biased process.

## VI.   REQUEST FOR RELIEF

WHEREFORE, THE DELAWARE RIVERKEEPER NETWORK; AND MAYA K. VAN ROSSUM, THE DELAWARE RIVERKEEPER pray that this Honorable Court:

      a)  DECLARE that the Commission's reimbursement mechanism as codified in the Omnibus Reconciliation Act of 1986 is unconstitutional;

      and/or in the alternative;

         i)  DECLARE that the Commission's power of eminent domain for jurisdictional natural gas pipeline projects, as codified in 15 U.S.C. § 717f(h), is unconstitutional; and/or,

      ii)     DECLARE the Commission's authority to preempt local and state laws with regard to jurisdictional natural gas pipeline projects is unconstitutional;

b) DECLARE that the procedure utilized by the Commission to issue a Certificate of Convenience and Necessity for the PennEast Pipeline Project subjects Plaintiffs and its members to a biased process which deprives Plaintiffs and its members their aesthetic, recreational, liberty, and/or property interests without Due Process and causes irreparable harm thereby;

c) DECLARE that the procedure utilized by the Commission to issue Certificates of Convenience and Necessity for Commission jurisdictional projects within the Delaware River Basin subjects Plaintiffs and its members to a biased process which deprives Plaintiffs and its members their aesthetic, recreational, liberty, and/or property interests without Due Process and cause irreparable harm thereby;

d) AWARD Plaintiffs its costs and all reasonable attorneys' fees; and

e) GRANT Plaintiffs such other and further relief as may be just and proper.

Respectfully Submitted March 2nd, 2016.

                        */s/ Aaron Stemplewicz*
                        AARON STEMPLEWICZ
                        D.C. Bar No. PA0057
                        Delaware Riverkeeper Network
                        925 Canal Street, Suite 3701
                        Bristol, PA 19007
                        (215) 369-1188
                        aaron@delawareriverkeeper.org

                        JORDAN B. YEAGER
                        D.C. Bar No. 437156
                        Curtin & Heefner LLP
                        2005 So. Easton Road, Suite 100

Doylestown, PA 18901
(267) 898-0570
jby@curtinheefner.com

*Attorneys for Plaintiffs Delaware*
*Riverkeeper Network and the*
*Delaware Riverkeeper*

## CERTIFICATE OF SERVICE

I hereby certify that, on March 2, 2016, I filed the original of the foregoing

Complaint via the Court's CM/ECF system, and also hand served all parties. It is

my understanding that the following parties were served as a result:

Federal Energy Regulatory Commission
General Counsel
888 First Street, NE
Washington, DC 20426

U.S. Attorney General
Loretta Lynch
950 Pennsylvania Avenue, NW, Room 511
Washington, DC 20530

Civil Process Clerk
U.S. Attorney for the District of Columbia
501 3rd Street, NW, 4th Floor
Washington, DC 20530

Dated: March 2, 2016

*/s/ Aaron Stemplewicz*
Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19007
TEL: 215-369-1188
FAX: 215-369-1181
aaron@delawareriverkeeper.org

*Attorney for Plaintiffs*