# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

DELAWARE RIVERKEEPER
NETWORK, *et al.*,

            Plaintiffs,

     v.

FEDERAL ENERGY REGULATORY
COMMISSION, *et al.*,

           Defendants.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 16-0416 (TSC)


## STATEMENT OF INTEREST OF THE UNITED STATES


Dated: May 10, 2016

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ERIC WOMACK
Assistant Branch Director

*/s/ Kristina A. Wolfe*
KRISTINA A. WOLFE (VA Bar No. 71570)
Trial Attorney, U. S. Dept. of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C.  20530
Tel. (202) 353-4519 / Fax (202) 616-8470
Kristina.Wolfe@usdoj.gov

*Attorneys for the United States*

## **TABLE OF CONTENTS**

STATEMENT OF INTEREST ........................................................................................... 1

BACKGROUND ............................................................................................................ 2

I.      Statutory Background .......................................................................................... 2

        A.      The Natural Gas Act ................................................................................ 2

        B.      The Omnibus Budget Reconciliation Act of 1986 ................................... 3

II.     Plaintiffs' Challenge to FERC's Natural Gas Pipeline Application Procedures. ............... 3

DISCUSSION ............................................................................................................... 5

I.      Plaintiffs Have Failed To Demonstrate That The Budget Act Impermissibly
        Incentivizes the Commission to Favor Natural Gas Pipeline Applicants. .......................... 5

II.     A Finding That FERC Is Structurally Biased Due To Its Funding Mechanism
        Would Undermine The Functions Of Other Agencies That Are Similarly Funded. ........ 14

CONCLUSION ............................................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**

*Aetna Life Insurance Co. v. Lavoie,*
  475 U.S. 813 (1986) ..................................................................................... 12

*Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley,*
  114 F.3d 840 (9th Cir. 1997) ........................................................................ 11

*Commonwealth of the N. Mariana Islands v. Kaipat,*
  94 F.3d 574 (9th Cir. 1996) ............................................................................ 9

*Doolin Sec. Sav. Bank, FSB v. FDIC,*
  53 F.3d 1395 (4th Cir. 1995) ......................................................... 10, 12, 15

*Dugan v. Ohio,*
  277 U.S. 61 (1928) ....................................................................................... 7, 9

*Esso Standard Oil Co. v. Lopez-Freytes,*
  522 F.3d 136 (1st Cir. 2008) ......................................................................... 10

*Gibson v. Berryhill,*
  411 U.S. 564 (1973) ......................................................................................... 6

*Hall v. Clinton,*
  285 F.3d 74 (D.C. Cir. 2002) .......................................................................... 1

*Hammond v. Baldwin,*
  866 F.2d 172 (6th Cir. 1989) ......................................................................... 10

*Marshall v. Jerrico, Inc.,*
  446 U.S. 238 (1980) ..................................................................................... 8, 9

*Mathews v. Eldridge,*
  424 U.S. 319 (1976) ......................................................................................... 5

*Richardson v. Perales,*
  402 U.S. 389 (1971) ....................................................................................... 16

*Schneidewind v. ANR Pipeline,*
  485 U.S. 293 (1988) ......................................................................................... 2

*Schweiker v. McClure,*
  456 U.S. 188 (1982) ................................................................................... 6, 15

*Tumey v. Ohio,*
  273 U.S. 510 (1927) ......................................................................................... 6

*United Church of the Medical Center v. Medical Center Commission,*
  689 F.2d 693 (7th Cir. 1982) ................................................................... 10, 11

*United States v. Benitez-Villafuerte,*
  186 F.3d 651 (5th Cir. 1999) ................................................................... 11, 12

*Van Harken v. City of Chicago,*
  103 F.3d 1346 (7th Cir. 1997) ...................................................................... 12

*Ward v. Village of Monroeville,*
  409 U.S. 57 (1972) ....................................................................................... 6, 7

*Withrow v. Larkin,*
  421 U.S. 35 (1975) ......................................................................................... 15

## Statutes

12 U.S.C. § 1817 ....................................................................................................... 15
12 U.S.C. § 16 ........................................................................................................... 15
12 U.S.C. § 1755 ....................................................................................................... 15
12 U.S.C. § 2250 ....................................................................................................... 15
12 U.S.C. § 243 ......................................................................................................... 15
12 U.S.C. § 4516 ....................................................................................................... 15
15 U.S.C. § 717f ................................................................................................ 2, 3, 13
15 U.S.C. § 717 ..................................................................................................... 2, 3
15 U.S.C. § 77f ......................................................................................................... 15
15 U.S.C. § 78m ........................................................................................................ 15
15 U.S.C. § 78n ......................................................................................................... 15
15 U.S.C. § 78ee ....................................................................................................... 15
25 U.S.C. § 2717 ....................................................................................................... 15
28 U.S.C. § 517 ........................................................................................................... 1
35 U.S.C. § 42 ........................................................................................................... 15
42 U.S.C. § 2214 ....................................................................................................... 15
42 U.S.C. § 7171 ................................................................................................. passim
42 U.S.C. § 7178 ................................................................................................. passim
42 U.S.C. §§ 7171-7178 ............................................................................................... 2

## Regulations

18 C.F.R. § 157.21 ...................................................................................................... 2
18 C.F.R. § 382.202 .................................................................................................... 8
18 C.F.R. § 154.402 .................................................................................................. 13
18 C.F.R. §§ 157.1-157.22 .......................................................................................... 3
18 C.F.R. §§ 382.201-03 ............................................................................................. 8
78 Fed. Reg. 19 ......................................................................................................... 13

## Other Authorities

Administrative Conference of the United States, Sourcebook of the United States
Executive Agencies,
    78 Fed. Reg. 19 .................................................................................................... 14
Note, *Independence, Congressional Weakness, and the Important of Appointment:
The Impact of Combining Budgetary Autonomy with Removal Protection*,
    125 Harv. L. Rev. 1822 (2012) .............................................................................. 14
FERC Order No. 472 .................................................................................................... 7
Pub. L. 108-7 ............................................................................................................. 13
Pub. L. 113-235 ......................................................................................................... 14
Pub. L. 95-91 .............................................................................................................. 2
Pub. L. No. 111-8 ...................................................................................................... 15
United States Government Accountability Office,
    GAO-98-011 ....................................................................................................... 14

**STATEMENT OF INTEREST**

Pursuant to 28 U.S.C. § 517[1], the United States of America respectfully submits this Statement of Interest.   In their Complaint, Plaintiffs allege, among other things, that FERC cannot constitutionally preside over the review and approval process for proposed interstate natural gas pipeline projects because the Omnibus Budget Reconciliation Act of 1986 ("Budget Act"), as codified at 42 U.S.C. § 7178, creates an impermissible structural bias in favor of pipeline applicants by requiring FERC to recover all of its costs through annual assessments and other fees levied against regulated entities.  *See* Compl. ¶ 8.  This funding mechanism, Plaintiffs contend, violates their Fifth Amendment due process rights to a disinterested decision-maker because it incentives FERC to approve pipeline applications "so that the Commission's revenue stream can continue to grow."  *Id.* ¶ 152.  If accepted, Plaintiffs' allegations would not only cripple FERC's ability to carry out its statutory responsibilities, but would also seriously undermine the adjudicative functions of numerous federal agencies with similar funding schemes.  The United States has a strong interest in ensuring that the ability of those agencies to adjudicate administrative disputes is not called into question by a finding that FERC's funding structure creates an inherent structural bias.

Accordingly, the United States respectfully expresses its view that Plaintiffs' general allegations of structural bias fail to demonstrate that FERC's funding mechanism offers a possible temptation to favor natural gas pipeline applicants because the number of pipeline applications FERC approves does not increase FERC's revenues above Congress's annual appropriation.  Nor is

---

[1] Title 28, Section 517 of the United States Code provides that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."  28 U.S.C. § 517.  "This provision affords the United States broad discretion to dispatch government lawyers to attend to any ... interest of the United States." *Hall v. Clinton*, 285 F.3d 74, 80 (D.C. Cir. 2002) (internal quotations omitted).

1

the grant of a pipeline application relevant to FERC's ability to comply with its obligations under the Budget Act. The relationship between FERC's institutional pecuniary interests and its decision to grant a pipeline application is, therefore, too remote to support Plaintiffs' claim of structural bias.

## BACKGROUND

### I.      Statutory Background

FERC is an independent regulatory commission within the Department of Energy. *See Dep't of Energy Organization Act*, Pub. L. 95-91, 91 Stat. 565 (1977); 42 U.S.C. § 7171(a). The Commission is charged with regulating the interstate aspects of the electric power, natural gas, oil pipeline, and hydroelectric industries. *See generally*, 42 U.S.C. §§ 7171-7178.

### A.      The Natural Gas Act

FERC's role in regulating the natural gas industry is largely defined by the Natural Gas Act, which grants the Commission jurisdiction over the transportation and wholesale sale of natural gas in interstate commerce. *See* 15 U.S.C. §§ 717(b) and (c); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988) (The Natural Gas Act "confers upon FERC exclusive jurisdictio[n] over the transportation and sale of natural gas in interstate commerce."). Pursuant to section 7(c) of the Act, any person or entity seeking to construct, extend, acquire, or operate a facility for the transportation or sale of natural gas in interstate commerce must secure a certificate of public convenience and necessity from the Commission. 15 U.S.C. § 717f(c)(1)(A).

Prospective applicants seeking certification from FERC must participate in a pre-filing process with FERC staff, federal and state agencies, tribal authorities, and the public to identify and address potential issues. *See* 18 C.F.R. § 157.21(b). Upon completion of the pre-filing process, potential interstate natural gas pipeline builders must submit a formal application and participate in public hearings and environmental review proceedings. *See generally* 18 C.F.R. §§ 157.1-157.22.

The Commission shall issue a certificate to any qualified applicant, thereby approving the proposed

natural gas pipeline project, upon a finding that the proposed construction and operation of a

pipeline facility is required by the public convenience and necessity.  15 U.S.C. § 717f(e).  The

Commission may attach to the issuance of the certificate such reasonable terms and conditions as the

public convenience and necessity may require.  *Id.*

## B.     The Omnibus Budget Reconciliation Act of 1986

FERC is statutorily required to send its annual appropriations request to the Office of

Management and Budget for approval and inclusion in the President's budget submitted to

Congress.  *See* 42 U.S.C. § 7171(j).  Congress reviews the request and appropriates the funds it

deems necessary to support FERC's operation.  *See id.*  A provision in the Budget Act requires

FERC to reimburse the U.S. Treasury for its annual appropriation by recovering the full cost of its

operations through annual charges and fees assessed on the industries it regulates.  *See* 42 U.S.C. §

7178(a)(1) (requiring FERC to "assess and collect fees and annual charges in any fiscal year in

amounts equal to all of the costs incurred by the Commission in that fiscal year").  This revenue is

deposited into the Treasury as a direct offset to its appropriation, which results in a net appropriation

of $0.  *See id.* § 7178(f).  At the end of the fiscal year, FERC is statutorily required to make any

necessary adjustments to its assessments to "eliminate any overrecovery or underrecovery of its total

costs."  *Id.* § 7178(e).   Thus, in the event that FERC recovers assessments and fees in excess of the

budget Congress imposed, FERC must refund the overages to the industry.

## II.     Plaintiffs' Challenge to FERC's Natural Gas Pipeline Application Procedures.

In September 2015, Plaintiff Delaware Riverkeeper Network ("DRN"), a non-profit

organization established to protect and restore the Delaware River and its associated watershed,

3

tributaries, and habitats,[2] intervened in administrative proceedings before FERC to protest the

PennEast Pipeline Company's application for a certificate of public convenience and necessity to

construct and operate a new interstate natural gas pipeline in New Jersey and Pennsylvania.  Compl.

¶¶ 25, 87, 90, 92.  PennEast's application is current pending before FERC.  *See* Def.'s Mem. in

Supp. of Mot. to Dismiss, ECF 11-1 (May 3, 2016), at 10.

On March 2, 2016, Plaintiffs filed a lawsuit in the United States District Court for the

District of Columbia seeking a declaration that (1) FERC's funding structure as codified in the

Budget Act is unconstitutional, or alternatively that the Commission's power of eminent domain and

authority to preempt state and local laws, as applied to natural gas pipeline projects, is

unconstitutional, (2) FERC's procedure for adjudicating PennEast's natural gas pipeline application

subjects Plaintiffs and its members to a biased process, depriving them of their aesthetic,

recreational, liberty and/or property interests without Due Process, and (3) FERC's procedure for

adjudicating all future natural gas pipeline applications subjects Plaintiffs and its members to a

biased process, depriving them of their aesthetic, recreational, liberty and/or property interests

without Due Process.  *See* Compl., Prayer for Relief.   In support of their requested relief, Plaintiffs

contend that FERC cannot constitutionally adjudicate natural gas pipeline applications because its

funding structure, as established by the Budget Act, creates an impermissible "temptation" to favor

applicants in order to increase the Commission's revenue stream.[3]  *See* Compl. ¶¶ 8, 152, 265-266.

This structural bias is enabled, Plaintiffs assert, by FERC's authority to both confer eminent domain

power to approved natural gas pipeline companies and preempt state and local laws.  *Id.* ¶¶ 272, 276.

---

[2] Plaintiff Maya Van Rossum is the Delaware Riverkeeper and leader of DRN.  *Id.* ¶ 45.

[3] Plaintiffs also allege that FERC's structural bias has "manifest[ed]" into actual bias.  *See* Compl. ¶ 175.  Even accepting those allegations as true, they do not directly factor into the structural bias analysis and thus the United States does not address them here.

FERC moved to dismiss the lawsuit on May 3, 2016, arguing:  (1) Plaintiffs lack standing because they have neither demonstrated a concrete and particularized injury traceable to Commission action nor shown that their alleged harms are redressible by their requested relief; (2) Plaintiffs' structural bias claim is meritless because the approval of a natural gas pipeline project does not result in an increase in Commission revenues; and (3) the Court should decline to exercise its discretion to entertain Plaintiffs' claim because they have a statutorily-prescribed method to seek administrative and judicial review of the Commission's final decision to grant or deny an pipeline application pursuant to the Natural Gas Act.  *See generally* Def.'s Mem. in Supp. of Mot. to Dismiss.

## DISCUSSION

I.   **Plaintiffs Have Failed To Demonstrate That The Budget Act Impermissibly Incentivizes the Commission to Favor Natural Gas Pipeline Applicants.**

Plaintiffs' claim that the Budget Act, as applied to FERC, creates an inherent structural bias that violates the neutrality requirement of the Fifth Amendment's Due Process clause is meritless. The Constitution prohibits the government from depriving parties of a protected liberty or property interest without due process of law.  U.S. Cons. Amend. V.; *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).  Even assuming, without deciding, that Plaintiffs have identified a constitutionally cognizable property interest in FERC's denial of a third-party's application to construct an interstate natural gas pipeline, their procedural due process claim must be dismissed because they have failed to demonstrate that the Commission's funding mechanism impermissibly offers a "possible temptation" to favor natural gas pipeline applicants.

The Supreme Court has long invalidated procedures that "offer a possible temptation to the average man as a judge . . . which might lead him not to hold the balance nice, clear, and true[.]" *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).  A procedure offers a "possible temptation" if it provides

5

the decision-maker with a "direct, personal, substantial pecuniary interest" in the outcome of the proceeding, *id.* at 523, or, in cases where the decision-maker has institutional responsibilities, "so strong a motive" to rule in a way that would aid the institution, *id.* at 533; *Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972).  These principles "appl[y] with equal force to . . . administrative adjudicators."  *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973).  Plaintiffs bear the burden of establishing a disqualifying interest.  *See Schweiker v. McClure*, 456 U.S. 188, 196 (1982).

A trio of Supreme Court cases guides the analysis of a claim of structural bias.  In *Tumey v. Ohio*, the case in which the Court first recognized a structural bias claim, a statute vested the mayor, who was the village's chief executive officer, with authority to try, without a jury, individuals accused of unlawfully possessing liquor.  273 U.S. at 516-17.  The mayor-judge was entitled to compensation for hearing liquor cases, above his regular salary, *if* he convicted the defendant, and the funds for his compensation were derived from a portion of the imposed criminal fines.  *Id.* at 520 (emphasis added).  Additional sums from the criminal fines were deposited in the village's general treasury fund.  Part of the funds the village received were used to pay the marshals and detectives who helped secure the convictions and part were used for village improvements and repairs.  *Id.* at 522.  The Supreme Court concluded that Tumey was denied due process because the mayor had "a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case," *id.* at 523, as well as a strong "official motive to convict and to graduate the fine to help the financial needs of the village," *id.* at 535.

One year later, in *Dugan v. Ohio*, 277 U.S. 61 (1928), the Supreme Court clarified *Tumey's* second basis for disqualifying a liquor court's mayor-judge.  There, the Court ruled that a mayor exercising only judicial functions is not impermissibly tempted to convict a defendant

and impose criminal fines.  *Id.* at 65.  The Court reasoned that, even though the mayor's salary was paid out of the general fund where the criminal fines were deposited, his relationship to the general fund was remote because he had limited executive authority and was not involved in the executive or financial policy of the city.  *Id.*   Thus, the mayor-judge did not have a strong motivation to favor a particular outcome of the proceedings over which he presided.

Ward v. Village of Monroeville, 409 U.S. 57 (1972), involved yet another mayor's court.  As in *Dugan*, a substantial portion of the village's revenue was derived from the fines, forfeitures, costs, and fees imposed by the mayor's court.  409 U.S. at 59.  However, the mayor in *Ward* exercised both judicial and executive responsibilities, which included supervision of the village's financial affairs.  *Id.*  The Supreme Court thus concluded that "the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court."  *Id.* at 60.

Viewed against this backdrop, it is clear that the Budget Act's requirement that FERC recover its costs from the entities it regulates does not subject the Commission to an "impermissible temptation" to approve natural gas pipeline applications.  The Supreme Court's decisions in *Tumey, Dugan,* and *Ward* all involved the imposition of fines and other fees that *increased* the revenues of the municipalities the mayor-judges served.  That common factual scenario is absent here—FERC does not receive additional revenue when it approves a natural gas pipeline project.  FERC's annual operating budget is set by Congress.  *See* 42 U.S.C. § 7171(j); *see also* FERC Order No. 472 at 30,620 ("Congress will continue to approve the Commission's budget through annual and supplemental appropriations.").  Pursuant to the Budget Act, FERC then reimburses the Treasury the full amount of Congress's appropriation by, *inter alia*, assessing a per-unit annual charge based on each regulated company's share of total

transported natural gas.[4]  18 C.F.R. § 382.202.  The number of natural gas pipeline projects

FERC approves is thus irrelevant to both the amount of funds available to FERC, above

Congress's annual appropriation, and its ability comply with its statutory obligation to reimburse

the Treasury because an increase in any given year of the number of regulated entities simply

results in a lower per-unit annual charge for each company.  Conversely, a decrease in the

number of regulated entities results in a larger per-unit annual charge for each company.

Moreover, in the event FERC collects revenues in excess of its annual appropriation, the

Commission is required to refund the overages back to the industry.  42 U.S.C. § 7178(e) ("The

Commission shall, after the completion of a fiscal year, make such adjustments in the

assessments for such fiscal year as may be necessary to eliminate any overrecovery or

underrecovery of its total costs, and any overcharging or undercharging of any person.").

FERC's funding structure, therefore, does not permit the Commission to increase its

annual revenues, over the amount appropriated by Congress, by approving natural gas pipeline

projects.  As such, the Budget Act does not motivate or otherwise offer FERC a "possible

temptation" to approve pipeline applications.  *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 246

(1980)[5] (upholding civil penalty provisions of the Fair Labors Standards Act, which required that

collected fines be returned to the Employment Standards Administration to reimburse costs

incurred in determining violations, in part because the civil penalty provisions did not result in

---

[4] FERC does not rely exclusively on annual charges from natural gas pipeline companies to reimburse the Treasury.  The Commission also assesses similar charges on the other industries it regulates and recovers fees for specific services provided.  *See* 18 C.F.R. §§ 382.201-03.

[5] The *Jerrico* Court concluded that the "ridged requirements" of *Tumey* and *Ward* were inapplicable to assessing whether the ESA's financial interest violated due process because the agency's administrative functions were prosecutorial, not judicial, in nature.  446 U.S. at 248. Nevertheless, *Jerrico*'s discussion of the agency's financial interest is relevant to its ultimate holding that the plaintiff failed to establish a disqualifying institutional bias.

"any increase in the funds available to the ESA over the amount appropriated by Congress."); *see also Commonwealth of the N. Mariana Islands v. Kaipat*, 94 F.3d 574, 580-81 (9th Cir. 1996) (holding that judges were not impermissibly tempted to impose fines even though fines were deposited into account statutorily established to fund a new judicial complex given that the courts will exist regardless of whether fines are imposed and the legislature, not the courts, determine how the collected fines will be spent).

Further, the appropriation approval process and the Budget Act's requirement that FERC adjust its assessments at the end of the fiscal year to eliminate any over-recovery or under-recovery limit FERC's executive discretion and responsibilities with respect to its annual operating budget. This limitation on FERC's executive function is similar to the limitation in *Dugan* where the mayor-judge did not have a role in developing and managing the city's financial policies, 277 U.S. at 65. *Dugan*, therefore, instructs that the relationship between FERC's institutional pecuniary interests and its decision to approve a natural gas pipeline application is too "remote" to offer a "possible temptation" to favor natural gas pipeline applicants. *Id.*

Plaintiffs appear to concede that FERC's approval of proposed natural gas pipeline projects does not result in an increase in the amount of funds available to the Commission over the amount appropriated by Congress. *See* Compl. ¶ 67. Rather, they assert FERC could never fairly determine whether a proposed pipeline project is required by the public convenience or necessity because the Commission is entirely reliant on the private companies that seek such approval to comply with its obligation to reimburse the Treasury its costs, which encourages FERC to "engage in a mutually lucrative profit-sharing scheme" to "grow the agency." *See* Compl. ¶¶ 117-126. Even if that assertion were supported by the funding scheme, which it is not

as explained above, such general allegations of bias are too remote to demonstrate a

disqualifying institutional temptation.  *See Doolin Sec. Sav. Bank, FSB v. FDIC*, 53 F.3d 1395,

1407 (4th Cir. 1995) (allegation that the "entire decisionmaking apparatus of the FDIC is biased .

. . implies an institutional bias much less influential than the institutional 'temptation' in *Ward*");

*Hammond v. Baldwin*, 866 F.2d 172, 177 (6th Cir. 1989) (concluding that general allegations of

institutional bias did not disqualify state government from decisionmaking).

   Further, Plaintiffs' reliance on *Esso Standard Oil Co. v. Lopez-Freytes*, 522 F.3d 136,

146 (1st Cir. 2008), and *United Church of the Medical Center v. Medical Center Commission*,

689 F.2d 693, 699 (7th Cir. 1982), *see* Compl. ¶ 117, to support its general allegations of

structural bias is misplaced.  These cases echo the common thread running through *Tumey*,

*Dugan*, and *Ward*—that an administrative adjudicator is "offer[ed] a possible temptation" to "not

hold the balance nice, clear, and true" in certain cases where the adjudicative decision results in

an increase in available revenue for the institution.  In *Esso*, the First Circuit disqualified an

administrative adjudicative body because the administrative body had "complete discretion over

the usage" of an "unprecedented and extraordinarily large" imposed fine.  522 F.3d at 147.  And

in *United Church*, the Seventh Circuit concluded that the Commission had an impermissible

pecuniary interest in the outcome of reverter proceedings because the challenged statute

"permit[ed] the Commission to award valuable property to itself without compensation."  689

F.2d at 699-700 (noting that Illinois law "provide[d] the Commission with greater authority to

retain and spend the money generated by a sale of property.").  These cases do not support

Plaintiffs' assertions because, as discussed above, FERC does not receive additional revenue,

above the amount appropriated by Congress, when it approves a natural gas pipeline application.

*See supra* 7-8.  Nor does the Commission directly control the fees and annual assessments it

recovers—Congress does through the annual appropriation process.  *See* 42 U.S.C. §§ 7171(j);

7178(f).[6]

 To the extent Plaintiffs argue that FERC's funding structure is inherently biased because

the Commission's budget request and subsequent appropriation is based, at least in part, on the

number of entities regulated by FERC, that argument also fails.  *See generally*, Compl. ¶¶ 124-

126.  Although it is arguably true that FERC's annual budget request for its natural gas pipeline

program is influenced by the number of entities the Commission regulates, the Commission's

pecuniary interest in approving pipeline applications remains too remote to offer a "possible

temptation" to favor pipeline project applicants in light of the Commission's ability to recover its

costs no matter the number of regulated entities.  Indeed, the Fifth Circuit has reached the same

conclusion when presented with a similar structural bias claim.  In *United States v. Benitez-*

*Villafuerte*, 186 F.3d 651 (5th Cir. 1999), an alien argued that his administrative deportation

violated due process because the Immigration and Naturalization Service had a "fiscal interest"

in his deportation given that the agency's budget was "measured largely by the number of aliens

it apprehends and deports[.]"  186 F.3d at 659.  The court concluded that, "[a]lthough the INS's

congressional funding depends to some extent on its statistical workload in apprehending and

deporting illegal aliens, th[at] fact provides too tenuous an influence to warrant a presumption

that the INS or its personnel had a direct, personal, substantial, and pecuniary interest in [the

alien]'s deportation."  *Id.* at 660.  Instead, the Court reasoned, the INS's "alleged pecuniary

---

[6] Plaintiffs also cite *Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley*, 114 F.3d
840 (9th Cir. 1997).  But there the Ninth Circuit rejected a claim of institutional bias, finding that
the Rent Stabilization Board was not strongly motivated to find landlords "covered" by a rent
control ordinance, which required covered landlords to pay a registration fee because, although
the Board was "directly responsible for its budget," it had the ability to obtain funding from
additional sources when necessary.  *Id.* at 847.

interest [] is of the type identified by the Supreme Court as being 'so remote, trifling and insignificant that it may fairly be supposed to be incapable of affecting the judgment or of influencing the conduct of'" the agency adjudicator.  *Id.* (quoting *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 827 n.3 (1986)).  Other judicial circuits have reached similar conclusions. *See Doolin Sec. Sav. Bank, FSB*, 53 F.3d at 1405-07 (concluding the FDIC, a self-funded agency, did not have a disqualifying "institutional pecuniary interest" in assessing deposit insurance premiums on member institutions because Congress's requirement that the agency consider the needs of the deposit insurance fund where the assessments were paid was less "influential" than the "institutional 'temptation' in *Ward*, in which the mayor's executive function substantially benefitted from [the] fines he imposed in his adjudicative function"); *Van Harken v. City of Chicago*, 103 F.3d 1346, 1353 (7th Cir. 1997) (rejecting an institutional bias claim where hearing officers adjudicated parking tickets paid to their employing agency because "the mere fact that an administrative or adjudicative body derives a financial benefit from fines or penalties that it imposes is not in general a violation of due process").

Plaintiffs also argue that the Commission is compelled to approve natural gas pipeline projects or risk losing a portion of its budget in the future because natural gas pipelines have a finite life-span and FERC can only increase the fees it levies on natural gas pipeline companies "so much" before the companies are unable to afford the fees.  *See* Compl. ¶¶ 141-145; 149-150. But FERC cannot, of course, control the timing or number of applications it receives.  And once FERC receives an application and the review process is completed, it may only approve the application if FERC concludes that the pipeline facility is required by the public convenience and necessity.  15 U.S.C. § 717f(e).  It is too remote and speculative to suggest that FERC is incentivized to approve applications to achieve some "ideal" distribution of assessments among

pipeline companies.  Furthermore, Plaintiffs' argument ignores the fact that FERC's regulations permit pipeline companies to pass the annual charges on to their customers.  *See* 18 C.F.R. § 154.402 ("a natural gas pipeline company may adjust its rates, annually, to recover from its customers annual charges assessed by the Commission under part 382 of [FERC's regulations] pursuant to an annual charge adjustment clause (ACA clause).").  In fact, "recovery of annual charges through an ACA clause" is a practice "widely used among Pipelines."  *Annual Charge Filing Procedures for Natural Gas Pipelines*, 78 Fed. Reg. 19,409, 19,409 (Apr. 1, 2013).

Plaintiffs next argue that FERC is insulated from congressional oversight because Congress has no incentive to question the size or growth of the Commission's budget request given FERC's reimbursement of the entirety of Congress's annual appropriation.  Compl. ¶¶ 155, 159-163.  This argument ignores the fact that Congress has, in some years, appropriated less than the amount requested by FERC.  For example, for fiscal year 2003, FERC requested that Congress appropriate $199.9 million to cover the cost of its operations.  *See* Budget Request, *available at* https://ferc.gov/about/strat-docs/fy03-budg.pdf.  Congress chose instead to appropriate $192 million.  *See* Consolidated Appropriations Resolution, 2003, Pub. L. 108-7, 117 Stat. 11 (Feb. 20, 2003).  Similarly, for fiscal year 2015, FERC requested that Congress appropriate over $327 million to cover the cost of its operations.  *See* Budget Request, *available at* http://www.ferc.gov/about/strat-docs/fy15-budg.pdf.  Congress appropriated $304,389,000. *See* Consolidated Appropriations Resolution, 2015, Pub. L. 113-235, 128 Stat. 2321 (Dec. 16, 2014).  Plaintiffs' contention that FERC is also insulated from Executive oversight is equally unavailing.  As explained above, the Commission is required to submit its annual budget request to Office of Management and Budget for inclusion in the President's budget submitted to Congress.  42 U.S.C. § 7171(j).  "[T]he President's influence over agencies through OMB has

been recognized as vast." Note, *Independence, Congressional Weakness, and the Importance of Appointment: The Impact of Combining Budgetary Autonomy with Removal Protection*, 125 Harv. L. Rev. 1822, 1828 n.42 (2012).

Finally, Plaintiffs contend that the Commission's structural bias "is compounded and enabled by" its ability to provide a natural gas pipeline entity with eminent domain power and its ability to preempt state and local laws. *See* Compl. ¶¶ 241-261, 272-278. Plaintiffs suggest that the Court could mitigate FERC's structural bias by removing FERC's eminent domain authority and its ability to preempt state and local laws. *See id.* ¶ 261. However, Plaintiffs' argument presumes that FERC's funding mechanism, as created by the Budget Act, is structurally biased. That presumption is, as explained above, incorrect. The Court, therefore, need not consider the merits of Plaintiffs' request.

For these reasons, Plaintiffs have failed to meet their burden of demonstrating that FERC's funding mechanism, as established by the Budget Act, incentivizes the Commission to favor natural gas pipeline applicants. Plaintiffs' Complaint, therefore, should be dismissed for failure to state a claim.

## II.     A Finding That FERC Is Structurally Biased Due To Its Funding Mechanism Would Undermine The Functions Of Other Agencies That Are Similarly Funded.

More than twenty-five (25) federal agencies receive a portion, if not all, of their respective operating costs through the collection of user fees and other annual assessments. *See* Administrative Conference of the United States, Sourcebook of the United States Executive Agencies 119-120 (1st ed. 2012); *see also* U.S. Gov't Accountability Office, GAO-98-011, Federal User Fees: Budgetary Treatment, Status, and Emerging Management Issues (1998). For example, the Federal Communications Commissions, Nuclear Regulatory Commission, National Credit Union Administration, Federal Reserve Board, Patent and Trademark Office, Federal

Housing Finance Agency, National Indian Gaming Commission, Federal Deposit Insurance

Corporation, and Securities and Exchange Commission all recover at least a portion of their

operating costs by levying annual or semi-annual assessments on the entities they respectively

regulate.[7]  In rejecting a structural bias claim against the self-funded FDIC, the Fourth Circuit

concluded that "finding the FDIC biased in this case would seriously undermine the ability of

agencies in general to adjudicate disputes that affect their official policies." *Doolin*, 53 F.3d at

1407.  The Court observed that although "all agencies inherently have some level of

'institutional bias,' [] such an interest does not render [] agencies incapable of adjudicating

disputes within their own proceedings given the strong public interest in effective, efficient, and

expert decisionmaking in the administrative setting." *Id.*  To accept Plaintiffs' institutional bias

claim, the Court concluded, would, therefore, "abrogate the presumption of honesty and integrity

of administrators who serve as adjudicators," *id.* (citing *Schweiker*, 456 U.S. at 195, *Withrow v.*

*Larkin*, 421 U.S. 35, 47 (1975)).  It follows that a finding that FERC's funding mechanism is

structurally-biased would "bring down too many procedures designed, and working well, for a

---

[7] *See* Omnibus Appropriations Act, 2009, Pub. L. No. 111-8, 123 Stat. 524, 657 (Mar. 11, 2009) (all Federal Communications Commission appropriations offset by regulatory fees); 12 U.S.C. § 2250 (annual assessment by Farm Credit Administration covers cost of administering programs); 42 U.S.C. § 2214 (Nuclear Regulatory Commission budget offset by annual charges); 12 U.S.C. § 16 (Office of the Comptroller of the Currency funded by annual assessments on national banks and federal savings associations); 12 U.S.C. § 1755 (National Credit Union Administration funded by assessment of annual fees); 12 U.S.C. § 243 (Federal Reserve Board recovers operation costs in part by levying semi-annual assessments on Federal Reserve banks); 35 U.S.C. § 42 (Patent and Trademark Office appropriations offset by recovery of service fees); 12 U.S.C. § 4516 (Federal Housing Finance Agency funded by annual assessments); 25 U.S.C. §§ 2717, 2717(a) (National Indian Gaming Commission funded entirely by fees collected from certain gaming operations); 12 U.S.C. 1817(b)(2)(A) (FDIC levies semi-annual risk assessments to fund its deposit insurance program); and 15 U.S.C. §§ 77f(b), 78m(e), 78n(g), 78ee(i), (requiring the SEC to collect fees to offset certain appropriations).

governmental structure of great and growing complexity[,]" *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

## <u>CONCLUSION</u>

For the forgoing reasons, the United States respectfully submits that the Omnibus Budget Reconciliation Act of 1986, as codified at 42 U.S.C. § 7178, does not create an inherent structural bias that violates the neutrality requirements of the Fifth Amendment's Due Process Clause.

Dated: May 10, 2016                         Respectfully submitted,

                                            BENJAMIN C. MIZER
                                            Principal Deputy Assistant Attorney General

                                            ERIC WOMACK
                                            Assistant Branch Director

                                            */s/ Kristina A. Wolfe*
                                            KRISTINA A. WOLFE (VA Bar No. 71570)
                                            Trial Attorney, U. S. Dept. of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave., NW
                                            Washington, D.C.  20530
                                            Tel. (202) 353-4519 / Fax (202) 616-8470
                                            Kristina.Wolfe@usdoj.gov

                                            *Attorneys for the United States*

16

## CERTIFICATE OF SERVICE

I certify that on May 10, 2016, I caused a copy of the foregoing to be filed electronically

and that the document is available for viewing and downloading from the ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


*/s/ Kristina A. Wolfe*
KRISTINA A. WOLFE (VA Bar No. 71570)
Trial Attorney, U. S. Dept. of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, D.C.  20530
Tel. (202) 353-4519 / Fax (202) 616-8470
Kristina.Wolfe@usdoj.gov

*Attorneys for the United States*

17