**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DELAWARE RIVERKEEPER NETWORK, *et al.*,<br>    Plaintiffs, | )<br>)<br>)<br>) |
| v. | )   Civil Action No. 1:16-cv-00416-TSC<br>) |
| FEDERAL ENERGY REGULATORY COMMISSION, *et al.*,<br>    Defendants. | )<br>)<br>)<br>)<br>) |

**DEFENDANT-INTERVENOR PENNEAST PIPELINE COMPANY'S**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6), Defendant-Intervenor PennEast Pipeline

Company moves to dismiss Plaintiffs' Complaint in its entirety.  The grounds for this motion are

more particularly stated in the accompanying memorandum of points and authorities.

Hearing on this motion to dismiss is respectfully requested.


Dated: May 10, 2016                     Respectfully submitted,


                                        */s/ Michael B. Wigmore*
                                        Michael B. Wigmore (D.C. Bar No. 436114)
                                        Jeremy C. Marwell (D.C. Bar No. 1000299)
                                        VINSON & ELKINS LLP
                                        2200 Pennsylvania Avenue, NW
                                        Suite 500 West
                                        Washington, DC 20037
                                        Phone: 202.639.6500
                                        Email: mwigmore@velaw.com

                                        *Attorneys for PennEast Pipeline Company, LLC*

*Of Counsel:*

Frank H. Markle
PENNEAST PIPELINE COMPANY, LLC
460 North Gulph Road
King of Prussia, PA 19406
Phone: 610.768.3625
Email: marklef@ugicorp.com

James D. Seegers
Sabina Dugal Walia
VINSON & ELKINS LLP
1001 Fannin St.
Suite 2500
Houston, TX 77002
Phone: 713.758.2939
Email: jseegers@velaw.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DELAWARE RIVERKEEPER NETWORK, *et al.*, | ) ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:16-cv-00416-TSC |
| | ) | |
| FEDERAL ENERGY REGULATORY COMMISSION, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## OF DEFENDANT-INTERVENOR PENNEAST PIPELINE COMPANY

Michael B. Wigmore (D.C. Bar No. 436114)
Jeremy C. Marwell (D.C. Bar No. 1000299)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6500
Email: mwigmore@velaw.com

*Attorneys for PennEast Pipeline Company, LLC*

*Of Counsel:*

Frank H. Markle
PENNEAST PIPELINE COMPANY, LLC
460 North Gulph Road
King of Prussia, PA 19406
Phone: 610.768.3625
Email: marklef@ugicorp.com

James D. Seegers
Sabina Dugal Walia
VINSON & ELKINS LLP
1001 Fannin St.
Suite 2500
Houston, TX 77002
Phone: 713.758.2939
Email: jseegers@velaw.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...........................................................................................iii

I.      INTRODUCTION ..................................................................................................1

II.     STATUTORY AND PROCEDURAL BACKGROUND ......................................2

III.    APPLICABLE STANDARDS ..............................................................................4

IV.     JURISDICTION ....................................................................................................5

        A.  DRN Fails To Allege Facts Establishing Its Standing In Its Own Right .....................5

        B.  DRN's Actual-Bias Claim Is Not Ripe For Review......................................6

V.      THE COMMISSION'S CERTIFICATE PROCESS DOES NOT DEPRIVE
        PLAINTIFFS OF A PROPERTY OR LIBERTY INTEREST THAT IS
        COGNIZABLE UNDER THE DUE PROCESS CLAUSE ...................................8

        A.  The Majority Of The Interests Asserted By DRN And Its Members Are Not
            Cognizable Under The Due Process Clause ...................................................10

        B.  The Remaining Interests Asserted In The Complaint Are Not Subject To
            "Deprivation" Within The Meaning Of The Due Process Clause.............................12

VI.     PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF UNDER A
        STRUCTURAL BIAS THEORY...........................................................................17

        A.  DRN's Allegations Based On The Commission's Funding Structure Fail To
            State A Claim For Relief ..............................................................................17

            1.  Neither The Statutory Funding Mechanism Nor The Commission's
                Financial Incentives Creates An Impermissible "Temptation.".....................19

            2.  Allegations Of Temptation Based On Potential Budget Shortfalls
                Decades In The Future Are "Too Remote And Insubstantial" To State
                A Claim. ...........................................................................................22

        B.  DRN's Allegations About Congressional And Executive Oversight Do Not
            Support A Claim For Relief..........................................................................24

VII.    PLAINTIFFS FAIL TO STATE A CLAIM FOR RELIEF UNDER AN ACTUAL
        BIAS THEORY ....................................................................................................25

        A.  The Complaint's Allegations Cannot Support DRN's Actual-Bias Claim .................25

        B.  The Commission's Alleged 100% Approval Rate For Pipeline Applications ...........27

            1.  The Commission's Approval Rate Does Not Establish Actual Bias..............27

            2.  The Public Record Flatly Contradicts The Allegation. ...................................28

        C.  The Commission's Alleged Failure To Enforce Certificate Conditions ....................31

            1.  The Commission's Use Of Other Means To Enforce Certificate
                Conditions Does Not Suggest Actual Bias....................................................31

            2.  The Public Record Flatly Contradicts The Allegation. ...................................33

D.  The Commission's Alleged Use Of Tolling Orders .......................................................34

    1.  The Use Of Tolling Orders Does Not Establish Actual Bias. .........................35

    2.  The Commission's Use Of Tolling Orders Does Not Violate Due
    Process Or Deprive Project Opponents Of An Opportunity For Judicial
    Review. ...................................................................................................................... 36

E.  The Commission's Alleged Pre-Judgment Of NEPA Analyses..................................38

F.  The Commission's Allegedly Biased Pipeline Policy Statement................................40

G.  The Commission's Alleged Failure To Request Funds For The Office Of
    Public Participation ......................................................................................................41

VIII.  THE ALLEGATIONS ABOUT EMINENT DOMAIN AND PREEMPTION FAIL
    TO STATE A CLAIM FOR RELIEF. ..........................................................................42

IX.  CONCLUSION. ...............................................................................................................45

# TABLE OF AUTHORITIES

**Court Cases**                                                                                          **Page(s)**

*Abdelfattah v. U.S. Dep't of Homeland Sec.,*
    787 F.3d 524 (D.C. Cir. 2015)...................................................................................4, 16, 27

*Aetna Life Ins. Co. v. Lavoie,*
    475 U.S. 813 (1986) ..............................................................................................18, 20, 23

*Air Line Pilots Ass'n, Int'l v. Civil Aeros. Bd.,*
    750 F.2d 81 (D.C. Cir. 1984)...........................................................................................6, 8

*Allen v. Cuomo,*
    100 F.3d 253 (2d Cir. 1996) ...............................................................................................18

*Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley,*
    114 F.3d 840 (9th Cir. 1997) ........................................................................................18, 21

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
    526 U.S. 40 (1999) ...............................................................................................................8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................................................4, 16, 27

*Ass'n of Am. Railroads v. U.S. Dep't of Transp.,*
    No. 12-5204, 2016 WL 1720357 (D.C. Cir. Apr. 29, 2016) ............................................19, 20

*Atherton v. D.C. Office of Mayor,*
    567 F.3d 672 (D.C. Cir. 2009)...........................................................................................11

*Banneker Ventures, LLC v. Graham,*
    798 F.3d 1119 (D.C. Cir. 2015)...........................................................................................4

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ...........................................................................................................27

*Bieneman v. City of Chicago,*
    864 F.2d 463 (7th Cir. 1988) .............................................................................................15

*Brandon v. D.C. Bd. of Parole,*
    823 F.2d 644 (D.C. Cir. 1987).....................................................................................12, 38

*Cal. Co. v. Fed. Power Comm'n,*
    411 F.2d 720 (D.C. Cir. 1969)...................................................................................35, 36, 37

*Cal. Utils. Ass'n v. FERC,*
    No. 01-1156, 2001 WL 936359 (D.C. Cir. July 31, 2001).....................................................36

*Caperton v. A.T. Massey Coal Co.,*
    556 U.S. 868 (2009) ...............................................................................7, 27, 30, 33, 36, 42

*Chapman v. Pub. Util. Dist. No. 1,*
    367 F.2d 163 (9th Cir. 1966) .............................................................................................44

**Court Cases—Continued**                                      **Page(s)**

*Cheney v. U.S. Dist. Court for Dist. of Columbia*,
   542 U.S. 367 (2004) ...................................................................37

*Cobell v. Jewell*,
   802 F.3d 12 (D.C. Cir. 2015)........................................................6

*Commonwealth of the Northern Mariana Islands v. Kaipat*,
   94 F.3d 574 (9th Cir. 1996) ........................................................19

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
   407 F.3d 1220 (D.C. Cir. 2005)......................................4, 25, 34

*Daniels v. Williams*,
   474 U.S. 327 (1986) ...................................................................15

*Davidson v. Cannon*,
   474 U.S. 344 (1986) ...................................................13, 15, 16

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ...........................................................38, 39, 40

*Doolin Sec. Sav. Bank, F.S.B. v. FDIC*,
   53 F.3d 1395 (4th Cir. 1995)..................................................18, 21

*Earle v. D.C.*,
   707 F.3d 299 (D.C. Cir. 2012)......................................................4

*FDIC v. Shain, Schaffer & Rafanello*,
   944 F.2d 129 (3d Cir. 1991) ......................................................43

*Fed. Power Comm'n v. Tuscarora Indian Nation*,
   362 U.S. 99 (1960) ...............................................................13, 44

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
   561 U.S. 477 (2010) ...................................................................25

*FTC v. Cement Inst.*,
   333 U.S. 683 (1948) ...................................................................26

*Gen. Am. Oil Co. of Tex. v. Fed. Power Comm'n.*,
   409 F.2d 597 (5th Cir. 1969)......................................................36

*Gen. Elec. Co. v. Jackson*,
   610 F.3d 110 (D.C. Cir. 2010)........................................11, 25, 43

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982) ................................................................5, 6

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ...................................................................33

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935) ...................................................................25

**Court Cases—Continued**                                                          **Page(s)**

*In re Beverly Hills Bancorp*,
   752 F.2d 1334 (9th Cir. 1984) ............................................................................26

*In re IBM Corp.*,
   618 F.2d 923 (2d Cir. 1980) ..............................................................................26

*In re Stop the Pipeline*,
   No. 15-926 (2d Cir. Apr. 21, 2015) ....................................................................37

*Jenkins v. Sterlacci*,
   849 F.2d 627 (D.C. Cir. 1988) ...............................................................25, 26, 39

*Kaempe v. Myers*,
   367 F.3d 958 (D.C. Cir. 2004) ..............................................................................4

*Khadr v. United States*,
   529 F.3d 1112 (D.C. Cir. 2008) ............................................................................4

*Knappenberger v. City of Phoenix*,
   566 F.3d 936 (9th Cir. 2009) ..............................................................................10

*Kokajko v. FERC*,
   837 F.2d 524 (1st Cir. 1988) .........................................................................36, 38

*Lingle v. Chevron U.S.A. Inc.*,
   544 U.S. 528 (2005) .......................................................................................13, 15

*Liteky v. United States*,
   510 U.S. 540 (1994) ...............................7, 26, 27, 28, 31, 34, 35, 36, 38, 41, 42

*Mathews v. Eldridge*,
   424 U.S. 319 (1976) ..............................................................................................9

*Miller v. Campbell Cty.*,
   945 F.2d 348 (10th Cir. 1991) ............................................................................14

*Mitchell v. Mills Cty.*,
   847 F.2d 486 (8th Cir. 1988) ..............................................................................16

*Moreau v. FERC*,
   982 F.2d 556 (D.C. Cir. 1993) ..............................................................................3

*Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n*,
   894 F.2d 571 (2d Cir. 1990) ..............................................................................44

*Nat'l Taxpayers Union, Inc. v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995) ..........................................................................5, 6

*NB ex rel. Peacock v. D.C.*,
   794 F.3d 31 (D.C. Cir. 2015) ................................................................................8

*NO Gas Pipeline v. FERC*,
   756 F.3d 764 (D.C. Cir. 2014) ..................................................................2, 16, 27

**Court Cases—Continued**                                                  **Page(s)**

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) ...........................................................................7

*Olim v. Wakinekona*,
  461 U.S. 238 (1983) ....................................................................11, 12

*Phillips v. Bureau of Prisons*,
  591 F.2d 966 (D.C. Cir. 1979) ..........................................................4

*Phillips v. Comm'r*,
  283 U.S. 589 (1931) ...................................................................38, 43

*Presley v. City of Charlottesville*,
  464 F.3d 480 (4th Cir. 2006) .......................................10, 13, 14, 43

*R.J. Reynolds Tobacco Co. v. FDA*,
  810 F.3d 827 (D.C. Cir. 2016) ..........................................................7

*Richardson v. Perales*,
  402 U.S. 389 (1971) .........................................................................22

*Ruhrgas AG v. Marathon Oil Co.*,
  526 U.S. 574 (1999) ...........................................................................6

*Sandin v. Conner*,
  515 U.S. 472 (1995) ...........................................................................8

*Schneidewind v. ANR Pipeline Co.*,
  485 U.S. 293 (1988) ....................................................28, 31, 41, 44

*Schweiker v. McClure*,
  456 U.S. 188 (1982) .........................................................................28

*Shango v. Jurich*,
  681 F.2d 1091 (7th Cir. 1982) ........................................................11

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ...........................................................................6

*Sierra Forest Legacy v. Rey*,
  577 F.3d 1015 (9th Cir. 2009) ........................................................22

*Thatcher v. Tenn. Gas Transmission Co.*,
  180 F.2d 644 (5th Cir. 1950) ..........................................................44

*TOMAC, Taxpayers of Mich. Against Casinos v. Norton*,
  433 F.3d 852 (D.C. Cir. 2006) ........................................................39

*Town of Dedham v. FERC*,
  No. 15-cv-12352-GAO, 2015 WL 4274884 (D. Mass. July 15, 2015) ...................37

*Tumey v. Ohio*,
  273 U.S. 510 (1927) .........................................................................17

vi

**Court Cases—Continued**                                                    **Page(s)**

*United States v. Benitez-Villafuerte,*
    186 F.3d 651 (5th Cir. 1999) ...................................................................18, 19

*United States v. Salerno,*
    481 U.S. 739 (1987) ...................................................................................17

*Van Harken v. City of Chicago,*
    103 F.3d 1346 (7th Cir. 1997) ....................................................................18

*Wager v. Pro,*
    603 F.2d 1005 (D.C. Cir. 1979) ..................................................................15

*Ward v. Vill. of Monroeville,*
    409 U.S. 57 (1972) ...................................................................17, 18, 23, 24

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ...................................................................................17

*Williams v. Lew,*
    ___ F.3d ___, No. 15-5065, 2016 WL 1612804 (D.C. Cir. Apr. 22, 2016) ...........................16

*Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,*
    473 U.S. 172 (1985) ...................................................................................14

*Withrow v. Larkin,*
    421 U.S. 35 (1975) ...................................................27, 30, 33, 36, 42

<u>**Administrative Cases**</u>

*Chestnut Ridge Storage LLC,*
    139 FERC ¶ 61,149 (2012) .........................................................................30

*Columbia Gas Transmission Co.,*
    103 FERC ¶ 61,094 (2003) .........................................................................32

*Constitution Pipeline Co. et al.,*
    149 FERC ¶ 61,199 (2014) .........................................................................28

*El Paso Nat. Gas Co.,*
    65 FERC ¶ 61,276 (1993) ...........................................................................29

*Enforcement of Statutes, Regulations and Orders,*
    123 FERC ¶ 61,156 (2008) .....................................................................31, 32

*Enogex, Inc. et al.,*
    105 FERC ¶ 61,308 (2003) .........................................................................34

*Greenbrier Pipeline Co.,*
    119 FERC ¶ 61,016 (2007) .........................................................................30

*Hamilton v. El Paso Nat. Gas Co.,*
    141 FERC ¶ 61,229 (2012) .........................................................................32

**Administrative Cases—Continued** Page(s)

*Independence Pipeline Co. et al.*,
   89 FERC ¶ 61,283 (1999)
   *on reh'g*, 91 FERC ¶ 61,102 (2000) .......................................................29

*Independence Pipeline Co. et al.*,
   92 FERC ¶ 61,022 (2000)
   *vacated*, 100 FERC ¶ 61,082 (2002) ......................................................30

*Iroquois Gas Transmission Sys., L.P.*,
   75 FERC ¶ 61,205 (1996) ........................................................................34

*Jordan Cove Energy Project, L.P.*,
   154 FERC ¶ 61,190 (2016) ......................................................................29

*Magnolia LNG LLC, et al.*,
   155 FERC ¶ 61,033 (2016) ......................................................................44

*Millennium Pipeline Co. et al.*,
   100 FERC ¶ 61,277 (2002) ......................................................................44

*Ozark Gas Transmission Sys.*,
   40 FERC ¶ 61,129 (1987) ........................................................................34

*Ozark Gas Transmission Sys.*,
   43 FERC ¶ 61,443 (1988) ........................................................................29

*Petal Gas Storage Co.*,
   64 FERC ¶ 61,190 (1993) ........................................................................32

*Picor Pipeline Co.*,
   65 FERC ¶ 61,421 (1993) ........................................................................33

Statement of Policy,
   88 FERC ¶ 61,227 (1999) ..................................................................40, 41

*Tenn. Gas Pipeline Co.*,
   85 FERC ¶ 61,246 (1998) ........................................................................34

*Texas E. Transmission, LP*,
   146 FERC ¶ 61,086 (2014) ......................................................................19

*Transcontinental Gas Pipe Line Co.*,
   149 FERC ¶ 61,258 (2014) ................................................................31, 32

*Turtle Bayou Gas Storage Co.*,
   135 FERC ¶ 61,233 (2011) ......................................................................29

## Statutes and Regulations

12 U.S.C. § 2250 .........................................................................................21

15 U.S.C. § 717(a) ......................................................................................13

15 U.S.C. § 717f ...................................................................9, 27, 31, 42

**Statutes and Regulations—Continued**                                    **Page(s)**

15 U.S.C. § 717f(a) .............................................................................................44

15 U.S.C. § 717f(c)(1)(B) ..........................................................................3, 9, 11

15 U.S.C. § 717f(e) ......................................................................3, 9, 28, 31, 41

15 U.S.C. § 717f(h) ...........................................................10, 13, 14, 43, 44

15 U.S.C. § 717r ...............................................................................................6

15 U.S.C. § 717r(b) ..........................................................2, 5, 25, 26, 37, 38, 40

15 U.S.C. § 717r(c) .....................................................................................35, 36

31 U.S.C. § 902(a)(8) ......................................................................................21

31 U.S.C. § 9701(a) ........................................................................................21

42 U.S.C. § 2214 ............................................................................................21

42 U.S.C. § 4332(2)(C) ..............................................................................38, 39

42 U.S.C. § 7178 ..........................................................3, 17, 20, 22, 23, 28

42 U.S.C. § 7178(a)(1) .................................................................................3, 19

42 U.S.C. § 7178(b) ..........................................................................................3

42 U.S.C. § 7178(e) .....................................................................................20, 22

Consolidated Appropriations Resolution of 2003,
  Pub. L. No. 108-7, 117 Stat. 11 (2003) ......................................................20

Omnibus Appropriations Act of 2009, Pub. L. No. 111-8, 123 Stat. 524 .....................21

## Rules and Regulations

18 C.F.R. § 382.202 .........................................................................................3

18 C.F.R. § 385.713(f) ....................................................................................35

40 C.F.R. § 1501.4 .........................................................................................38

Fed. R. Civ. P. 12(b)(1) ...................................................................................4

Fed. R. Civ. P. 12(b)(6) .........................................................................4, 18, 27

## Other Authorities

*Algonquin Gas Transmission, LLC et al.*,
  Notice of Availability of the Environmental Assessment for the Atlantic Bridge Project,
  Docket No. CP16-9-000 (May 2, 2106) ......................................................40

Charles Kruly, *Self-Funding and Agency Independence*,
  81 Geo. Wash. L. Rev. 1733 (2013) ...........................................................25

Daniel R. Mandelker et al., *NEPA Law and Litigation* § 7:11 (2d ed. 2015) .............40

**Other Authorities—Continued**                                    **Page(s)**

*Hearing on S. 1733 Before the S. Comm. on Env't and Pub. Works*, 111th Cong. 8 (Oct. 27, 2009)..............................................................................................................42

National Commission on the BP Deepwater Horizon, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling: Report to the President* 56 (Jan. 2011).......................................22

Notice of Schedule for Environmental Review of the PennEast Pipeline Project, 81 Fed. Reg. 19,167 (Apr. 4, 2016)..........................................................................................39

I.     **Introduction**

Thirty years ago, Congress enacted a key fiscal reform that shields taxpayers from bearing the full cost of the critically important work of the Federal Energy Regulatory Commission.  Under that mechanism, each year the Commission submits to Congress a proposed budget, and Congress decides whether to approve or modify it in an enacted appropriation.  At the end of each year, the Commission recovers from regulated companies the cost of running the Commission's programs.  By statute, FERC must collect the costs actually incurred — not a penny more — and deposit the money back in the general fund of the U.S. Treasury.

Plaintiffs oppose the development of domestic natural gas resources that are necessary to meet the Nation's growing energy demands, including the upgrading and expansion of the natural gas pipeline grid.  Although they routinely and vigorously oppose such projects in proceedings before the Commission and in the federal courts of appeals, they now ask this District Court for the unprecedented relief of declaring the Commission's statutory funding mechanism facially unconstitutional.  More egregiously, Plaintiffs ask this District Court to find that the funding mechanism has fatally prejudiced — albeit in entirely speculative and unspecified ways — the Commission's ongoing certificate review of PennEast's pipeline project, while those proceedings remain ongoing.  Their sole claim for relief is that this reimbursement mechanism creates an impermissible financial incentive for the Commission to approve pipeline projects, which results in the Commission's review of project applications depriving Plaintiffs of due process of law.

This Court can and should dismiss the complaint without reaching the merits.  As the Commission explains in its own motion to dismiss, Plaintiffs have not adequately alleged standing, and this Court lacks statutory jurisdiction to consider any claim of "actual bias" in a particular proceeding, including PennEast's pending certificate application, under the exclusive

appellate review provision in 15 U.S.C. § 717r(b).   And Plaintiffs' actual-bias claims —
untethered as they are from any specific factual allegations regarding ongoing proceedings — are
not yet ripe for judicial review.

Even if this Court had jurisdiction, Plaintiffs have not pleaded a plausible claim for relief.
For starters, they have not established that the Commission's proceedings deprive them of any
liberty or property interest protected by the Due Process Clause, an absolute prerequisite for their
novel constitutional bias claims.   Furthermore, the complaint fails to allege facts sufficient to
support Plaintiffs' structural-bias clam.   That claim's essential premise — that the Commission
benefits financially when it approves a pipeline — is foreclosed by the plain language of the
relevant statutory and regulatory provisions.   And even if the Commission had some diffuse
financial interest in approving projects, Plaintiffs cite no case — and PennEast is aware of none
— *ever* recognizing a due process violation on facts remotely comparable to those here.   To the
contrary, courts have overwhelmingly rejected "bias" claims, including at the 12(b)(6) stage,
where the alleged financial incentive was far stronger than here.

Plaintiffs also offer a laundry-list of other allegations, which they claim show "actual
bias."   That list appears to be an attempt to avoid the precedential effect of the D.C. Circuit's
recent decision dismissing, for want of jurisdiction, a case raising a strikingly similar bias claim.
*See NO Gas Pipeline v. FERC*, 756 F.3d 764 (D.C. Cir. 2014).   These allegations are irrelevant
to the single operative claim for relief.   In any event, they fail as a matter of law.   The
government has catalogued the many strong reasons to dismiss the complaint.   PennEast
highlights here additional defects.

## II.   Statutory And Procedural Background

This case involves two components of the Commission's statutory structure.   The first is
a 1986 statute establishing the fee-based funding mechanism by which the Commission

reimburses the U.S. Treasury for funds appropriated to it by Congress.  *See* 42 U.S.C. § 7178; Compl. ¶ 7.  Under that mechanism, the Commission shall "assess and collect fees and annual charges in any fiscal year in amounts equal to all of the costs incurred by the Commission in that fiscal year," doing so "on the basis of methods that the Commission determines, by rule, to be fair and equitable."  42 U.S.C. § 7178(a)(1), (b).  The Commission has chosen to assess fees proportionally, based on a volumetric annual charge, so any particular natural gas pipeline company pays an amount based on the ratio of its natural gas sold and transported that year, to the total gas transported on FERC-jurisdictional pipelines.  *See* 18 C.F.R. § 382.202.  The funding mechanism is explained further in Part VI.A.1 below.

The second component is the statutory requirement that the Commission hold a hearing before deciding whether to issue a certificate of public convenience and necessity for a pipeline project.  *See* 15 U.S.C. § 717f(c)(1)(B) (requiring a hearing); *id.* § 717f(e) (outlining the basis for issuing a certificate).  That hearing need not be (and typically is not) a "trial-type hearing"; rather, a "paper hearing" suffices.  *See Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993).

Plaintiffs Delaware Riverkeeper Network and Maya van Rossum (collectively, "DRN") allege that the interaction between these two statutes deprives them or their members of a protected liberty or property interest without due process of law, in violation of the Fifth Amendment.  *See* Compl. ¶¶ 263-66.  Specifically, DRN alleges that the Commission's statutory funding mechanism creates a possible temptation for the Commission to approve pipeline applications, thereby injecting impermissible bias into the Commission's process for deciding whether to grant certificates of public convenience and necessity.  *Id.* ¶¶ 94-239, 263.  The complaint pleads only a single cause of action, but Plaintiffs appear to have two separate theories:  (1) the funding scheme, on its face, creates "structural bias" or at least the appearance

of bias, *id.* ¶¶ 94-174, 263; and (2) the Commission has in fact shown "actual bias" in specific proceedings, including the pending application for a Certificate of Public Convenience and Necessity for the PennEast Pipeline Project, *id.* ¶¶ 175-239, 263.

## III.   Applicable Standards

When considering a Rule 12(b)(1) motion, the court asks whether the plaintiff has carried its burden of establishing jurisdiction over its claim.  *See Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  In doing so, the court may consider the complaint, any undisputed facts evidenced in the record, as well as any disputed facts that the court resolves.  *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015).

When considering a Rule 12(b)(6) motion, the court asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 533 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  However, a court need not "accept as true the complaint's factual allegations insofar as they contradict . . . matters subject to judicial notice."  *Kaempe v. Myers*, 367 F.3d 958, 963 (D.C. Cir. 2004).  This Court can, of course, consider whether the allegations are contradicted by cases, statutes, and other legal authorities. *See Earle v. D.C.*, 707 F.3d 299, 308 n.10 (D.C. Cir. 2012).  And this Court can take judicial notice of facts in the public record.  *See Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir. 1979).  These authorities rest on the commonsense notion that Rule 12(b)(6) permits courts "to avoid unnecessary proceedings when an undisputed fact on the public record makes it clear that the plaintiff does not state a claim upon which relief could be granted."  *Covad Commc'ns*, 407 F.3d at 1222 (internal quotation marks omitted).

## IV.     Jurisdiction

PennEast joins the Commission's arguments that (1) Plaintiffs have not shown Article III standing and (2) this Court lacks statutory jurisdiction over any "actual bias" claim associated with a particular proceeding (including PennEast's), because that claim amounts to a challenge to the Commission's (hypothetical future) grant of a certificate order, which can only be brought in the Court of Appeals pursuant to 15 U.S.C. § 717r(b)'s grant of "exclusive" appellate jurisdiction.  *See* FERC Br. 12-30.  PennEast raises two additional jurisdictional defects.

### A.     DRN Fails To Allege Facts Establishing Its Standing In Its Own Right

To the extent Plaintiffs rely on the standing of the Delaware Riverkeeper Network organization in its own right, not associational standing based on injury to its members, that argument falls short.  Compl. ¶ 41.  To sue on its own behalf, DRN must allege that it "'has suffered injury in fact,' including '[s]uch concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests.'"  *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (alterations and ellipsis in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).  DRN has not done so.

First, DRN does not allege any injury to its organizational activities.  The complaint lists a number of DRN's activities:  (1) organizing and implementing various programs to protect and restore the river's watershed, Compl. ¶ 34; (2) raising awareness about "the environmental impacts of natural gas and pipeline infrastructure development," *id.* ¶ 37; (3) advocating for and funding "expert scientific studies" on such impacts, *id.* ¶ 38; and (4) participating in litigation involving the river's environmental issues, *id.* ¶ 39.  But DRN does not allege that any of those efforts have been impeded in any way by the Commission.  To be sure, the complaint may allege that the Commission has approved (or will soon approve) pipeline projects that cause the kind of

effects on the river that DRN's activities aim to prevent.  *See id.* ¶¶ 36, 40, 48-49.  But those actions are "simply a setback to the organization's abstract social interests."  *Havens*, 455 U.S. at 379; *see Sierra Club v. Morton*, 405 U.S. 727, 739 (1972) (holding that "a mere 'interest in a problem'" is not enough "to render the organization 'adversely affected' or 'aggrieved'").  The complaint does not allege a "consequent drain on the organization's resources" as it must to establish standing.  The cost of bringing this (and other) lawsuits challenging the Commission's actions is plainly insufficient.  *See National Taxpayers*, 68 F.3d at 1434.

Second, the complaint does not allege injury to any property interest held by DRN itself, as distinct from general allegations that DRN's (unnamed) individual members have property interests that are affected by pipeline projects.  *See* Compl. ¶¶ 46-56.  Thus, the complaint makes no allegation of a concrete and imminent injury to a legal interest held by DRN itself.

**B.     DRN's Actual-Bias Claim Is Not Ripe For Review**

Even if this Court had statutory jurisdiction to hear an actual-bias claim despite 15 U.S.C. § 717r, the issue would not be ripe for review.[1]  This Court must consider:  "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Cobell v. Jewell*, 802 F.3d 12, 21 (D.C. Cir. 2015) (internal quotation marks omitted).  And it should be mindful that "[t]he usual presumption in favor of withholding judicial review until after final agency action applies with even greater force in the context of a bias claim."  *Air Line Pilots Ass'n, Int'l v. Civil Aeros. Bd.*, 750 F.2d 81, 88 (D.C. Cir. 1984).

The first ripeness factor weighs against hearing any actual-bias claim now.  That claim is not "purely legal" in a way that supports adjudication now, because it will turn on specific events and characteristics of the Commission's ongoing PennEast certificate proceeding that have not

---

[1] Because ripeness also affects this Court's jurisdiction, it is an available alternate ground to dismiss the claim.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577-78 (1999).

yet occurred.  *See Liteky v. United States*, 510 U.S. 540, 555 (1994) (explaining that, for actual-bias claims, the most relevant evidence is "events occurring in the course of the current proceedings").  Indeed, in adjudicating actual-bias claims, the Supreme Court undertakes a close examination of the record of the challenged proceeding.  *See, e.g.*, *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 884 (2009).  Adjudicating the actual-bias claim would benefit from a more concrete factual setting, because only *after* the Commission has issued or denied the certificate can this Court assess how the Commission addressed particular issues.  Of course, if the Commission were to deny PennEast's certificate application, that would presumably moot Plaintiffs' need to bring any actual-bias claim as to the PennEast proceeding.  *E.g.*, *R.J. Reynolds Tobacco Co. v. FDA*, 810 F.3d 827, 830 (D.C. Cir. 2016) (claims are not ripe if they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all").

The second ripeness factor also weighs against reviewing DRN's actual-bias claim now.  The Commission has yet to issue any substantive order in the PennEast certificate proceeding.  So as the case stands before this Court, the challenged action does not "command anyone to do anything or to refrain from doing anything"; "subject anyone to any civil or criminal liability"; or create any "legal rights or obligations."  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). Thus, there is no hardship to the parties in declining to review the claim now.

To the extent the Plaintiffs allege any actual-bias claim with respect to certificate proceedings other than PennEast, those claims are even more obviously unripe.  The Plaintiffs have not identified any other specific pending proceedings, never mind alleged how they are fit for consideration now.  Rather than stopping an unnamed and potentially indefinite number of Commission proceedings "to allow for excursions in the courts," this Court should require the Plaintiffs to wait until the proper time to raise an actual-bias claim:  when they seek "judicial

review of [the] agency action having preserved the point of claimed disqualification in the administrative hearing." *Air Line Pilots*, 750 F.2d at 88.

## V.    The Commission's Certificate Process Does Not Deprive Plaintiffs Of A Property Or Liberty Interest That Is Cognizable Under The Due Process Clause

In the typical case involving judicial review of agency action, the challenger will rely on a specific statutory cause of action, such as the procedural and substantive obligations of the Administrative Procedure Act, or an agency's organic statute.  This case, however, is different in a critical respect:  the sole pleaded basis for relief (under either a structural-bias or actual-bias theory) is the Due Process Clause of the Fifth Amendment.  *See* Compl. ¶¶ 19, 263.  Therefore, Plaintiffs must not only fit their claim into that constitutional framework but bear a heavy burden in justifying any expansion of that doctrine, given the sweeping consequences for all federal, state, and local government agencies of any change to basic due process norms.  *Cf. Sandin v. Conner*, 515 U.S. 472, 482-83 (1995) (rejecting expansive approach to defining protected liberty interests, to reduce judicial intrusion into administrators' decisionmaking).

To state a claim for relief under the Due Process Clause, a plaintiff must allege: "(i) deprivation of a protected liberty or property interest, (ii) by the government, (iii) without the process that is 'due' under the Fifth Amendment."  *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 41 (D.C. Cir. 2015) (citations omitted).  If the government conduct at issue does not deprive the plaintiff of a cognizable liberty or property interest, then the Due Process Clause has no application.  *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) ("Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process.").

The complaint rests on the assertion that the Due Process Clause guarantees Plaintiffs a right to a neutral decisionmaker in the adjudicatory process by which the Commission decides

whether to approve applications for a certificate of public convenience and necessity.  *See* 15 U.S.C. § 717f(c)(1)(B), (e); Compl. ¶ 1 (challenging "the review and approval process" for certificates); *id.* ¶ 116 (similar).  To phrase the claim in the vernacular of the Due Process Clause, *see Mathews v. Eldridge*, 424 U.S. 319, 330-31 (1976), Plaintiffs claim a constitutional right to a "predeprivation hearing," as the allegedly biased process occurs *before* any deprivation of liberty or property.  Under well-established law, the Constitution guarantees a predeprivation hearing before a neutral decisionmaker only if the government is depriving the plaintiff of a liberty or property interest that is protected by the Due Process Clause.  *Id.* at 332.

The complaint, however, does not identify any protected liberty or property interest, held by DRN or its members, that is subject to deprivation through the certificate-approval process. To begin with, although the complaint contains a range of harms alleged to be caused by the construction and operation of natural gas pipelines, the relevant focus is on the *government* procedure and actions being challenged.  The Commission's grant of a certificate does not, in and of itself, deprive Plaintiffs or other affected individuals of any liberty or property interests. Approval gives *the pipeline company* the right to proceed with its project.  The distinction — obscured by the allegations in the complaint — is important.

To illustrate:  one step that often follows certificate approval is taken not by the Commission, but by the project developer:  i.e., attempting to secure "the necessary right-of-way to construct, operate, and maintain [the] pipe line or pipe lines."  15 U.S.C. § 717f(h).  The developer either negotiates with property owners to reach an acquisition agreement or, if necessary, exercises the statutory right of eminent domain.  If the parties reach agreement, no "deprivation" of property has occurred for purposes of the Due Process Clause, because the owner has bargained away his or her property right, not been deprived of it.  *Cf. Knappenberger*

*v. City of Phoenix*, 566 F.3d 936, 941 (9th Cir. 2009) (public employee's resignation or retirement must be "involuntary" to "constitute a deprivation of property for purposes of a due process claim"). Conversely, if the company sues in federal or state court under 15 U.S.C. § 717f(h) to secure the right-of-way by "exercise of the right of eminent domain," the acquisition of property is a "taking" governed by the Takings Clause and not a "deprivation" that triggers the full predeprivation protections of the Due Process Clause. *See Presley v. City of Charlottesville*, 464 F.3d 480, 489-90 (4th Cir. 2006); *see also infra* Part V.B. Thus, the certificate-approval process does not, by itself, involve any deprivation that supports a due process claim.

PennEast now turns to the particular allegations in the complaint and explains why they either (1) do not raise an interest protected by the Due Process Clause, or (2) do not allege a "deprivation" that triggers the Due Process Clause's normal procedural protections.

### A. The Majority Of The Interests Asserted By DRN And Its Members Are Not Cognizable Under The Due Process Clause

The complaint asserts, in a largely conclusory fashion, that DRN and its members have "aesthetic, conservation, economic, recreational, scientific, educational, [and] wildlife preservation . . . interests"[2] that will be injured by the Commission's approval of applications for certificates of public convenience and necessity. Compl. ¶ 279. Whether or not these allegations satisfy Article III's standing requirements, and whether or not they would be relevant to claims under the Natural Gas Act or NEPA in a challenge to the Commission's (hypothetical future) approval of a particular pipeline certificate, they are not the kind of specific and defined property or liberty interests protected by the Due Process Clause.

---

[2] Allegations of injury to "property interests," *see* Compl. ¶¶ 46, 49, are discussed *infra*, Part V.B.

To qualify as a protected interest under the Due Process Clause, the interest must either

be protected by the Constitution itself, or so firmly guaranteed by other laws or regulations that it

rises to a constitutionally cognizable level.  For liberty interests, the interest must "either be

located in the Constitution itself" or arise from laws or policies that "contain substantive

limitations on official discretion, embodied in mandatory statutory or regulatory language."

*Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009) (internal quotation marks

omitted).   As for property interests, the interest must be "defined by existing rules or

understandings that stem from an independent source such as state law — rules or

understandings that secure certain benefits and that support claims of entitlement to those

benefits."  *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 119 (D.C. Cir. 2010) (internal quotation

marks omitted).  None of the interests asserted in the complaint reach that level.

While the complaint does not directly assert it as a liberty interest, the mere fact that

DRN and its members have a statutory right to participate in the Commission's certificate

process does not automatically confer a *constitutionally* protected liberty interest.[3]  *See* 15 U.S.C.

§ 717f(c)(1)(B).  As the Supreme Court has explained, a mere procedural right, such as the right

to participate in a hearing, is not the kind of substantive liberty interest protected by the Due

Process Clause.  *See Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) (holding that a regulation

requiring "a particular kind of hearing" did not trigger the Due Process Clause because the

Clause protects only "substantive interest[s]" and "[p]rocess is not an end in itself"); *Shango v.*

*Jurich*, 681 F.2d 1091, 1100 (7th Cir. 1982) (explaining why procedural rights cannot

---

[3] The complaint separately alleges that the Commission has "violated DRN's right to timely judicial review of Commission certifications."  Compl. ¶ 53.  But that asserts a right to appeal from the Commission's decision to grant or deny a certificate, not a right to participate in the Commission's hearing.  In any event, Plaintiffs retain access to appellate review notwithstanding the Commission's use of tolling orders, and every court to consider the question has found no due process violation.  *See infra* Part VII.D.2.

themselves give rise to liberty or property interests).  Applying *Olim*, the D.C. Circuit has held that "an expectation of receiving process is not, without more, a liberty interest protected by the Due Process Clause."  *Brandon v. D.C. Bd. of Parole*, 823 F.2d 644, 648 (D.C. Cir. 1987) (quoting *Olim*, 461 U.S. at 250 n.12).

Other interests listed in the complaint suffer the same defect.  Any alleged "aesthetic" interest that DRN and its members have in "enjoying the scenery, wildlife, recreation opportunities, and undeveloped nature" of the area is not a cognizable liberty interest for purposes of the Due Process Clause.  *See* Compl. ¶ 47.  No federal or state laws give Plaintiffs the kind of right that creates a cognizable constitutional interest in those aesthetic activities.  As for "conservation, economic, recreational, scientific, educational, [and] wildlife" interests, the complaint does not identify any state or federal laws or regulations that elevate those into liberty or property interests protected by the Due Process Clause.  *See id.* ¶¶ 54-55, 279.  For example, whether or not the Delaware River's "American Shad population" is "ecologically, recreationally, and economically important," *id.* ¶ 32, neither DRN nor its members have any legal right to those fish that amounts to a protected liberty or property interest.

### B.   The Remaining Interests Asserted In The Complaint Are Not Subject To "Deprivation" Within The Meaning Of The Due Process Clause

The complaint alleges that the Commission's certificate-approval process affects DRN members' property interests in three ways:  (1) subjecting members' real property to eminent domain proceedings; (2) having members' property "adversely impacted by . . . pipeline construction and operational activities"; and (3) leading members to fear bodily or property harm from "pipeline accidents or explosions."  Compl. ¶¶ 48-50.  None of these qualify as a "deprivation" for purposes of the Due Process Clause.

12

First, the complaint alleges that DRN members' property "will be[] subject to eminent domain proceedings" under 15 U.S.C. § 717f(h). *See* Compl. ¶ 50. But condemnation of property pursuant to the government's eminent domain power is a taking governed by the Takings Clause. A taking is not a deprivation of property that triggers the normal predeprivation protections of the Due Process Clause, at least absent any allegation (and none is advanced here) that the *eminent domain proceeding itself* is conducted by a biased decisionmaker. DRN's claim here is not addressed to the federal or state court where eminent domain rights would be adjudicated, but rather the entirely separate (and earlier) proceeding before the Commission involving the certificate order. *See Presley*, 464 F.3d at 489-90.

The Due Process and Takings clauses serve two very different purposes. The Takings Clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (internal quotation marks omitted). In contrast, "the Due Process Clause was designed to prevent" "abusive government conduct." *Davidson v. Cannon*, 474 U.S. 344, 348 (1986). Because eminent domain is a form of government conduct the Constitution expressly facilitates, it would be nonsensical to subject it to the requirements designed for preventing "abusive government conduct." *See id.*

As a result, the Supreme Court and the courts of appeals have repeatedly held that, where property is taken pursuant to eminent domain to be put to a public use,[4] the property holder is not

---

[4] There can be no question that the construction of a natural gas pipeline qualifies as a "public use" for purposes of the Takings Clause. *See* 15 U.S.C. § 717(a) (declaring that federal regulations facilitating interstate transport of natural gas are "necessary in the public interest"). Nor is there any question that the condemnation is pursuant to the federal government's eminent domain power. *See Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 120 (1960) (holding that a private company acts as a licensee of the federal government when exercising eminent domain authority pursuant to an identical provision in the Federal Power Act).

entitled to any predeprivation hearing — only a right to just compensation.[5]  *See Williamson Cty.*

*Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 n.14 (1985)

("Unlike the Due Process Clause, however, the Just Compensation Clause has never been held to

require pretaking process . . . ."); *Presley*, 464 F.3d at 489-90 (collecting "a century of

precedent" for the proposition that a "physical taking" does not require a hearing or notice prior

to the taking).  And because a taking does not require any predeprivation process whatsoever, the

property holder cannot claim a constitutional right to a predeprivation hearing in front of a

neutral adjudicator (again, distinct from the later eminent domain proceeding itself).

To hold otherwise, and treat a taking as a deprivation of property that triggers due process

— when the Takings Clause "imposes very specific obligations upon the government" — would

risk "impos[ing] new and potentially inconsistent obligations upon the parties under the

substantive or procedural components of the Due Process Clause."  *Miller v. Campbell Cty.*, 945

F.2d 348, 352 (10th Cir. 1991).  In short, the eminent domain proceedings that may (or may not)

be conducted pursuant to 15 U.S.C. § 717f(h) are all the process that DRN and its members

could be "due" under the Fifth Amendment.  *See Presley*, 464 F.3d at 490.  As a result, the

potential future taking of DRN's members' property under the Natural Gas Act's eminent

domain authority is not a "deprivation" that triggers the kind of due process right that DRN

claims in the context of the Commission's certificate proceeding.[6]

---

[5] Of course, if the government decides that compensation should be determined through "a judicial condemnation or just-compensation proceeding," then it must give the property owner adequate notice so that the property owner may participate in that process.  *Presley*, 464 F.3d at 490.  Plaintiffs do not raise any concern — nor could they — about the adequacy of notice or fairness and impartiality of the process available in an eminent domain action, which would be litigated in a federal district or state court.  15 U.S.C. § 717f(h).

[6] The complaint also alleges that the potential for eminent domain proceedings undermines "DRN's members' bargaining position with pipeline companies for easement agreements." Compl. ¶ 51.  DRN appears to assert that its members have a constitutional right to extract more

Second, the complaint alleges that DRN members will suffer "physical damage to real estate as a result of . . . pipeline construction activity, and encroachment of construction debris upon their homes and property." Compl. ¶ 48.  To begin with, these harms occur, if at all, due to actions of the pipeline company, not the Commission itself.  Moreover, to the extent DRN suggests these collateral effects on the members' property themselves constitute takings, the above analysis applies.  To the extent they are something *other* than a taking, the complaint fails to allege any facts showing that the Commission acts with the heightened intent required for these collateral effects on the members' property to rise to the level of a "deprivation" actionable under the Due Process Clause.

Damage to property is not a "deprivation" if the government's conduct is merely negligent.  *See Davidson*, 474 U.S. at 347-48.  Thus, the noise from operating an airport is not a deprivation of property — even though the noise qualifies as a nuisance under state law — if the plaintiff cannot establish that the government acted with more than negligence in authorizing that noise.  *Bieneman v. City of Chicago*, 864 F.2d 463, 466-67 (7th Cir. 1988) (Easterbrook, J.).  A plaintiff must allege, at the very least, government conduct amounting to gross negligence.  *See Daniels v. Williams*, 474 U.S. 327, 334 n.3 (1986) (leaving open whether reckless or grossly negligent behavior "is enough to trigger the protections of the Due Process Clause").  And "gross negligence implies an extreme departure from the ordinary standard of care."  *Wager v. Pro*, 603 F.2d 1005, 1010 (D.C. Cir. 1979) (internal quotation marks omitted).  The complaint contains no such allegations, only conclusory assertions that there will be some form of "physical damage to real estate" and some "encroachment of construction debris" — again, presumably at the hands

---

money from pipeline companies than they could obtain through a judicial condemnation proceeding.  There is no such right, which would squarely conflict with the Takings Clause's command that citizens are entitled only to "just compensation."  *See Lingle*, 544 U.S. at 536.

of the pipeline company, not the Commission.  *See* Compl. ¶ 48.  The complaint does not explain

how those harms will occur or what level of fault will be attributable to the Commission.[7]  *See*

*id.*  The complaint therefore does not "state a claim to relief that is plausible on its face."

*Abdelfattah*, 787 F.3d at 533 (quoting *Iqbal*, 556 U.S. at 678).

Third, and finally, the complaint alleges that DRN's members "who live within the blast

radius of proposed or existing . . . pipelines are concerned about the increased risk of bodily

and/or property harm as a result of pipeline accidents or explosions."  Compl. ¶ 49.  These

allegations suffer the same general flaw as the construction harms to property above, in that they

do not allege what the Commission's role, if any, would be, or an actionable level of fault.  What

is more, speculative concerns about potential future risks do not qualify as "deprivations" of

liberty or property.[8]  In fact, even *actual* injuries to persons or property as a result of accidents or

explosions do not qualify as "deprivations" in the specific context of the Due Process Clause.

*See Davidson*, 474 U.S. at 347-48 ("[L]ack of due care . . . simply does not approach the sort of

abusive government conduct that the Due Process Clause was designed to prevent."); *Mitchell v.*

*Mills Cty.*, 847 F.2d 486, 489 (8th Cir. 1988) (applying *Davidson* and finding no deprivation

where the plaintiffs failed "to set forth specific facts showing that the damage to their property

stemmed from something more than negligent road improvement by county officials").

---

[7] Because the complaint seeks only prospective declaratory and injunctive relief, it must contain allegations of ongoing or future deprivations.  *See Williams v. Lew*, ___ F.3d ___, No. 15-5065, 2016 WL 1612804, at *5 (D.C. Cir. Apr. 22, 2016).

[8] Although the allegations are taken as true for purposes of this motion, it bears emphasis that the pipeline will be constructed and operated under exacting safety specifications and subject to stringent regulatory standards, likely to include express conditions in any certificate the Commission might issue.  *Cf. NO Gas Pipeline*, 756 F.3d at 768 (holding that challengers lacked standing to raise even *statutory* claims related to "the safety of pipeline operations," because they had not shown the "danger is either actual or imminent").

## VI.     Plaintiffs Fail To State A Claim For Relief Under A Structural Bias Theory

The complaint's main theory about why the Commission's certificate approval process violates the Due Process Clause is that the fee-collection mechanism in 42 U.S.C. § 7178 on its face creates a "structural bias" that compromises the Commission's ability to serve as a neutral adjudicator.  Compl. ¶¶ 94-152.[9]  The claim appears to be a disfavored facial challenge, asserting that the statutory structure violates due process regardless of the facts of a particular proceeding. *See id.*; *United States v. Salerno*, 481 U.S. 739, 745 (1987); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).

### A.     DRN's Allegations Based On The Commission's Funding Structure Fail To State A Claim For Relief

At the outset, it is important to establish what this case is *not*.  The typical claim that financial bias violates due process involves a traditional trial-type setting in which the adjudicator has a personal financial stake.  *See Tumey v. Ohio*, 273 U.S. 510 (1927).  The complaint here, however, does not (and could not) allege that any of the Commission's *individual* decisionmakers have a "personal, substantial pecuniary interest" in the adjudicatory proceedings.  *Ward v. Vill. of Monroeville*, 409 U.S. 57, 60 (1972).  *See* Compl. ¶ 111 (clarifying that "structural bias . . . is the type of bias" alleged in the complaint (internal quotation marks omitted)).  Rather, Plaintiffs argue that a multi-member body of administrative decisionmakers, and professional Commission staff charged with processing a certificate application, are biased by alleged financial benefit to the government agency that employs them.  That claim has a far more tenuous foundation in existing law.  A careful examination of the nature of the alleged financial interest shows that Plaintiffs have not pleaded a valid claim for relief.

---

[9] The complaint sometimes refers to this theory as an "appearance of bias."  *See, e.g.*, Compl. ¶ 102.  For simplicity, this brief refers the theory only as "structural bias."

To state a structural-bias claim based on "institutional pecuniary interests," a complaint must allege facts establishing the existence of "'a possible temptation to the average [adjudicator] which might lead him not to hold the balance nice, clear, and true.'" *Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, 1406 (4th Cir. 1995) (quoting *Ward*, 409 U.S. at 60). In interpreting and applying that general standard, courts have taken care to draw lines past which a "biasing influence . . . will be too remote and insubstantial to violate the constitutional constraints." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 826 (1986) (omission in original) (internal quotation marks omitted).

The courts of appeals have consistently found no due process violation where the connection between an agency's adjudication process and its finances is at most "remote and attenuated," *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996), not "strong, so that it reasonably warrants fear of partisan influence on the judgment," *Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley*, 114 F.3d 840, 845-46 (9th Cir. 1997) (alterations and internal quotation marks omitted).  In *Doolin*, the Fourth Circuit held that the self-funding, independent federal agency, FDIC, had no disqualifying "institutional pecuniary interest" in assessing deposit insurance premiums on member institutions, despite FDIC's conceded interest in the "revenue needs of the deposit insurance fund" where the premiums were paid.  53 F.3d at 1405-07. Similarly, the Seventh Circuit's decision in *Van Harken v. City of Chicago* affirmed the Rule 12(b)(6) dismissal of an institutional bias claim where hearing officers adjudicated parking tickets paid to their employing agency.  103 F.3d 1346, 1353 (7th Cir. 1997).  In *United States v. Benitez-Villafuerte*, the Fifth Circuit concluded that the Immigration and Naturalization Service did *not* have an institutional bias in deportation proceedings even though its funding "depend[ed] . . . on its statistical workload in apprehending and deporting illegal aliens."  186 F.3d 651, 660

18

(5th Cir. 1999).  And in *Commonwealth of the Northern Mariana Islands v. Kaipat*, the Ninth Circuit rejected an institutional bias claim even though the fines imposed by Commonwealth courts were paid into a fund to build the judges a new courthouse.  94 F.3d 574, 581-82 (9th Cir. 1996).  Viewed against this wall of precedent, the allegations regarding the Commission's supposed financial self-interest fall short as a matter of law.[10]

1.     Neither The Statutory Funding Mechanism Nor The Commission's Financial Incentives Creates An Impermissible "Temptation."

Plaintiffs fail to allege any plausible institutional self-interest in approving pipeline projects, given the clear language of the relevant provisions establishing the Commission's funding system.  As the Commission's brief explains, *see* FERC Br. 3, 6-8, 32-35, the Commissioners' decision to grant a certificate to any particular pipeline does not have any impact on the agency's funding levels — and certainly not the direct and substantial effect needed for a structural-bias claim.  The amount of fees the Commission collects in a given year is pegged to its costs, not to the number of pipelines operating.  *See* 42 U.S.C. § 7178(a)(1).  The Commission "imposes a proportional volumetric charge on each company," in which the assessment imposed on Company A is equal to the overall costs the Commission incurred, multiplied by the ratio of the gas that Company A sold and shipped that year, to the overall volume of gas sold and shipped that year by all the natural gas companies being regulated by the Commission.  *See Texas E. Transmission, LP*, 146 FERC ¶ 61,086, 61,372 (2014).  As a result,

---

[10] The D.C. Circuit's recent decision in *Association of American Railroads v. U.S. Department of Transportation*, No. 12-5204, 2016 WL 1720357 (D.C. Cir. Apr. 29, 2016), does not help Plaintiffs.  That decision addressed the very different issue of "whether an economically self-interested entity may exercise regulatory authority over its rivals."  *Id*. at *5.  That "specific fairness question" arises only where a governmental entity "is a self-interested market participant wielding regulatory power."  *Id*.  Even if it were self-interested (and it is not), the Commission is not a market participant.

the Commission recovers the same amount regardless of how many pipeline companies exist, or how many pipeline projects the Commission approves.

If the fees the Commission collects exceed or fall short of its costs, the Commission must "true up" its collection at the end of each year.  *See* 42 U.S.C. § 7178(e) (requiring the Commission annually "to eliminate any overrecovery or underrecovery of its total costs, and any overcharging or undercharging of any person").  Thus, the Commissioners' decision on a particular application does not affect its level of funding.  As the D.C. Circuit recently observed, "governmental entities" are "decidedly not self-interested" if they "strive[] for an equilibrium of revenues and expenditures, where the revenue obtained is no more and no less than the operating costs of the services provided."  *Ass'n of Am. Railroads v. U.S. Dep't of Transp.*, No. 12-5204, 2016 WL 1720357, at \*10 (D.C. Cir. Apr. 29, 2016).  Precisely so here.

Even putting aside that reality, the complaint's theory of bias is unavailing, as any institutional pecuniary interest created by 42 U.S.C. § 7178 is "too remote and insubstantial to violate the constitutional constraints."  *Aetna Life Ins. Co*, 475 U.S. at 826 (internal quotation marks omitted).  According to DRN, "[t]he more pipeline projects the Commission approves, the more 'product' the Commission can tap for funding" and thus "provid[e] revenue to sustain and grow the agency."  Compl. ¶¶ 124, 126.  But, as explained above and by the Commission, the fact that fee collection is limited to recovering costs and relies on volumetric charging means that a decision on an individual application does not affect the agency's funding levels.  The number of certificated pipelines is irrelevant to the Commission's funding mechanism.  Furthermore, the Commission must submit annual budget requests to Congress, and Congress can and has granted the agency less funding than the Commission requested.  *See, e.g.*, Consolidated Appropriations Resolution of 2003, Pub. L. No. 108-7, Div. D, Title III, 117 Stat. 11 (2003) (setting lower

budget than requested).  The Commission cannot increase the funds available in a given year through its actions on a given pipeline application.

To the extent the complaint can be read to allege an alternative theory of temptation — i.e., an interest in maintaining and growing a "healthy crop" of pipelines from which to collect fees in the future — that theory also fails.  The miniscule effect that a single decision on one pipeline application has on that aggregate and long-term concern is not so "strong . . . that it reasonably warrants fear of partisan influence on the judgment."  *City of Berkeley*, 114 F.3d at 847 (alterations omitted) (internal quotation marks omitted).  Among other things, the theory depends on the idea that the Commission would approve pipeline applications to guard against difficulty in reimbursing the Treasury for appropriated funds.  But it is hardly plausible to suggest that Congress would penalize the Commission through the withdrawal of funding if, in some hypothetical future market conditions, regulated industry has difficulty paying their volumetric charges.

As in *Doolin*, finding structural bias based on such an attenuated financial interest "would seriously undermine the ability of [other self-funding] agencies in general to adjudicate disputes."  53 F.3d at 1407.  Many agencies recover most or all of their costs through annual fees.  *See, e.g.*, Omnibus Appropriations Act of 2009, Pub. L. No. 111-8, 123 Stat. 524, 657 (all of Federal Communications Commission appropriations offset by regulatory fees); 12 U.S.C. § 2250 (annual assessment by Farm Credit Administration covers cost of administering programs); 42 U.S.C. § 2214 (90% of Nuclear Regulatory Commission budget authority offset by annual charges).[11]  Consequently, DRN's theory of bias "would bring down too many

---

[11] *See also* Independent Offices Appropriation Act, 31 U.S.C. § 9701(a) ("[E]ach service . . . provided by an agency . . . to a person . . . is to be self-sustaining to the extent possible . . . ."); *id.* § 902(a)(8) (similar).

procedures designed, and working well, for a governmental structure of great and growing complexity." *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

DRN makes two misguided attempts to bolster its allegations. First, the complaint cites a report critiquing the Minerals Management Service for focusing on revenue generation to the detriment of its regulatory goals. *See* Compl. ¶¶ 128-32. But that report explains that the Minerals Management Service had a completely different funding mechanism, in which the agency's revenues collected were directly tied to the number of leases sold and the number of producing wells from which royalty payments were collected. *See* National Commission on the BP Deepwater Horizon, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling: Report to the President* 56 (Jan. 2011). In contrast, the Commission's ability to collect revenue is fixed, because the statutory "true up" provision requires it "eliminate any overrecovery" that exceeds "its total costs." 42 U.S.C. § 7178(e). Second, the complaint cites what it characterizes as a decision by the Ninth Circuit, but in fact is only a concurring opinion by a single judge. *See* Compl. ¶¶ 133-37 (citing *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1024-26 (9th Cir. 2009) (Noonan, J., concurring)). The majority opinion gave no indication of accepting the concurrence's bias theory. Additionally, the agency adjudication in that case had a direct impact on the amount of funds available to the agency. *See id.* at 1020 (majority opinion). There was no volumetric charge or bar on overrecovery as there is with the Commission.

2.      Allegations Of Temptation Based On Potential Budget Shortfalls Decades In The Future Are "Too Remote And Insubstantial" To State A Claim.

The complaint also alleges that the Commission has a structural bias in favor of granting applications because, in the long run, the Commission must approve new pipelines in order to continue collecting fees pursuant to 42 U.S.C. § 7178. *See* Compl. ¶¶ 141-52. The complaint's reasoning relies on two factors playing out over the course of many years and decades: First,

because the "useful lifespan" of a pipeline is "roughly forty years," the number of pipelines available to pay annual fees will dwindle if the Commission does not grant new applications. *See id.* ¶¶ 144-45.   Second, the Commission's budgetary needs will rise due to increasing overhead costs and inflation.  *See id.* ¶¶ 147-48.   Combined, those two factors lead Plaintiffs to the flawed conclusion the Commission will have to grant applications for new pipeline projects to ensure enough operational pipelines to fund the portion of the Commission's budget that relies on fees collected pursuant to 42 U.S.C. § 7178.  Compl. ¶¶ 149-52.

This alleged temptation, which relies on a series of implausible inferences, is simply "too remote and insubstantial to violate the constitutional constraints."  *Aetna Life Ins. Co.*, 475 U.S. at 826 (internal quotation marks omitted).  To begin with, it ignores that pipeline infrastructure does not exist simply to fund the Commission, but rather to serve the proven and continuing need by consumers of natural gas, including local distribution companies and power generators.  The prospect of dwindling pipeline infrastructure is incompatible with the basic reality of this Nation's growing population and energy demand.

In any event, the theory implausibly assigns to the Commissioners a fixation on risk to the agency's long-term institutional interest that is well beyond what would tempt the "average" adjudicator.  *See Ward*, 409 U.S. at 60.  Specifically, Plaintiffs essentially allege that when the Commissioners assess individual applications for certificates of public convenience and necessity, they are driven by the concern that — if there are not enough meritorious applications over the coming years or decades (despite the reality of long-term population and demand growth), and if the Commission's budgetary costs continue to rise — then the Commission will face a budgetary shortfall decades in the future if it does not place a thumb on the scale to approve applications now.  The theory also assigns to the Commissioners the unrealistic and

unlikely expectation that Congress would penalize the Commission for falling short in its annual reimbursement obligations, despite the (posited) extreme market conditions that had led to a shortage of pipeline infrastructure.  No prior decision has recognized a structural-bias claim based on so remote and speculative a risk.  To permit Plaintiffs to bring structural-bias claims based on this kind of inference piling would move the doctrine well beyond its boundaries.

**B.     DRN's Allegations About Congressional And Executive Oversight Do Not Support A Claim For Relief**

DRN claims the alleged structural bias is "aggravate[d]" by a lack of oversight from the political branches.  Compl. ¶ 166.  In particular, the complaint alleges that:  (1) the Commission is not subject to budgetary oversight by Congress, *id.* ¶¶ 153-66; and (2) the Commissioners are not subject to at-will removal by the President, *id.* ¶¶ 167-74.

As an initial matter, these allegations do not themselves establish or contribute to a claim for relief based on structural bias.  Such a claim requires the existence of "a possible temptation to the average [adjudicator] which might lead him not to hold the balance nice, clear, and true." *Ward*, 409 U.S. at 60 (internal quotation marks omitted).  The alleged absence of oversight — whether from the legislature or the executive — is not itself a "temptation."  At most, such an absence would amount to a lack of a check on a temptation.  But without an actual temptation in the first instance, the absence of oversight is meaningless.  In any event, as explained above and by the Commission, the funding mechanism here does not create "a possible temptation." *See supra* Part VI.A; *see also* FERC Br. 6-8, 31-38.  Furthermore, the complaint offers no allegations to show that *political* oversight would make the Commission more neutral.  To the contrary, one important theory of tenure protection for independent agencies — whose legality the Supreme Court has repeatedly upheld — is that insulation from the political branches *increases* neutrality.

*See Humphrey's Ex'r v. United States*, 295 U.S. 602, 630 (1935); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 493-94 (2010).[12]

## VII.   Plaintiffs Fail To State A Claim For Relief Under An Actual Bias Theory

DRN also claims that the Commission has shown "actual bias" in its past or ongoing conduct regarding pipelines.  *See* Compl. ¶¶ 175-240.  As discussed above, this Court lacks jurisdiction over this claim under the exclusive appellate review provision in 15 U.S.C. § 717r(b) and the ripeness doctrine.  Even assuming otherwise, Plaintiffs have not stated a claim.  The actual-bias claim contains numerous allegations, but none supports a claim for relief under the Due Process Clause, and many are flatly contradicted by the public record and therefore cannot survive a motion to dismiss.  *See Covad Commc'ns Co.*, 407 F.3d at 1222.

### A.   The Complaint's Allegations Cannot Support DRN's Actual-Bias Claim

To begin with, none of the actual-bias allegations matter unless the complaint adequately alleges that the Commission's certificate approval process triggers the Due Process Clause by working a "deprivation" of a protected liberty or property interest of DRN or its members.  *See Gen. Elec. Co.*, 610 F.3d at 117.  It does not.  *See supra* Part V.

Even assuming otherwise, DRN's allegations do not support an actual-bias claim.  At most, they involve *past* actions by the Commission — either in certificate proceedings or in other regulatory contexts.  *See* Compl. ¶¶ 177-239.  But a proper actual-bias claim alleges that the decisionmaker or factfinder is actually biased in the proceeding at issue.  *See Jenkins v. Sterlacci*, 849 F.2d 627, 631 (D.C. Cir. 1988).  Here, the only pending proceeding that Plaintiffs have

---

[12] The suggestion that "[n]o other independent federal agency is equally free from congressional, executive, and internal oversight" (Compl. ¶ 173) is disproved by the organic statutes of other independent agencies — such as the Federal Reserve — whose "funding source is not only independent of Congress, but whose authority to use those funds is not conditioned on congressional budgetary approval."  *See* Charles Kruly, *Self-Funding and Agency Independence*, 81 Geo. Wash. L. Rev. 1733, 1735 & n.6 (2013) (emphasis omitted) (collecting statutes).

identified involves the PennEast Project.  Furthermore, even in the context of a judicial-style proceeding,[13] actual bias is usually established through "extra-judicial conduct or statements" by the judge in *that proceeding* "that are plainly inconsistent with his responsibilities as an impartial decisionmaker." *Id.* at 634.

In contrast, past "[adjudicative] rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555.  Normally, those past rulings "are proper grounds for appeal" in the past proceedings, and "not [grounds] for recusal." *Id.* (Here, of course, any appeal from prior Commission actions could have occurred only pursuant to the exclusive-review provision and time periods in 15 U.S.C. § 717r(b).)  Allegations based on past rulings will support an actual-bias claim only in "the rarest circumstances," where the past actions "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555.  Merely pointing to an "extraordinarily high" number of "[u]nfavorable rulings" is not enough.  *In re Beverly Hills Bancorp*, 752 F.2d 1334, 1341 (9th Cir. 1984); *In re IBM Corp.*, 618 F.2d 923, 929-30 (2d Cir. 1980) (holding that unfavorable rulings on 86% of oral motions and 93.6% of written motions did not establish bias).

DRN's allegations of the Commission's actions (and supposed errors) in past proceedings simply do not rise to the level required to state a claim for relief under an actual-bias theory connected to the PennEast Project.  The complaint makes no allegations concerning extrajudicial statements or conduct by the Commission in the current adjudicatory proceeding that show a bias in favor of PennEast or its pipeline project.  *See* Compl. ¶¶ 175-240.  Nor do the various allegations of past conduct demonstrate "such a high degree of favoritism . . . as to make fair

---

[13] Although the precedent discussed here addresses actual-bias claims in the judicial context, those precedents set a minimal standard for allegations of actual bias in the administrative context.  After all, agencies "cannot possibly be under stronger constitutional compulsions [from due process] than a court." *FTC v. Cement Inst.*, 333 U.S. 683, 702-03 (1948).

judgment impossible." *Liteky*, 510 U.S. at 555.  *See also* FERC Br. 19 (citing *NO Gas Pipeline* for proposition that applicants "are not likely to pursue . . . hopeless [applications]").

### B.    The Commission's Alleged 100% Approval Rate For Pipeline Applications

DRN alleges that, "[s]ince the funding mechanism was put in place, the Commission has **never** denied an application for a natural gas pipeline project that was submitted for vote to the Commissioners."  Compl. ¶ 179.  In DRN's view, this supposed 100% approval rate shows the Commission's actual bias for approving pipeline projects.  *Id.* ¶ 178.

### 1.    The Commission's Approval Rate Does Not Establish Actual Bias.

A high rate of favorable or unfavorable rulings does not demonstrate impermissible bias. *See supra* Part VII.A.  What's more, DRN does not identify any alleged error in a single past approval, let alone one that indicates bias.  DRN's barebones allegations have not overcome the "presumption of honesty and integrity in those serving as adjudicators."  *Caperton*, 556 U.S. at 891 (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)).[14]  They do not "state a claim to relief that is plausible on its face."  *Abdelfattah*, 787 F.3d at 533 (quoting *Iqbal*, 556 U.S. at 678).

Furthermore, DRN's fixation on mere outcome — whether the Commission granted a certificate or not — overlooks a key feature of 15 U.S.C. § 717f.  The statute does not limit the Commission to a simple "yes" or "no."  Instead, it gives the Commission "the power to attach to the issuance of the certificate . . . such reasonable terms and conditions as the public convenience

---

[14] To be sure, Rule 12(b)(6) generally requires the court to draw all reasonable inferences in favor of the nonmoving party.  *See Abdelfattah*, 787 F.3d at 533.  But the presumption of honesty and integrity is part of the substantive standard for a bias claim.  *See Caperton*, 556 U.S. at 891. And where the substantive law at issue contains presumptions that forbid certain inferences, or requires certain facts to establish an essential element, the court cannot draw inferences that contradict those substantive rules.  For example, in *Bell Atlantic Corp. v. Twombly*, the Court reviewed a Rule 12(b)(6) motion, but applied substantive antitrust law's presumption that mere joint collateral action is not the result of a conspiracy, and thus refused to infer the existence of a conspiracy based on allegations of parallel business behavior.  *See* 550 U.S. 544, 553-54 (2007).

and necessity may require." 15 U.S.C. § 717f(e).  The Commission routinely attaches a broad range of conditions to certificate orders, covering a broad range of issues.[15]  There is nothing wrong, from a due process perspective or otherwise, with the Commission's exercising that statutory authority.  *See Schweiker v. McClure*, 456 U.S. 188, 197 n.9 (1982).  In fact, attaching such conditions, where warranted, is part of the agency's "statutory duty."  *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 302 (1988).  What's more, attaching such conditions shows that the Commission properly considers and advances the public interest and does not, as DRN asserts, simply rubberstamp pipeline projects.  Yet the complaint contains no allegations about the frequency with which the Commission imposes such conditions before granting a certificate, or how that practice shows actual bias.  Therefore, the complaint's allegations do not establish the "high degree of favoritism" toward industry or "antagonism" toward the public interest that an actual-bias claim requires.  *See Liteky*, 510 U.S. at 555.

### 2. The Public Record Flatly Contradicts The Allegation.

DRN's conclusory allegation about the Commission's "100%" approval rate is flatly contradicted by the public record.  The public record shows the Commission has (1) denied certificate applications, (2) withheld authority, and (3) vacated authorizations.

First, the Commission has denied applications for certificates of public convenience and necessity numerous times since 42 U.S.C. § 7178 was enacted.  In fact, the Commissioners did so this year.  And they have denied certificates based on concerns about the impact on landowners or the environment — the very concerns DRN presumptively alleges the Commission ignores due to supposed bias.  *See* Compl. ¶¶ 119, 123-27.  To take a few examples:

---

[15] *E.g.*, *Constitution Pipeline Co. et al.*, 149 FERC ¶ 61,199, at App. ¶¶ 1-43 (2014) (order issuing certificates included 43 separate environmental conditions ranging from water quality and wetlands to noise and impacts on specific species).

28

- *Jordan Cove Energy Project, L.P.*, 154 FERC ¶ 61,190, at PP 38-41 (2016) (denying certificate for proposed pipeline associated with LNG export facility on the ground that the applicant's evidence of need for the pipeline did "not outweigh the potential for adverse impact on landowners and communities").

- *Turtle Bayou Gas Storage Co.*, 135 FERC ¶ 61,233, at P 34 (2011) (denying an application to construct and operate a natural gas storage facility because the applicant presented only general assertions about regional and national demand, which "does not outweigh the impact on the landowner that holds the majority of property rights needed to develop the proposed project").

- *Ozark Gas Transmission Sys.*, 43 FERC ¶ 61,443, at 62,109 (1988) (dismissing a portion of an application in part due to a lack of information on facilities necessary to complete the environmental assessment, which prevented a finding that the proposed service is required by the public convenience and necessity).

The public record thus flatly contradicts DRN's allegation that the Commission has "never denied an application for a natural gas pipeline that was submitted for vote to the Commissioners." Compl. ¶ 179 (emphasis omitted).

The Commission has also withheld certificate authority where the project applicant did not demonstrate sufficient market need in light of environmental or public convenience concerns:

- *Independence Pipeline Co. et al.*, 89 FERC ¶ 61,283, at 61,837 (1999) (deciding to "withhold[] our final approval of the authorizations requested by the applicants" because the applicant failed to demonstrate market need as required for the project), *on reh'g*, 91 FERC ¶ 61,102, at 61,336 (2000) (explaining that the Commission was requiring a higher level of firm contractual commitments — 35% of capacity as opposed to 25% used in other cases — in light of the greater disruption to the environment and landowners expected from construction of a 622-mile pipeline).

- *El Paso Nat. Gas Co.*, 65 FERC ¶ 61,276, at 62,270 (1993) (withholding approval of a pipeline's certificate applications due to a lack of "any hard evidence of market demand in the form of either executed contracts or binding precedent agreements for firm capacity"); *id*. at 62,271 ("[I]f an applicant cannot submit credible evidence . . . of long-term firm commitments for a substantial amount of the project's capacity, we do not believe that the public convenience and necessity requires certification of that project to the potential detriment of landowners in the path of the project.").

The public record thus demonstrates that the Commission takes its duties seriously and refuses to approve a certificate application where doing so would be inconsistent with the public interest, including effects on the environment and affected landowners.

The Commission has also vacated certificates where the applicant was unable to satisfy the conditions.  For example:

- *Greenbrier Pipeline Co.*, 119 FERC ¶ 61,016, at P 2 (2007) (vacating certificate because pipeline failed to meet condition of executing firm, long-term service agreements for 90 percent of the project's firm transportation capacity and also failed to meet environmental condition requiring implementation plan addressing required mitigation measures).

- *Chestnut Ridge Storage LLC*, 139 FERC ¶ 61,149, at P 8 n.9 (2012) (vacating certificate and explaining that "the data that underpin our conclusions on the need for a project . . . and its environmental impacts are subject to change. Thus, the validity of our conclusions and environmental mitigation conditions cannot be sustained indefinitely. Accordingly, when we issue a certificate authorizing a project, the certificate comes with an expiration date"); *id*. at P 10 (justifying the Commission's decision not to extend the timeframe for construction because the pending certificate "can constrain landowners within the certificated boundaries from pursuing activities that could prove incompatible with the project's construction or operation").

- *Independence Pipeline Co. et al.*, 92 FERC ¶ 61,022, at 61,049 (2000) (issuing certificates subject to the condition that developers file executed contracts for 68.2 and 71.7 percent of capacity, respectively), *vacated*, 100 FERC ¶ 61,082 (2002) (vacating certificates after developers indicated an inability to comply with the requirement to execute firm contracts before construction).

Thus, the public record demonstrates that the Commission continues to take its statutory duty seriously after the initial decision to approve a certificate application.

Given the conclusory nature of the complaint's allegations regarding the Commission's approval rate, and the clear public record showing that the Commission has conditioned, denied, withheld, and vacated certificates, the complaint has not overcome the general "presumption of honesty and integrity in those serving as adjudicators."  *See Caperton*, 556 U.S. at 891 (quoting *Withrow*, 421 U.S. at 47).  Nor has it alleged facts sufficient to establish the "high degree of

favoritism" toward industry or "antagonism" toward the public interest that an actual-bias claim requires. *See Liteky*, 510 U.S. at 555.

### C.  The Commission's Alleged Failure To Enforce Certificate Conditions

DRN similarly alleges that the Commission "has **never** issued a civil penalty for violations related to construction, maintenance, or operational misconduct for any pipeline project despite noncompliance events." Compl. ¶ 185.  In DRN's view, this allegation shows that DRN is biased in favor of industry in the certificate-approval process. *See id.* ¶ 181.  But DRN's allegation is both irrelevant and untrue.

#### 1.  The Commission's Use Of Other Means To Enforce Certificate Conditions Does Not Suggest Actual Bias.

For starters, DRN does not offer any allegation or explanation identifying why the frequency of civil penalties is an indicator of the Commission's bias toward industry.  In the context of 15 U.S.C. § 717f, the Commission's "statutory duty" is to "attach 'to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require.'"  *Schneidewind*, 485 U.S. at 302 (quoting 15 U.S.C. § 717f(e)).  There is no statutory duty to levy civil penalties against certificate holders who do not comply with their conditions — only a general duty to ensure that the certificate holders' exercise of their rights complies with their certificates' conditions.

The Commission has a range of "enforcement tools" to foster compliance.  *Enforcement of Statutes, Regulations and Orders*, 123 FERC ¶ 61,156, at P 6 (2008).  Those tools include:

(1) "requiring corrective actions" and remediation, *Transcontinental Gas Pipe Line Co.*, 149 FERC ¶ 61,258, at P 41 (2014);

(2) "stoppage of work where warranted" (*id.*), i.e. a "stop-work" order, *id.* at App. B;

(3) "withholding authorization to place facilities into service . . . until all pre-conditions have been satisfied and rehabilitation and restoration is proceeding satisfactorily," *id.* at P 41;

(4) "imposition of compliance plans," 123 FERC ¶ 61,156, at P 6;

(5) "disgorgement of unjust profits," *id.*;

(6) "the ability to condition, suspend, or revoke . . . certificate authority," *id.*; and

(7) "the ability to refer matters to the Department of Justice for criminal prosecution," *id.*

Thus, as the Commission itself explained in rejecting a similar argument by DRN in an agency proceeding, "civil penalties are but one of the tools the Commission may use to achieve compliance with Commission orders." *Transcontinental*, 149 FERC ¶ 61,258, at P 41. And it "routinely utilizes other tools to achieve compliance with environmental requirements." *Id.*

The public record confirms that the Commission routinely uses those mechanisms to correct noncompliance with certificate conditions. For example, the Commission has often required compliance with environmental conditions:

- *Hamilton v. El Paso Nat. Gas Co.*, 141 FERC ¶ 61,229, at PP 1, 29 (2012) (requiring a pipeline to perform remedial compaction and restoration work where the pipeline left a landowner's property in a disturbed condition in violation of Commission regulations and its obligation as a certificate holder to restore disturbed property).

- *Petal Gas Storage Co.*, 64 FERC ¶ 61,190, at 62,574 (1993) (after an inspection showed erosion was occurring in a right of way, the Commission required an applicant to implement erosion control measures, which the applicant subsequently implemented).

- *Columbia Gas Transmission Co.*, 103 FERC ¶ 61,094, at PP 1, 11 (2003) (rejecting a compliance filing in part because "Columbia is in violation of [an] environmental [c]ondition" requiring prior written authorization of the Director of the Office of Energy Projects before commencement of service, which is only granted after restoration begins).

- Environmental Compliance Monitoring Report Regarding the Virginia Southside Expansion Project at 6, *Transcontinental Gas Pipe Line Co.*, Docket No. CP13-30-000 (May 21, 2015) (recognizing that the lead environmental inspector "immediately called for an environmental stand-down to address the issue with the Contractor" regarding removal of tree stumps and digging in wetlands).

Similarly, the Commission takes action to enforce compliance with cultural conditions:

- Letter from Office of Energy Projects, FERC, to Rendezvous Pipeline Co. re Certificate Conditions Violation, Docket No. CP05-40-000 (July 21, 2006) (finding a violation of certificate environmental conditions due to a failure to protect archaeological resources and to obtain prior approval of the Office of Energy Projects before excavations, and providing that Rendezvous "may not conduct any construction activities . . . [on] the portion of the pipeline through [the affected] archaeological site. . . until we complete our investigation and specifically notify Rendezvous in writing that construction may proceed through this area").

- Notice to Proceed with Abandonment and Partial Construction of Line 1896 - Rock Springs Expansion Project, *Transcontinental Gas Pipe Line Co.*, Docket No. CP02-142-000 (May 21, 2003) (prohibiting construction between specified mileposts where the Advisory Council on Historic Preservation had not yet reviewed information regarding a specified site).

The public record shows the Commission routinely enforces certificate conditions.

DRN offers no allegation or explanation as to why using these enforcement tools, instead of seeking civil penalties, shows bias in favor of industry. There are many legitimate reasons why an agency may prefer one method of enforcement to another, including the need to conserve resources and the relative effectiveness of the various enforcement methods. *See generally Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985). Without any factual allegations establishing that the Commission has chosen its enforcement methods based on impermissible reasons, the complaint has not overcome the general "presumption of honesty and integrity in those serving as adjudicators." *See Caperton*, 556 U.S. at 891 (quoting *Withrow*, 421 U.S. at 47).

2.   The Public Record Flatly Contradicts The Allegation.

In any event, the public record directly contradicts DRN's claim that the Commission has never issued a civil penalty to a pipeline company for failure to comply with a certificate's conditions. To take just a few examples:

- *Picor Pipeline Co.*, 65 FERC ¶ 61,421, at 63,154-55 (1993) (approving a settlement under which Picor "will pay a civil penalty of $80,000" among other remedies for failure to obtain required environmental and cultural resources clearances before construction, including consultation under the Endangered Species Act, even though there was "no indication that the construction of the Pipeline harmed any species

protected under the Endangered Species Act or harmed any cultural resources eligible for inclusion in the National Register of Historic Places").

- *Enogex, Inc. et al.*, 105 FERC ¶ 61,308, at 62,475 (2003) (after self-reported violations of regulations requiring other agencies' environmental clearances for pipeline construction, approving a settlement imposing a civil penalty of a minimum of $80,000 among other requirements, although "[n]one of the clearances indicated that these projects harmed the environment or cultural resources").

- *Ozark Gas Transmission Sys.*, 40 FERC ¶ 61,129, at 61,376-77 (1987) (approving a stipulation requiring, among other remedies, that a pipeline (1) pay $4,460,000 to its customers for expenses resulting from the pipeline's failure to comply with a certificate condition regarding erosion and restoration and other violations, and (2) donate $40,000 to a state agency for the pipeline's construction in a "remnant tallgrass prairie" that deviated from alignment sheets).

- *Tennessee Gas Pipeline Co.*, 85 FERC ¶ 61,246, at 62,024-25 (1998) (approving a stipulation that prohibited recovery through rates of $1,138,281.70 in costs related to the pipeline's investigation of its noncompliance and required payment of $325,000 to the U.S. Treasury to cover costs of the Commission's investigation after a pipeline failed to obtain and follow environmental clearances).

- *Iroquois Gas Transmission Sys., L.P.*, 75 FERC ¶ 61,205, at 61,671 (1996) (after pipeline failed to clean up water bodies, wetlands and other disturbed areas, among other environmental violations, the Commission approved a stipulation requiring the pipeline to bear the burden of correcting the violations by eliminating $2,004,656 from an account used to derive rates).

These "facts on the public record" indisputably show that DRN's allegation cannot support a claim for relief.  *See Covad Commc'ns*, 407 F.3d at 1222.

In sum, DRN's allegations have not made out an actual-bias claim based on the Commission's track record for enforcing the conditions of certificates.  Between the complaint's conclusory allegations and the judicially noticeable facts in the public record, the complaint does not come close to alleging facts establishing the "high degree of favoritism or antagonism" required for an actual-bias claim.  *See Liteky*, 510 U.S. at 555.

### D.  The Commission's Alleged Use Of Tolling Orders

DRN further alleges that the Commission uses "tolling orders" and allows work on pipeline projects to proceed before acting on the merits of a rehearing application, as a means to

avoid or frustrate judicial review.  *See* Compl. ¶¶ 191-209.  In DRN's view, this practice not only demonstrates actual bias, but also constitutes a standalone due process violation.  Neither is true.

1.    The Use Of Tolling Orders Does Not Establish Actual Bias.

To begin, the complaint does not contain any factual allegations that demonstrate the "high degree of favoritism or antagonism" required for an actual-bias claim.  *See Liteky*, 510 U.S. at 555.  The complaint merely alleges that the Commission issues "tolling orders" that avoid rehearing requests being deemed denied under the 30-day default period provided in the Commission's rules.  *See* 18 C.F.R. § 385.713(f) ("Unless the Commission acts upon a request for rehearing within 30 days after the request is filed, the request is denied.").  The complaint further alleges that the Commission permits pipeline projects to proceed with construction while the Commission considers the merits of the application for rehearing.

This is perfectly permissible under the plain language of the statute.  Congress expressly provided that "[t]he filing of an application for rehearing . . . shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order."  15 U.S.C. § 717r(c).  Since as early as 1969, the Commission's use of such tolling orders was seen as a "long standing" practice and "a time honored interpretation" of the statute "worthy of judicial deference."  *California Co. v. Fed. Power Comm'n*, 411 F.2d 720, 721-22 (D.C. Cir. 1969).  Rather than showing bias toward the certificate holder, the use of tolling orders allows the Commission to "giv[e] careful and mature consideration" to the arguments raised in the application for rehearing, *id.* at 721 — which often involve hundreds of pages of detailed legal and factual arguments.  *E.g.*, Requests for Rehearing by Delaware Riverkeeper Network, *Tennessee Gas Pipeline Co.*, Docket CP-11-161-001 (June 28, 2012 & Dec. 18, 2015) (two requests for rehearing totaling 490 pages, with exhibits).

35

Every court of appeals to consider the issue — including the D.C. Circuit — has upheld the use of tolling orders. *See California Co.*, 411 F.2d at 721-22; *Cal. Utils. Ass'n v. FERC*, No. 01-1156, 2001 WL 936359, at *1 (D.C. Cir. July 31, 2001); *Gen. Am. Oil Co. of Tex. v. Fed. Power Comm'n.*, 409 F.2d 597, 599 (5th Cir. 1969); *see also Kokajko v. FERC*, 837 F.2d 524, 525-26 (1st Cir. 1988) (same; for identical provision of the closely related Federal Power Act). If an agency action is lawful, it is not evidence of actual bias. *See Liteky*, 510 U.S. at 555. Furthermore, the fact that the complaint merely alleges that the Commission has used tolling orders consistently — without alleging facts showing that bias or animosity played a role in the use of those orders — means that the complaint has not overcome the general "presumption of honesty and integrity in those serving as adjudicators." *See Caperton*, 556 U.S. at 891 (quoting *Withrow*, 421 U.S. at 47). Thus, it has not stated a claim for relief.

2.  The Commission's Use Of Tolling Orders Does Not Violate Due Process Or Deprive Project Opponents Of An Opportunity For Judicial Review.

DRN also claims that the use of tolling orders "is, by itself, a gross deprivation of Due Process." Compl. ¶ 203. DRN bases its claim on the assertion that parties who participate in the hearing before the Commission have a "right to have their day in court prior to construction proceeding on the project they seek to challenge." *Id.* ¶ 271.

To begin with, DRN's claim relies on the mistaken premise that the use of tolling orders denies DRN and its members "an opportunity of being heard." Compl. ¶ 203. That allegation is incorrect as a matter of law. Congress expressly provided that parties aggrieved by a Commission order must seek rehearing from the agency before going to court, and that applications for rehearing do not stay certificate orders unless the Commission provides otherwise. 15 U.S.C. § 717r(c). Aggrieved parties seeking to prevent construction from proceeding until the Commission acts on rehearing can — and routinely do — seek a stay. *Id.*

To be sure, an aggrieved party may not petition for review of the Certificate Order until the Commission has acted on rehearing. *Id.* § 717r(b). But DRN and other project opponents are not without judicial recourse. If the Commission denies a stay, a project opponent can seek a writ of mandamus from the appropriate U.S. Court of Appeals. In *Town of Dedham v. FERC*, No. 15-cv-12352-GAO, 2015 WL 4274884 (D. Mass. July 15, 2015), the district court dismissed for lack of jurisdiction a related attempt to interfere with the Commission's ongoing certificate process. But the court emphasized that "[u]nder the All Writs Act, [a project opponent] may apply to the Court of Appeals for, and that Court may grant, ancillary relief in aid of its future jurisdiction" even before the Commission has acted on a rehearing request. *Id.* at *2. Of course, the standard for relief under the All Writs Act is extremely high. *E.g.*, *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 380-81 (2004); Order, *In re Stop the Pipeline*, No. 15-926 (2d Cir. Apr. 21, 2015) (summarily denying mandamus where petitioner sought to force FERC to act on a rehearing request or deem the request denied).

Given the availability of both administrative and judicial relief while a request for rehearing is pending, DRN's complaint can only be about the delay in adjudicating a formal petition for review pursuant to § 717r(b). But whatever protection the Due Process Clause provides, it does not give DRN the right to its preferred form of judicial review before the Commission moves forward on a pipeline project. As decisions by the D.C. Circuit and other courts make clear, the Natural Gas Act does not vest DRN with a statutory right to a specific form of judicial review prior to the beginning of construction on a pipeline project. *See California Co.*, 411 F.2d at 721-22; *supra* Part VII.D.1 (collecting cases).

Even if DRN did *not* have recourse to administrative and judicial relief while rehearing requests are pending, mere delay of the form of judicial review provided under § 717r(b) would

not violate due process here.  "Where only property rights are involved, *mere postponement of the judicial enquiry is not a denial of due process*, if the opportunity given for the ultimate judicial determination of the liability is adequate."  *Phillips v. Comm'r*, 283 U.S. 589, 596-97 (1931) (emphasis added).  Indeed, the First Circuit has specifically rejected the argument that this kind of tolling violates the Due Process Clause.  *See Kokajko*, 837 F.2d at 525-26.  In any event, Plaintiffs' purely procedural right to appeal is not a substantive liberty interest that supports a due process claim.  *See Brandon*, 823 F.2d at 648.

Thus, the complaint's allegations regarding tolling orders fail to state a claim for relief.

### E.    The Commission's Alleged Pre-Judgment Of NEPA Analyses

Plaintiffs next allege that the Commission demonstrates actual bias in favor of pipelines because it sometimes prepares a full Environmental Impact Statement ("EIS") without first preparing an Environmental Assessment ("EA").  Compl. ¶¶ 210-18.  Plaintiffs cite 40 C.F.R. § 1501.4 for the proposition that the Commission must prepare an EA as "the vehicle to determine when an [EIS] is necessary." *Id*. ¶¶ 212-15.  These allegations do not establish or support a claim of actual bias.

To begin with, these allegations, like many others in the complaint, at most constitute alleged errors by the Commission in other past proceedings that would have been grounds for appeal under 15 U.S.C. § 717r(b).  But such "rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555.

Even assuming otherwise, the allegations do not support a claim of bias.  NEPA requires agencies "to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57 (2004).  NEPA's core obligation is that agencies prepare "a detailed statement" of the "environmental impact[s] of [a] proposed action." 42 U.S.C. § 4332(2)(C).  "This detailed statement is called an Environmental Impact Statement

(EIS)." *Pub. Citizen*, 541 U.S. at 757.  However, "if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS," then Council on Environmental Quality regulations instead "allow an agency to prepare a more limited document, an Environmental Assessment (EA)." *Id.* Typically, disputes over the adequacy of an agency's environmental review focus on a decision to prepare *only* an EA and "finding of no significant impact" — i.e., a party will allege that the agency was required to prepare a more comprehensive EIS.  *E.g.*, *TOMAC, Taxpayers of Mich. Against Casinos v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006).

To the extent Plaintiffs allege that the Commission shows actual bias by declining to prepare an EIS, and instead relying on an EA, they have failed to make an actionable allegation as to the PennEast project, the only proceeding at issue, *see Sterlacci*, 849 F.2d at 631.  The public record clearly shows that the Commission is currently preparing a full EIS for PennEast. *See* Notice of Schedule for Environmental Review of the PennEast Pipeline Project, 81 Fed. Reg. 19,167, 19,167 (Apr. 4, 2016) ("On January 13, 2015, the Commission issued, in th[e] [PennEast] docket, a *Notice of Intent to Prepare an Environmental Impact Statement for the Planned PennEast Pipeline Project, Request for Comments on Environmental Issues, and Notice of Public Scoping Meetings* (NOI).").

To the extent the Plaintiffs perceive "actual bias" in the Commission's decision to prepare a comprehensive EIS without first preparing a "more limited" EA (*Public Citizen*, 541 U.S. at 757), they misperceive NEPA's legal obligations.  Where an agency has elected to prepare an EIS, that document is the means by which a court analyzes compliance with NEPA, because the "detailed statement" of environmental effects that NEPA requires, 42 U.S.C. § 4332(2)(C), "is called an [EIS]," *Pub. Citizen*, 541 U.S. at 757.  NEPA does not require the

preparation of an EA prior to an EIS. *E.g.*, Daniel R. Mandelker et al., *NEPA Law and Litigation* § 7:11 (2d ed. 2015) ("Agencies may also decide not to prepare an environmental assessment. They rely instead on their basic threshold environmental impact statement criteria to determine the need for an impact statement."); *see also id.* ("An environmental assessment must be prepared unless the agency has decided to prepare an impact statement . . . ."). Plaintiffs cite no case or authority to the contrary.[16]

### F.      The Commission's Allegedly Biased Pipeline Policy Statement

The complaint next alleges actual bias by offering a single heavily edited quote from a 1999 Commission policy statement. *See* Compl. ¶¶ 219-20.  Plaintiffs allege that the Commission's objective in conducting hearings "is for the applicant to develop whatever record is necessary . . . for the Commission to be able to find that the benefits to the public from the project outweigh the adverse impact on the relevant interests." *Id.* ¶ 220 (alteration in original) (emphasis omitted) (quoting Statement of Policy, 88 FERC ¶ 61,227, at 26 (Sept. 15, 1999)).  In Plaintiffs' view, this quotation shows that the Commission slants hearings to find favorable evidence for industry-applicants and to exclude unfavorable evidence. *See id.* ¶¶ 221-23.

To begin with, the complaint does not allege that the Commission relied on this aspect of the policy statement in the only proceeding identified here — i.e., the PennEast Project.  Even

---

[16] In passing, Plaintiffs allege "actual bias" in the Commission's ongoing environmental review of the "Atlantic Bridge Project," citing a letter to Senator Warren that Plaintiffs believe shows the Commission misunderstands its NEPA obligations. *See* Compl. ¶ 216.  But an agency can "meet [its] responsibilities under the [NEPA]" (Compl. ¶ 216) by "prepar[ing] a[n EA]," *Public Citizen*, 541 U.S. at 757.  Plaintiffs make no specific substantive allegations to suggest an EA is improper for the Atlantic Bridge Project.  Such a claim would not be ripe, because that review is ongoing. *See Algonquin Gas Transmission, LLC et al.*, Notice of Availability of the Environmental Assessment for the Atlantic Bridge Project, Docket No. CP16-9-000 (May 2, 2106) (setting deadline of June 1, 2016 for comments on Environmental Assessment).  Plaintiffs can, of course, raise any properly-preserved NEPA and "actual bias" claims only under 15 U.S.C. § 717r(b), if and when the Commission decides to issue a certificate for that project and denies any timely requests for rehearing.

assuming otherwise, the allegation is meritless.  If the quote is read in full, the policy statement

plainly does not have the import DRN claims.  The policy statement provides, in pertinent part:

> The more interests adversely affected or the more adverse impact a project would
> have on a particular interest, the greater the showing of public benefits from the
> project required to balance the adverse impact.  The objective is for the applicant
> to develop whatever record is necessary, *and for the Commission to impose
> whatever conditions are necessary*, for the Commission to be able to find that the
> benefits to the public from the project outweigh the adverse impact on the
> relevant interests.

No. PL99-3-000, 88 FERC ¶ 61,227, at 61,749 (emphasis added).   The full statement is

consistent with the "statutory duty" of the Commission.  *See Schneidewind*, 485 U.S. at 302

(discussing 15 U.S.C. § 717f(e)).  In addition, the full statement emphasizes the Commission's

duty to "consider the effects of the project on all the affected interests," including "the general

societal interests."  88 FERC ¶ 61,227, at ¶ 61,747.  It also stresses the obligation to consider

both "the interests of the landowners and the surrounding community," as well as "the

environmental impacts of a project."  *Id.* at 61,748.  PennEast is not aware of any authority

raising any similar concern about the policy statement in the 17 years since it was adopted.

The complaint's single, misleading quotation does not demonstrate the "high degree of

favoritism or antagonism" required to state a claim for actual bias.  *See Liteky*, 510 U.S. at 555.

### G.  The Commission's Alleged Failure To Request Funds For The Office Of Public Participation

The Complaint also alleges that the Commission has shown actual bias in favor of

industry by never requesting funding for, or allocating funds to, the Office of Public Participation

— an office that Congress created in 1978 but chose never to fund.  *See* Compl. ¶¶ 224-29.  In

DRN's view, this is "inexcusabl[e]" and a clear sign of bias in favor of industry.  *Id.* ¶¶ 227, 229-

30.  But there are many legitimate reasons why the Commission could view its regulatory goals

as better served by prioritizing other portions of the agency when making budgetary requests, or

allocating its limited funds.  To state a plausible claim for relief, DRN cannot simply assert that

the Commission has never asked for funding and then ask this Court to supply the logical leap

that the reason must be bias  *See Caperton, Inc.*, 556 U.S. at 891 (stressing the "presumption of

honesty and integrity" (quoting *Withrow*, 421 U.S. at 47)).

Furthermore, the public record again flatly contradicts DRN's allegation.  In 2009, the

Commission's Chairman recommended that Congress consider funding the Office.  *See Hearing

on S. 1733 Before the S. Comm. on Env't and Pub. Works*, 111th Cong. 8 (Oct. 27, 2009)

(testimony of Jon Wellinghoff, Chairman, Fed. Energy Regulatory Comm'n),

http://www.ferc.gov/EventCalendar/Files/20091027115535-Wellinghoff-10-27-09.pdf.        The

allegation therefore has not established the "high degree of favoritism or antagonism" necessary

to state an actual-bias claim.  *See Liteky*, 510 U.S. at 555.

## VIII.   The Allegations About Eminent Domain And Preemption Fail To State A Claim For Relief.

Finally, DRN alleges that the Commission's supposed bias "is compounded and enabled"

by the eminent domain power in 15 U.S.C. § 717f, and the Natural Gas Act's general preemptive

effect on state and local laws.  Compl. ¶ 241.  The complaint admits that these allegations are not

a freestanding claim for relief, but instead merely an alternative *remedy* for the sole pleaded

claim of bias.  *See id.* ¶ 261 (explaining that "the Court could *mitigate* the constitutional

violation by removing or reducing the Commission's other powers" (emphasis added)).

Plaintiffs do not allege that the eminent domain power or preemptive effect violates the Due

Process Clause.  Given that the complaint has not otherwise stated a claim for relief under a

structural- or actual-bias theory, *see supra* Parts V-VII, the allegations in paragraphs 241 to 261

are irrelevant.  *See* Compl. ¶¶ 241-61.  Nevertheless, they fail to state a claim for relief.

42

As an initial matter, neither the exercise of federal eminent domain power, nor the preemptive authority that comes from exercising that federal power, offends the Due Process Clause. As explained above, *see supra* Part V.B, where federal eminent domain power is exercised to condemn real property through a judicial condemnation, the Fifth Amendment simply requires that a property owner be: (1) afforded adequate notice of the judicial condemnation, and (2) awarded just compensation. *See Phillips*, 283 U.S. at 596-97; *Presley*, 464 F.3d at 489-90. The complaint does not contain any factual allegations establishing that the (hypothetical future) judicial proceedings under 15 U.S.C. § 717f(h) fail to meet that standard.

As for the Natural Gas Act's preemptive effect on state or local laws that operate in a preempted field, or conflict with or unreasonably delay Commission-authorized projects, preemption of state-law rights in property does not offend the Due Process Clause. That is a necessary result of how the Supremacy Clause functions. *See* U.S. Const. art. VI, cl. 2. A due process claim requires a deprivation of a protected property interest, which means the interest must be grounded in "an independent source such as state law." *Gen. Elec. Co.*, 610 F.3d at 119. But when the state law that supports a property interest is preempted, the Supremacy Clause invalidates the independent source for the property interest and thereby eliminates any due process claim. *Cf. FDIC v. Shain, Schaffer & Rafanello*, 944 F.2d 129, 136 (3d Cir. 1991) (holding that the state-law right was eliminated when the state law was preempted, thereby eliminating any due process claim based on the right). So the allegations regarding eminent domain and preemption cannot afford a basis for a claim to relief under the Due Process Clause.

The complaint also misunderstands the Natural Gas Act's statutory structure. DRN attempts to characterize eminent domain power as being conferred by the Commission. *See* Compl. ¶ 244. But it is Congress — not the Commission — that has vested certificate holders

with eminent domain authority. *See* 15 U.S.C. § 717f(a), (h); *Thatcher v. Tenn. Gas Transmission Co.*, 180 F.2d 644, 648 (5th Cir. 1950). Certificate holders are licensees authorized by Congress. *See, e.g.*, *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 120 (1960) (interpreting an analogous FPA provision); *Chapman v. Pub. Util. Dist. No. 1*, 367 F.2d 163, 167 (9th Cir. 1966) (same). So the power of eminent domain, and the NGA's preemptive effects, flow from Congress — not an allegedly biased agency decisionmaker.

Plaintiffs misunderstand the statutory right of eminent domain in other ways. Far from being "wield[ed] whenever, and however, the project applicant sees fit," Compl. ¶ 244, the geographic scope of eminent domain authority is limited to areas specified in the Commission's certificate order. *E.g.*, *Magnolia LNG LLC, et al.*, 155 FERC ¶ 61,033, at App. P. 5 (2016) (exercise of eminent domain "must be consistent with" alignment sheets showing facilities approved by Commission). And far from "bypass[ing] the traditional avenue for securing eminent domain rights through a federal or state judicial proceeding," Compl. ¶ 246, the Natural Gas Act requires that proceedings occur "in the district court of the United States for the district in which such property may be located, or in the State courts." 15 U.S.C. § 717f(h).

The suggestion that this Court declare unconstitutional the Natural Gas Act's preemptive effect on state and local laws (Compl. p. 60) must fail for the added reason that this Court lacks authority to overrule decisions of the Supreme Court and courts of appeals holding that such laws are preempted. *E.g.*, *Schneidewind*, 485 U.S. at 310; *see also Nat'l Fuel Gas Supply Corp. v. Pub. Serv. Comm'n*, 894 F.2d 571, 575-79 (2d Cir. 1990). In any event, as the Commission has explained, "[t]he federal regulatory scheme could not function if state law was allowed to prohibit takings by eminent domain for gas facilities" or otherwise interfere with Commission-certificated projects. *Millennium Pipeline Co. et al.*, 100 FERC ¶ 61,277, at P 96 (2002).

In the end, eminent domain and preemptive authority have no connection to adjudicative bias.   Both are powers of the federal government — not processes to which the neutral adjudicator requirement could attach.   DRN cites no authority, and PennEast is aware of none, suggesting a link between adjudicative bias and either eminent domain or preemptive authority. The allegations therefore cannot support the complaint's claim for relief.

## IX.   Conclusion.

This Court should dismiss the complaint in its entirety, for lack of jurisdiction or failure to state a claim on which relief can be granted.

Respectfully submitted,

May 10, 2016

*/s/ Michael B. Wigmore*
Michael B. Wigmore (D.C. Bar No. 436114)
Jeremy C. Marwell (D.C. Bar No. 1000299)
VINSON & ELKINS LLP
2200 Pennsylvania Avenue, NW
Suite 500 West
Washington, DC 20037
Phone: 202.639.6500
Email: mwigmore@velaw.com

*Attorneys for PennEast Pipeline Company, LLC*

*Of Counsel:*

Frank H. Markle
PENNEAST PIPELINE COMPANY, LLC
460 North Gulph Road
King of Prussia, PA 19406
Phone: 610.768.3625
Email: marklef@ugicorp.com

James D. Seegers
Sabina Dugal Walia
VINSON & ELKINS LLP
1001 Fannin St.
Suite 2500
Houston, TX 77002
Phone: 713.758.2939
Email: jseegers@velaw.com

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DELAWARE RIVERKEEPER )
NETWORK, *et al.*, )
)
    Plaintiffs, )
)
           v. )     Civil Action No. 1:16-cv-00416-TSC
)
FEDERAL ENERGY REGULATORY )
COMMISSION, *et al.*, )
)
    Defendants. )
)

## [PROPOSED] ORDER GRANTING PENNEAST PIPELINE COMPANY, LLC'S MOTION TO DISMISS

Upon consideration of the Motion to Dismiss Plaintiffs' Complaint and the accompanying memorandum of points and authorities filed by Defendant-Intervenor PennEast Pipeline Company, IT IS HEREBY **ORDERED** that Defendant-Intervenor's Motion is GRANTED and Plaintiffs' Complaint is **DISMISSED**.

 

_____
TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE