# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DELAWARE RIVERKEEPER NETWORK, *et al.*, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| FEDERAL ENERGY REGULATORY COMMISSION, *et al.*, | ) ) |
| | ) ) |
| Defendants. | ) ) ) ) |

Civil Action No. 1:16-cv-416-TSC

**BRIEF OF *AMICUS CURIAE* THE INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA IN SUPPORT OF DEFENDANTS**

Richard D. Klingler (D.C. Bar No. 438908)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8063
rklingler@sidley.com

*Counsel for The Interstate
Natural Gas Association of
America*

May 27, 2016

## CORPORATE DISCLOSURE STATEMENT

The Interstate Natural Gas Association of America has no parent corporation.  No publicly-held company owns more than ten percent of its stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..............................................................i

TABLE OF AUTHORITIES................................................................................iii

INTEREST OF *AMICUS CURIAE* ...............................................................1

SUMMARY OF ARGUMENT.......................................................................1

I.  PLAINTIFFS LACK STANDING TO CHALLENGE THE IMPLEMENTATION OF THE NATURAL GAS ACT AND THIS COURT LACKS JURISDICTION OVER AN ACTUAL BIAS CLAIM ..............................................................................3

II. THE COMMERCIAL, STATUTORY, AND REGULATORY CONTEXT SURROUNDING THE DEVELOPMENT OF NATURAL GAS PIPELINES AND FERC'S CERTIFICATION PROCESS PRECLUDES PLAINTIFFS' THEORY OF "STRUCTURAL BIAS." ...........................................................................5

    A.  The Scale and Dynamics of the Natural Gas Pipeline Industry..............................5

    B.  FERC's Implementation of the Natural Gas Act....................................................7

    C.  The Cost Recovery Established by the 1986 Budget Act Precludes A Claim of "Structural Bias."................................................................................13

    D.  Any Possible Effect of the Charge Structure on FERC Decisionmaking Falls Far Short of Structural Bias Under the Due Process Clause.......................................15

CONCLUSION .........................................................................................19

## TABLE OF AUTHORITIES

Page

**Cases**

*Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*,
    114 F.3d 840 (9th Cir. 1997) .................................................................................16

*Am. Mfr. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) ..............................................................................................15

*Am. Council of Life Insurers v. D.C. Health Benefit Exch. Auth.*,
    815 F.3d 17 (D.C. Cir. 2016)................................................................................17

*Ass'n of Am. Physicians & Surgeons, Inc. v. U.S. Dep't of Health & Human
    Servs.*,
    2006 WL 2882707 (D.D.C. Oct. 6, 2006) ..............................................................4

*Caperton v. AT Massey Coal Co.*,
    556 U.S. 868 (2009) .............................................................................................16

*Commonwealth of N. Mariana Islands v. Kaipat*,
    94 F.3d 574 (9th Cir. 1996) ..................................................................................16

*Dugan v. Ohio*,
    277 U.S. 61 (1928) ...............................................................................................16

*Fertilizer Inst. v. EPA*,
    938 F.Supp. 52 (D.D.C. 1996)................................................................................3

*Gibson v. Berryhill*,
    411 U.S. 564 (1973) .............................................................................................16

*Great Lakes Gas Transmission v. FERC*,
    984 F.2d 426 (D.C. Cir. 1993)................................................................................8

*Lucky Dogs LLC v. City of Santa Rosa*,
    913 F. Supp. 2d 853 (N.D. Cal. 2012)..................................................................16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...........................................................................................3, 4

*Mallinckdrodt v. Little*,
    616 F. Supp. 2d 128 (D. Me. 2009) ......................................................................17

*Marshall v. Jerrico, Inc.*,
    446 U.S. 238 (1980) .............................................................................................16

*Minisink Residents. for Envtl. Pres. v. FERC,*
   762 F.3d 97 (D.C. Cir. 2014)................................................................7

*Myersville Citizens for a Rural Cmty. v. FERC,*
   783 F.3d 1301 (D.C. Cir. 2015)...........................................................8

*Nat'l Cable Television Ass'n, Inc. v. United States,*
   415 U.S. 336 (1974) ............................................................................17

*NO Gas Pipeline v. FERC,*
   756 F.3d 764 (D.C. Cir. 2014)..........................................................4, 9

*Physicians' Educ. Network, Inc. v. Dep't of Health, Educ.& Welfare,*
   653 F.2d 621 (D.C. Cir. 1981)..............................................................4

*Richardson v. Perales,*
   402 U.S. 389 (1971) ............................................................................19

*San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.,*
   967 F.2d 683 (1st Cir. 1992)...............................................................17

*Summers v. Earth Island Inst.,*
   555 U.S. 488 (2009) ..............................................................................3

*Tumey v. Ohio,*
   273 U.S. 437 (1927) ......................................................................15, 16

*United States v. Benitez-Villafuerte,*
   186 F.3d 651 (5th Cir. 1999) ..........................................................16, 17

*Van Harken v. City of Chi.,*
   103 F.3d 1346 (7th Cir. 1997) ...........................................................16

**Statutes**

Omnibus Appropriations Act 2009, Pub. L No. 111-8, 123 Stat. 525 .........................18

15 U.S.C. § 717r(b) ...........................................................................................12

25 U.S.C. § 2717 ...............................................................................................18

28 U.S.C. § 1914 ...............................................................................................18

31 U.S.C. § 9701 ...............................................................................................17

35 U.S.C. § 42 ...................................................................................................18

42 U.S.C. § 2214 ...............................................................................................18

42 U.S.C. § 7178 ...........................................................................................13, 14

Cal. Pub. Util. Code § 421(a)-(b) ................................................................18

35 Ill. Adm. Code 855.101(b) ...................................................................18

Va. Code Ann. § 45.1-161.58 ..................................................................18

18 C.F.R. § 382.202 ................................................................................14

*Annual Charges Under the Omnibus Budget Reconciliation Act of 1986*, 52 Fed.
Reg. 21263 (June 5, 1987) ...............................................................14

*Annual Charge Filing Procedures for Natural Gas Pipelines*, 78 Fed. Reg. 19409
(Apr. 1, 2013) ...................................................................................14

**Administrative Decisions**

*Certification of New Interstate Gas Pipeline Facilities*,
88 FERC ¶ 61,227 (1999), *clarified*, 90 FERC ¶ 61,128, *further clarified*, 92
FERC ¶ 61,094 (2000) ...........................................................10, 11, 12

*Certification of New Interstate Gas Pipeline Facilities* ,
90 FERC ¶ 61,128, *clarified*, 92 FERC ¶ 61,094 (2000) ...................10, 11

*Certification of New Interstate Gas Pipeline Facilities*,
92 FERC ¶ 61,094 (2000) ...............................................................10, 11

*Tenn. Gas Pipeline Co.*,
47 F.P.C. 1417 (1972) ..........................................................................12

**Other Authorities**

District of Columbia Office of the People's Counsel, *What is the average natural
gas use per customer in the District?*, http://www.opc-dc.gov/index.php/who-
are-dc-consumers/919-what-is-the-average-natural-gas-usage-per-customer-in-
the-district ............................................................................................6

FERC, Office of the Chief Fin. Officer*, Gas Assessment Table for FERC
Administrative Charges – FY 2015* (June 2015),
http://www.ferc.gov/industries/gas/annual-charges/2015/fy-2015-gas-annual-
charges-assessment-table.pdf ................................................................14

FERC, *FY 2015 Annual Performance Report* (2016),
https://www.ferc.gov/about/strat-docs/2016/FY17-Budget-Request.pdf ...............14

FERC, *FY 2016 Congressional Performance Budget Request* (2015),
http://www.ferc.gov/about/strat-docs/2015/FY16-Budget-Request.pdf .................14

Matthew E. Glassman, Cong. Research Serv., *Judiciary Appropriations FY 2016*
(June 18, 2015), https://www.fas.org/sgp/crs/misc/R44078.pdf ......................17

Northwest Pipeline LLC, *Notice of Withdrawal of Certificate Application*, Docket
    No. CP13-507, May 9, 2016 ...................................................................................... 12

La. Dep't of Wildlife & Fisheries, *Fishing Licenses*,
    http://www.wlf.louisiana.gov/licenses/fishing (last viewed May 24, 2016) ........................ 19

Palomar Gas Transmission LLC, Notice of Withdrawal of Certificate Application,
    Docket No. CP09-35-000, Mar. 23, 2011,
    https://www.scribd.com/doc/51418064/2011-03-23-Palomar-Withdrawal-
    Notice .......................................................................................................................... 12

St. Paul, Minn., *Zoning Variances*, https://www.stpaul.gov/departments/safety-
    inspections/zoning/zoning-variances (last viewed May 24, 2016) ......................................... 18

U.S. Energy Info. Admin., *About U.S. Natural Gas Pipelines* (June 2007),
    https://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/
    index.html ...................................................................................................................... 6

U.S. Energy Info. Admin., *Annual Energy Outlook 2015* (Apr. 2015),
    http://www.eia.gov/forecasts/aeo/pdf/tbla13.pdf .................................................................. 6

U.S. Energy Info. Admin., *Estimated Natural Gas Pipeline Mileage in the Lower
    48 States, Close of 2008,*
    https://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/
    mileage.html (last viewed May 24, 2016) ............................................................................ 6

U.S. Energy Info. Admin., *Expansion of the U.S. Natural Gas Pipeline Network*
    (Sept. 2009),
    https://www.eia.gov/pub/oil_gas/natural_gas/feature_articles/2009/pipelinenet
    work/pipelinenetwork.pdf .............................................................................................. 7

U.S. Energy Info. Admin., *Frequently Asked Questions*,
    https://www.eia.gov/tools/faqs/faq.cfm?id=45&t=8 (last updated Apr. 6, 2016) ................... 6

U.S. Energy Info. Admin., *Frequently Asked Questions: What is the U.S.
    electricity generation by energy source?*,
    https://www.eia.gov/tools/faqs/faq.cfm?id=427&t=3 (last updated Apr. 1,
    2016) ............................................................................................................................. 5

U.S. Energy Info. Admin., *Major Changes in Natural Gas Transportation
    Capacity, 1998 – 2008* (Nov. 2008),
    https://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/
    comparemapm.pps ......................................................................................................... 7

U.S. Energy Info. Admin., *Natural Gas Pipelines in the Southwest Region*,
    https://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/
    southwest.html (last viewed May 24, 2016) ...................................................................... 7

U.S. Energy Info. Admin., *Today in Energy, September 25, 2014* (2014),
http://www.eia.gov/todayinenergy/detail.cfm?id=18131 .........................................................5

U.S. Energy Info. Admin., *Today in Energy, March 16, 2016* (2016),
http://www.eia.gov/todayinenergy/detail.cfm?id=25392 .........................................................6

## INTEREST OF *AMICUS CURIAE*

The Interstate Natural Gas Association of America ("INGAA") is a trade association that advocates regulatory and legislative positions of importance to the interstate natural gas pipeline industry in North America.  INGAA represents the vast majority of interstate natural gas transportation pipeline companies operating in the United States, as well as comparable companies in Canada.  Its members transport much of the nation's natural gas through a network of approximately 200,000 miles of pipelines and operate many interstate natural gas storage facilities.  INGAA's members are regulated by the Federal Energy Regulatory Commission ("FERC") under the Natural Gas Act.  INGAA and its individual members have a substantial interest in pipeline development, continued investment in energy infrastructure, and ensuring predictable, consistent, rational, and fair law and policy affecting natural gas transportation.  To advance those interests, INGAA regularly participates as an *amicus* in cases, such as this one, that concern the proper regulation of the industry.[1]

## SUMMARY OF ARGUMENT

The Court should grant the defendants' motion to dismiss.  Plaintiffs' constitutional challenge to a provision of the Omnibus Budget Reconciliation Act of 1986 ("1986 Budget Act") rests on the profoundly mistaken premise that FERC has a substantial pecuniary interest in the approval of particular pipelines, creating a "structural bias" that violates the Due Process Clause.  Based on this premise, plaintiffs launch a series of attacks on FERC's administration of the Natural Gas Act, its environmental review practices, its authorization of eminent domain, and its consideration of a pending application by the PennEast Pipeline Company to develop a new

---

[1] The parties to this case do not oppose the filing of this *amicus* brief.  No party's counsel authored this brief in whole or in part, and no party or its counsel made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than *amicus* or its counsel contributed money that was intended to fund preparation or submission of the brief.

natural gas pipeline.   However, this Court need not address those broader assertions because plaintiffs lack standing to raise them, and because the premise underlying them is so clearly wrong.

As to standing, plaintiffs cannot show that they have suffered injury within the scope of Article III of the Constitution, that any injury is fairly traceable to the challenged provision of the Budget Act, or that any relief this Court could provide would benefit them in any way.

As to the merits, the Budget Act's operation precludes the conclusion that approving a pipeline application provides any financial benefit to FERC.   The Budget Act's cost recovery mechanism ensures that FERC does not secure additional funds if it approves an additional pipeline.   That approval would, instead, only slightly reduce the burden imposed on other pipelines and their customers.   In addition, plaintiffs' suggestion that FERC faces some realistic prospect that too few pipelines would remain in operation to support cost recovery, in the absence of biased decisionmaking, rests on a misunderstanding of the scale and dynamics of natural gas markets, the objectives of the Natural Gas Act (NGA), how FERC implements that Act in considering certification applications, and how FERC has implemented the Budget Act.   Each of these considerations confirms that FERC has no financial interest in whether to grant particular applications—much less any financial interest significant enough to establish that the Budget Act violates the Due Process Clause.   Plaintiffs' contrary argument is absurdly broad: it would render many regulatory fees commonly imposed by federal, state and local governments constitutionally suspect and require a broad change to government funding across the nation.

I.    **PLAINTIFFS LACK STANDING TO CHALLENGE THE IMPLEMENTATION OF THE NATURAL GAS ACT AND THIS COURT LACKS JURISDICTION OVER AN ACTUAL BIAS CLAIM.**

Although plaintiffs' ostensible challenge is to the constitutionality of the 1986 Budget Act, they seek to manufacture standing to challenge that Act by asserting a range of broader issues with the Natural Gas Act and its administration.  For instance, they claim that FERC is overly "insulated from the oversight of the executive branch," Compl. ¶ 167, that the agency fails to issue "civil penalt[ies] for violations" of orders by pipelines, *id.* ¶ 185, and that it does not timely act on rehearing petitions, *id*. ¶¶ 191-208.

As FERC explains in greater detail in its motion to dismiss, plaintiffs lack standing to assert these challenges because they have no concrete injury, fairly traceable to the administration of the Act, that can be redressed by a favorable decision of this Court.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  First, Riverkeeper has not demonstrated that any of its members will "imminent[ly]" suffer a "concrete and particularized" injury.  *Id.*; *see Summers v. Earth Island Inst.*, 555 U.S. 488, 495 (2009) (an imminent future injury is necessary to support a claim for prospective relief).  Riverkeeper identifies only one member, Maya Van Rossum, Compl. ¶ 45, and entirely fails to explain how Ms. Van Rossum's alleged interest in "the aesthetic beauty of the river" is concretely threatened with an "imminent future injury"— particularly given that FERC has not even approved the only pipeline application identified in the complaint, the PennEast Pipeline project.  *Summers*, 555 U.S. at 495.

Plaintiffs also fail to show both causation and redressability.  To demonstrate that their injuries are "fairly traceable to the challenged action of the defendant," *Lujan*, 504 U.S. at 560 (alterations omitted), plaintiffs must show both an imminent threat of concrete injury from the PennEast pipeline or another pipeline, and that FERC would not approve the pipeline absent the allegedly unconstitutional bias.  Compl. ¶ 263; *see Fertilizer Inst. v. EPA,* 938 F. Supp. 52, 55

(D.D.C. 1996).   Any such claim is clearly too speculative to support standing; indeed, plaintiffs do not even allege that the PennEast application fails to meet the statutory standards for approval.

For similar reasons, plaintiffs have also failed to show that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision,'" *Lujan*, 504 U.S. at 561:   Plaintiffs fail to allege facts showing that FERC's decision on the PennEast pipeline—or any other FERC decision impacting them—would be different if this Court declared the 1986 Budget Act provision to be unconstitutional, barring FERC from collecting costs to be reimbursed to the Treasury.  *See Physicians' Educ. Network, Inc. v. Dep't of Health, Educ., & Welfare*, 653 F.2d 621, 627 (D.C. Cir. 1981) (per curiam) (no redressability where it was not "substantially likely" that rescission of an allegedly biased committee report would lead to congressional action); *Ass'n of Am. Physicians & Surgeons, Inc. v. U.S. Dep't of Health & Human Servs.*, 2006 WL 2882707, at *8 (D.D.C., Oct. 6, 2006) (similar).  A favorable decision would affect only FERC's collection of charges, not its issuance of certificates or other exercises of power; plaintiffs' alternative remedy related to eminent domain and exercise of NGA powers simply demonstrates the overreaching nature of the complaint.

Finally, even apart from Riverkeeper's lack of standing, this Court lacks jurisdiction over any claim of actual bias because that claim can be brought only in the Court of Appeals following FERC's final decision on the PennEast application, including action on any timely request for rehearing.  Unlike in *NO Gas Pipeline v. FERC*, 756 F.3d 764 (D.C. Cir. 2014), which held that 15 U.S.C. § 717r(b) did not apply where the plaintiff "raised "no claim . . . that the process that produced [FERC's] decision was tainted by actual bias," *id.* at 769, Riverkeeper alleges bias— and other flaws—with respect to FERC's ongoing consideration of the PennEast Project.  *See* Compl. ¶¶ 1, 18, 139-40*;* FERC Mot. to Dismiss 19-20.  Those claims may therefore be brought only in the Court of Appeals.

II.     **THE COMMERCIAL, STATUTORY, AND REGULATORY CONTEXT SURROUNDING THE DEVELOPMENT OF NATURAL GAS PIPELINES AND FERC'S CERTIFICATION PROCESS PRECLUDES PLAINTIFFS' THEORY OF "STRUCTURAL BIAS."**

The industry, statutory, and regulatory context for FERC's determinations whether a particular pipeline should receive a certificate of public convenience and necessity eliminates any possibility of the "structural bias" that plaintiffs allege.  Plaintiffs' theory is that, in the absence of biased decisionmaking, there would be so few pipelines in operation that they would be unable to bear the costs imposed under the 1986 Budget Act, requiring FERC to make biased decisions to prop up its budget.   Compl. ¶¶ 146-151.  However, for the reasons described below, this scenario is so implausible that it could not possibly influence determinations regarding individual pipeline applications.  To conclude otherwise would be to ignore the scale and dynamics of the natural gas industry, the policies embedded in the Natural Gas Act, how FERC's certification process implements those policies, and FERC's implementation of the Budget Act's cost recovery provisions.

    A.     **The Scale and Dynamics of the Natural Gas Pipeline Industry.**

Natural gas is one of the principal sources of the nation's energy, and will remain so for the foreseeable future.  Natural gas provides 33 percent of the nation's energy needs.[2]  At least 56 million households, or just under half the households in the nation, use natural gas to heat their homes, cook, or for other purposes.[3]  Natural gas is increasingly displacing coal as the energy source used to generate electricity.  In 2007, coal accounted for more than twice as much

---

[2] *See* U.S. Energy Info. Admin., *Frequently Asked Questions: What is U.S. electricity generation by energy source?*, https://www.eia.gov/tools/faqs/faq.cfm?id=427&t=3 (last updated Apr. 1, 2016) (data for 2015).
[3] *See* U.S. Energy Info. Admin., *Today in Energy, September 25, 2014*, http://www.eia.gov/todayinenergy/detail.cfm?id=18131 (data for 2009).

electricity generation as natural gas; by last year, they were equal.[4]  And this year, natural gas is projected to surpass coal in power generation for the first time.[5]  Natural gas is increasingly favored because it produces far fewer greenhouse gas emissions than other fossil fuels.  As a result of ongoing innovations in the discovery and production of natural gas, the nation's natural gas reserves continue to increase.  Domestic natural gas production is currently projected to grow from 24 trillion cubic feet per year in 2012 to more than 35 trillion cubic feet per year in 2040.[6]

Because consumers of natural gas are often located far from natural gas production sources, an extensive and growing pipeline network is needed to transport natural gas. Approximately 300,000 miles of pipeline transport natural gas within the United States, and more than 217,000 miles of pipeline transport gas across state borders.[7]  More than 210 distinct pipeline systems serve the lower 48 states.[8]  *See infra* App. A.  For example, the largest such system operates more than 10,000 miles of pipeline, delivering 2.67 billion dekatherms of natural gas annually.[9]

---

[4] *See* U.S. Energy Info. Admin,, *Today in Energy, March 16, 2016*, http://www.eia.gov/todayinenergy/detail.cfm?id=25392
[5] *Id.*
[6] *See* U.S. Energy Info. Admin., *Annual Energy Outlook 2015*, tbl. A13, http://www.eia.gov/forecasts/aeo/pdf/tbla13.pdf
[7] *See* U.S. Energy Info. Admin., *Estimated Natural Gas Pipeline Mileage in the Lower 48 States, Close of 2008*, https://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/mileage.html
[8] *See* U.S. Energy Info. Admin., *About U.S. Natural Gas Pipelines*, https://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/index.html
[9] A "dekatherm" is a unit of energy, equal to one million British Thermal Units (Btu).  One Btu is the amount of energy required to raise the temperature of one pound of water by one degree Farenheit.  *See* U.S. Energy Info. Admin., *Frequently Asked Questions*, https://www.eia.gov/tools /faqs/faq.cfm?id=45&t=8.  A dekatherm is also roughly equal to 1,000 cubic feet of natural gas. For comparison, the average residential customer in D.C. in 2010 consumed 7 dekatherms per month, or 84 dekatherms per year.  *See* District of Columbia Office of the People's Counsel, *What is the average natural gas use per customer in the District?*, http://www.opc-dc.gov/index.php/who-are-dc-consumers/919-what-is-the-average-natural-gas-usage-per-customer-in-the-district

That pipeline network continues to expand to meet the demands of consumers and industry for more natural gas, or for more efficiently delivered gas.  From 1998 to 2008 – even before recent rapid increases in the use of natural gas – the pipeline network added over 20,000 miles of new lines, representing over 97 billion cubic square feet per day of additional capacity.[10] Each year, many new pipelines or extensions of current pipelines are placed into operation.[11]  In addition, natural gas pipelines have very extended useful lives.  Plaintiffs acknowledge that pipelines can last "twenty years, forty years, or longer."  Compl. ¶ 122.  And that understates the useful lives of many pipelines, which can continue to operate for upwards of eighty years.[12] Because natural gas pipelines are closely regulated by the Pipeline and Hazardous Materials Safety Administration, they can remain safely in operation for such extended periods  of time.

**B.**      **FERC's Implementation of the Natural Gas Act**.

1.  <u>The Natural Gas Act</u>.

While plaintiffs argue that FERC's approval of pipelines shows pecuniary bias, determinations that the public interest is served by appropriately developed and regulated pipelines are, in fact, entirely consistent with the purposes of the Natural Gas Act.  "The statute provides that a certificate 'shall be issued to any qualified applicant' upon a finding that 'the applicant is able and willing properly to do the acts and perform the service proposed . . . and that the proposed service' and 'construction . . . is or will be required by the present or future public convenience and necessity.'"  *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97,

---

[10] *See* U.S. Energy Info. Admin., *Major Changes in Natural Gas Transportation Capacity, 1998 – 2008*, https://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/ comparemapm.pps

[11] *See* U.S. Energy Info. Admin., *Expansion of the U.S. Natural Gas Pipeline Network*, https://www.eia.gov/pub/oil_gas/natural_gas/ feature_articles/2009/pipelinenetwork/ pipelinenetwork.pdf.

[12] *See* U.S. Energy Info. Admin., *Natural Gas Pipelines in the Southwest Region*, https://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/ngpipeline/ southwest.html

101 (D.C. Cir. 2014) (quoting 15 U.S.C. § 717f(e)).

Thus, the statute is based on Congress' judgment that the "public convenience and necessity" is served when gas resources are developed and appropriately delivered to residential and industrial consumers.  Indeed, "Congress enacted the Natural Gas Act with the 'principal purpose' of 'encourag[ing] the orderly development of plentiful supplies of . . . natural gas at reasonable prices." *Myersville Citizens for a Rural Cmty. v. FERC*, 783 F.3d 1301, 1307 (D.C. Cir. 2015) (citations omitted) (quoting *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669-70 (1976)); *see Minisink*, 762 F.3d at 101 (same).  The Act's "'[s]ubsidiary' purposes include respecting 'conservation, environmental, and antitrust' limitations." *Myersville Citizens*, 783 F.3d at 1307 (quoting *NAACP v. Fed. Power Comm'n*, 425 U.S. at 670).  The Act therefore also provides that FERC shall, "in issuing such a certificate, attach 'such reasonable terms and conditions as the public convenience and necessity may require.'" *Minisink*, 762 F.3d at 101 (quoting 15 U.S.C. § 717f(e)).  The D.C. Circuit has stated that "the Commission 'has extremely broad authority' to condition certificates under section 7(e)," *Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d 426, 432 (D.C. Cir. 1993) (quoting *Transcontinental Gas Pipe Line Corp. v. FERC*, 589 F.2d 186, 190 (5th Cir. 1979)), and FERC routinely imposes significant conditions on certificates.  Those conditions may extend, for example to requiring compliance with specific environmental protections, rate and contract requirements, accounting and recordkeeping duties, and community protections.  These powers "are the means by which the Commission effectuates the purposes of the Act, 'to underwrite just and reasonable rates to the consumers of natural gas,' and 'to afford consumers a complete, permanent and effective bond of protection from excessive rates and charges.'" *Id*. (quoting *Atl. Ref. Co. v. Pub. Serv. Comm'n*, 360 U.S. 378, 388 (1959)).

For these reasons, FERC is acting fully in accord with the purposes of the Natural Gas

Act when it grants a certificate of public convenience and necessity after conducting a thorough review, and imposing appropriate rate, environmental, and service requirements. The Act does not treat as an open issue for FERC whether natural gas resources are to be developed or transported at all, nor does it contemplate that FERC will refuse to approve all additional gas pipelines. Yet plaintiffs' entire "structural bias" argument assumes that, in the absence of bias, FERC would find itself in just such a scenario, and would be unable to collect pipeline fees under the Budget Act. *See* Compl. ¶¶ 149-150. Because that scenario is so fanciful, and so contrary to the Act's purposes and its implementation, it cannot plausibly form the basis for any claim of "structural bias."

2. <u>FERC's Implementation of the NGA when Considering Certificate Applications</u>.

Plaintiffs also claim that FERC's high approval rate of certificate applications demonstrates that the agency's decisionmaking reflects a structural bias. However, this argument rests on important mischaracterizations of the nature of the application review process. FERC's frequent, eventual determination that a pipeline applicant's application should be granted actually reflects the outcome of a process designed to implement the Natural Gas Act's policies and to ensure that all relevant interests are advanced by a pipeline's development to the maximum extent possible *before* the Commission makes a final determination regarding the pipeline.

Indeed, FERC's pipeline review process operates exactly as the D.C. Circuit suggested in *NO Gas Pipeline*, 756 F.3d at 770:

> [Plaintiffs'] only asserted basis for the actual bias is that FERC has consistently granted applications from pipelines. This adds nothing to the strength of an otherwise unsupported claim. Presumably under most regulatory schemes, by the time applicants and their expert counsel have worked through changes, adaptations, and amendments, they are not likely to pursue many certificates that are hopeless. The fact that they generally succeed in choosing to expend their resources on applications that serve their own financial interests does not mean that an agency which recognizes merit in such applications is biased.

FERC has structured its application review process to meet broad policy objectives and to create incentives for pipeline applicants to address and accommodate various competing interests as early in the application process as possible.  The application review process is designed to "advance development of a sustainable energy infrastructure that supports economic growth, environmental protection and other social benefits over the life of the project."  *Certification of New Interstate Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999) ("*Certification Policy*"), *clarified*, 90 FERC ¶ 61,128, at 61,389 (2000) ("*Clarified Certification Policy*"), *further clarified*, 92 FERC ¶ 61,094 (2000) ("*Further Clarified Certification Policy*").  Procedurally, the review process does this "[b]y encouraging applicants to devote more effort before filing to minimize the adverse effects of a project, . . . giv[ing] them the ability to expedite the decisional process by working out contentious issues in advance."  *Certification Policy*, 88 FERC ¶ 61,227, at 61,743.  That is, FERC has structured its processes to produce just the result the D.C. Circuit in *NO Gas Pipeline* contemplated.

In particular, FERC has adopted a three-step process to achieve these substantive and procedural objectives.  The first, threshold step is for the pipeline applicant to establish that "the project can proceed without subsidies from [the pipeline's] existing customers."  *Further Clarified Certification Policy*, 92 FERC ¶ 61,094, at 61,373; *see Certification Policy*, 88 FERC ¶ 61,227, at 61,746.  This requirement ensures that market demand exists for the pipeline, while also ensuring that existing customers of an "expanding pipeline [do] not have to subsidize a project that does not serve them," and that landowners are "not . . . subject to eminent domain for projects that are not financially viable."  *Certification Policy*, 88 FERC ¶ 61,227, at 61746.  The second step requires the pipeline applicant to show that it has "made efforts to eliminate or minimize any adverse effects the project might have" on three groups of interested parties:  "the

existing customers of the pipeline proposing the project, existing pipelines in the market and their captive customers, and landowners and communities affected by the route of the new pipeline." *Clarified Certification Policy*, 90 FERC ¶ 61,128, at  61,389; *see Further Clarified Certification Policy*, 92 FERC ¶ 61,094, at 61,373.

Only in the case where the applicant cannot eliminate such adverse effects does the Commission then move to the third step, assessing the public benefits and adverse effects of the project and "approv[ing] an application for a certificate only if the public benefits from the project outweigh any adverse effects." *Certification Policy*, 88 FERC ¶ 61,227, at 61,750.  These public benefits might take the form of "meeting unserved demand, eliminating bottlenecks, access to new supplies, lower costs to consumers, providing new interconnects that improve the interstate grid, providing competitive alternatives, increasing electric reliability, or advancing clean air objectives."  *Clarified Certification Policy*, 90 FERC ¶ 61,128, at 61,396.  The Commission would impose, and its assessment would take into account, "whatever conditions are necessary" to ensure that the public interest outweighs adverse effects.  *Certification Policy*, 88 FERC ¶ 61,227, at 61,749.

FERC's final approval of applications thus reflects the conclusion of an extensive regulatory process that seeks to eliminate or reduce any adverse consequences of a project prior to any final determination, either through the applicants' initial actions or the Commission's imposition of conditions.  Its structure ensures that the pipeline project has been modified or regulated to serve the public interest, and does not reflect any capriciousness or bias on the Commission's part.

Three other structural aspects of the application review process further buttress this conclusion.  First, the final results of the application process flatly contradict plaintiffs' claim that there is a "100 percent approval rate for projects."  Compl. ¶ 177; *see* PennEast Mot. To Dismiss

at 28 - 31.   Second, examining only the final Commission determinations would not accurately assess the outcome of regulatory proceedings.   Many projects are withdrawn or not pursued for a variety of reasons as they are subjected to the incentives and requirements established by the application process.[13]   The Commission's broad ability to impose conditions related to the certificate may, for example, result in requirements that effectively make the project impractical or uneconomical to pursue.   *See supra* p. 8.   And finally, to the extent that the Commission's final determination in any particular proceeding might in fact reflect bias or caprice arising from any source, Congress has established a review process designed to overturn that result—creating a further disincentive to poor decisionmaking.   *See, e.g.*, 15 U.S.C. § 717r(b).

Finally, the longstanding nature of FERC's process for reviewing applications is inconsistent with any claim of structural bias created by the 1986 Budget Act.   Long before the Budget Act was enacted, FERC focused principally on whether the applicant had demonstrated that the new pipeline or extension was supported by sufficient shipper demand and also considered other public interest factors.   *See, e.g.*, *Tenn. Gas Pipeline Co.*, 47 F.P.C. 1417, 1422 –23 (1972).   The more formal policy outlined above largely continued and made explicit this review process and criteria.   *See Certification Policy*, 88 FERC ¶ 61,227, at 61,743.   Indeed, that policy was formalized in 1999 and 2000 and, to the extent the policy changed, review was made *more* stringent and demanding.   *See id.* at 61,745-50.   Whether FERC's review process is viewed as largely continuous or as becoming somewhat more stringent, either characterization is entirely inconsistent with plaintiffs' claim that the 1986 Budget Act introduced a new set of incentives that biased FERC's decisionmaking towards approving pipeline operators'

---

[13] *See, e.g.*, Palomar Gas Transmission LLC, *Notice of Withdrawal of Certificate Application*, Docket No. CP09-35-000, Mar. 23, 2011, https://www.scribd.com/doc/51418064/2011-03-23-Palomar-Withdrawal-Notice; Northwest Pipeline LLC, *Notice of Withdrawal of Certificate Application*, Docket No. CP13-507, May 9, 2016.

applications.

**C.      The Cost Recovery Established by the 1986 Budget Act Precludes A Claim of "Structural Bias."**

Several core features of the 1986 Budget Act, and of FERC's implementation of the Act, eliminate any realistic possibility that the prospect of cost recovery affects FERC's determinations regarding pipeline applications.

Most importantly, the Act's provisions ensure that a Commission determination to grant a particular application does not increase the amount of funds that FERC recovers. For that reason, FERC has no financial interest in the outcome of particular application determinations. This is so because, as described below, (i) the Commission's total costs subject to recovery are capped, independently of application review determinations and (ii) granting a pipeline application simply adds an additional or expanded source of cost recovery, spreading the fixed amount of FERC costs over a very slightly broader pool of interstate pipelines.

FERC's costs are limited to the sums appropriated by Congress, and the 1986 Budget Act requires FERC to "assess and collect fees and annual charges . . . equal to all the costs incurred by the Commission in that fiscal year." 42 U.S.C. § 7178(a)(1). The Act further removes any incentive on FERC to increase cost recovery for its own benefit by requiring the Commission to eliminate "any overrecovery . . . of its total costs" by reimbursing the charges, *id.* § 7178(e), and to deposit all the funds it receives with the Treasury, rather than retain them for its own use. *Id.* § 7178(f).

FERC's determination that costs will be recovered from a wide range of regulated entities, including by having regulated entities recover costs from their *customers*, further ensures that no "structural bias" could arise. The Commission may assess "fees or annual charges . . . on the basis of methods that [it] determines . . . to be fair and equitable," *id.* § 7178(b). The

13

Commission has chosen to "distribut[e] direct and indirect costs among [its] gas, oil, and electric programs," with separate charges assessed against each set of entities subject to each of those regulatory programs. *Annual Charges Under the Omnibus Budget Reconciliation Act of 1986*, 52 Fed. Reg. 21263, 21266 (June 5, 1987). For pipelines regulated as part of the natural gas program, that program's costs are "assessed against each natural gas pipeline company based on the proportion of the total gas subject to Commission regulation which was sold and transported by each company" in the relevant year. 18 C.F.R. § 382.202. "Pipelines are entitled to recover these annual charges from their customers," and may do so through the pipeline's general transportation charge or, as most do, through an annual charge adjustment ("ACA") tariff clause. *Annual Charge Filing Procedures for Natural Gas Pipelines*, 78 Fed. Reg. 19409, 19409 (Apr. 1, 2013).

FERC's annual assessment of the Budget Act charges imposed on natural gas pipelines (or, more accurately, their customers) illustrates how approving an additional pipeline operator's application has no impact on FERC's ability to recover costs. For fiscal year 2015, the Commission's annual appropriation was just over $304 million, and offsetting collections resulting from filing fees and annual charges was the same amount. FERC, *FY 2015 Annual Performance Report* ii (2016), https://www.ferc.gov/about/strat-docs/2016/FY17-Budget-Request.pdf. Estimated natural gas program costs during that period were approximately $62.7 million. FERC, *FY 2016 Congressional Performance Budget Request* iii (2015), https://www.ferc.gov/about/strat-docs/2015/FY16-Budget-Request.pdf.

Because regulated gas volumes were over 44 *billion* dekatherms, the resulting ACA charge imposed by pipeline operators on their customers was less than 14 *hundredths of a cent* per dekatherm. FERC, Office of the Chief Financial Officer, *Gas Assessment Table for FERC Administrative Charges – FY 2015* (June 2015), http://www.ferc.gov/industries/gas/annual-

charges/2015/fy-2015-gas-annual-charges-assessment-table.pdf.  For example, one of the larger natural gas pipeline companies transported nearly 670 million dekatherms that year, resulting in an annual charge of less than $1 million to its customers.  *Id*.  That company was one of 159 pipeline companies that paid ACA charges.  *Id*.  If the number had been 160 instead, FERC would have received exactly the same amounts of funds, and there would have been an almost imperceptible decrease in costs to each of the many customers of the pipelines.  In these circumstances, FERC does not benefit financially in any way when it grants an additional pipeline application.  The granting or denial of the applications of individual pipelines has no effect, now or in the foreseeable future, on FERC's ability to recover costs from the pipelines and their customers.

### D.   Any Possible Effect of the Charge Structure on FERC Decisionmaking Falls Far Short of Structural Bias Under the Due Process Clause.

Even if plaintiffs had been deprived of a protected liberty or property interest,[14] their allegations of bias are insufficient to state a claim under the Due Process Clause.  As shown above, *supra* Part II A-C, FERC has no financial interest in particular application determinations. Even if plaintiffs could establish some *de minimis* institutional financial interest related to the long-term prospects of natural gas pipelines in the absence of biased application determinations, that interest would be speculative and fall far short of the requisite legal standard.  A claim of bias requires at least a showing that the adjudicator has a "direct" and "substantial" "pecuniary interest" in the outcome of the adjudication.  *Tumey v. Ohio*, 273 U.S. 437, 523 (1927).  The type

---

[14] As intervenor PennEast explains in detail, plaintiffs' due process claim fails at the threshold because their allegations fail to show that they have been deprived of any property or liberty interest that is protected by the Due Process Clause.  PennEast Mot. to Dismiss at 8-17; *see Am. Mfr. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) ("Only after finding the deprivation of a protected interest do we look to see if the [government's] procedures comport with due process.").

of interest that plaintiffs allege is far "too remote and insubstantial to violate the constitutional constraints." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 243 (1980).

Furthermore, where the claimed bias arises from a "structural" interest rather than a "personal" interest, the Due Process test is markedly less "stringent." *Alpha Epsilon Phi Tau Chapter Hous. Ass'n v. City of Berkeley*, 114 F.3d 840, 844 – 45 (9th Cir. 1997).  The many cases plaintiffs cite involving an adjudicator's *personal* interest are therefore inapposite here, as plaintiffs do not and cannot claim that the FERC Commissioners have any personal pecuniary interests whatsoever in deciding whether to approve a pipeline application.  Compl. ¶ 111; *see, e.g., Tumey*, 273 U.S. at 523; *Gibson v. Berryhill*, 411 U.S. 564 (1973); *Caperton v. AT Massey Coal Co.*, 556 U.S. 868 (2009); *Lucky Dogs LLC v. City of Santa Rosa*, 913 F. Supp. 2d 853 (N.D. Cal. 2012).

Where, as here, the plaintiffs claim "structural" bias, a demonstration that an agency has "*any* pecuniary interest" in a decision is not sufficient, *Alpha Epsilon*, 114 F.3d at 844; the interest must be so strong that it "reasonably warrant[s] fear of partisan influence on [the] judgment." *Commonwealth of N. Mar. Islands v. Kaipat*, 94 F.3d 574, 575 (9th Cir. 1996); *see Van Harken v. City of Chi.*, 103 F.3d 1346, 1353 (7th Cir. 1997) ("the mere fact than an administrative or adjudicative body derives a financial benefit from fines or penalties that it imposes is not in general a violation of due process").  Indeed, in cases such as this one, where "the challenged provisions have not . . . resulted in any increase in the funds available to the [agency] over the amount appropriated by Congress," courts have consistently rejected claims of structural bias.  *Marshall*, 446 U.S. at 246; *see, e.g., Dugan v. Ohio*, 277 U.S. 61, 65 (1928) (finding no due process violation where adjudicator had only a "remote" connection to "the fund contributed to by his fines as judge"); *United States v. Benitez-Villafuerte*, 186 F.3d 651, 659-60 (5th Cir. 1999) (rejecting claim that INS was structurally biased because "the INS's

16

congressional funding depends to some extent on its statistical workload in apprehending and deporting illegal aliens"); *Mallinckdrodt v. Little*, 616 F. Supp. 2d 128, 147 (D. Me. 2009) (finding no due process violation where fees "will be deposited in . . . a fund which . . . the Board does not control," and increases to the fund will not increase the Board's "statutorily allowed annual appropriation"). Because any impact on FERC's budget of a decision to approve a pipeline is at best highly "tenuous," the agency's funding does not render it structurally biased. *Benitez-Villafuerte*, 186 F.3d at 659-60.

Plaintiffs' contrary argument would make a wide range of regulatory fees at all levels of government constitutionally suspect. Indeed, the very definition of a regulatory fee is a charge "imposed by an agency upon those subject to its regulation." *San Juan Cellular Tel. Co. v. Pub. Serv. Comm'n of P.R.*, 967 F.2d 683, 685 (1st Cir. 1992); *Am. Council of Life Insurers v. D.C. Health Benefit Exch. Auth.*, 815 F.3d 17, 19 (D.C. Cir. 2016) (defining a regulatory fee as a charge that "raises revenue merely to cover the cost of offering a service to the payers of the fee (including financing regulatory systems applicable to them)"); *see also Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340-41 (1974) (similar). A wide range of common, well-accepted, and wholly unproblematic fees would become constitutionally forbidden. For instance, courts commonly charge filing fees to plaintiffs to help defray the costs of court administration. 28 U.S.C. § 1914; *see* Matthew E. Glassman, Cong. Research Serv., *Judiciary Appropriations FY 2016*, at 3 (June 18, 2015). Plaintiffs' due process theory would lead to the absurd conclusion that these fees create an impermissible "structural bias" for courts to favor plaintiffs, to ensure that they can collect enough filing fees to maintain their budgets.

Further, U.S. policy for decades has been that federal agencies should "be self-sustaining to the extent possible" by charging fees to regulated parties for "each service or thing of value provided by an agency." 31 U.S.C. § 9701. Thus, as the United States explains, "more than

twenty-five (25) federal agencies receive a portion, if not all, of their respective operating costs through the collection of user fees and other annual assessments." U.S. Statement of Interest at 14. For instance, the Federal Communications Commission reimburses the full amount of its congressional appropriation to the Treasury by assessing fees across the companies it regulates—just as FERC does. Omnibus Appropriations Act 2009, Pub. L No. 111-8, 123 Stat. 524, 657 (2009). And the Patent and Trademark Office obtains a significant portion of its budget by charging fees to patentees. 35 U.S.C. § 42; *see also, e.g.,* 42 U.S.C. § 2214 (Nuclear Regulatory Commission funded by fees upon licensed nuclear facilities); 25 U.S.C. § 2717 (National Indian Gaming Commission funded by fees upon regulated gaming operations). Under plaintiffs' theory, a multitude of federal agencies would have an impermissible "structural bias" to favor the parties they regulate—requiring a drastic change to the funding of the United States government and a significant increase in the burdens on taxpayers.

Nor would the impact of plaintiffs' theory stop with the federal government; its interpretation of due process would also prohibit a wide range of regulatory fees that are used to finance state and local government operations, such as zoning, hunting and fishing, hazardous waste, coal and mineral mining, and common carriers. *See, e.g.*, Cal. Pub. Util. Code § 421(a)-(b) ("The commission shall annually determine a fee to be paid by every [common carrier] . . . . established to produce a total amount equal to the amount established in the authorized commission budget for the same year . . . ."); 35 Ill. Adm. Code 855.101(b) (hazardous waste fees); Va. Code Ann. § 45.1-161.58 (fees for coal mine license); St. Paul, Minn., *Zoning Variances*, https://www.stpaul.gov/departments/ safety-inspections/zoning/zoning-variances (fees for zoning variances); La. Dep't of Wildlife & Fisheries, *Fishing Licenses*, http://www.wlf.louisiana.gov/fishing/commercial-license (fees for fishing licenses).

Plaintiffs' interpretation of the structural bias doctrine is absurdly broad, and would "bring down too many procedures designed, and working well, for a governmental structure of great and growing complexity." *Richardson v. Perales*, 402 U.S. 389, 410 (1971).

## CONCLUSION

The Court should grant the defendants' motion to dismiss.

May 27, 2016                     Respectfully submitted,

                                 /s/ Richard D. Klingler

                                 Richard D. Klingler (D.C. Bar No. 438908)
                                 SIDLEY AUSTIN LLP
                                 1501 K Street, N.W.
                                 Washington, D.C. 20005
                                 (202) 736-8063
                                 rklingler@sidley.com

                                 *Counsel for The Interstate*
                                 *Natural Gas Association of*
                                 *America*

19

**APPENDIX A**



Source: Energy Information Administration, Office of Oil & Gas, Natural Gas Division, Gas Transportation Information System

Source: U.S. Energy Information Administration, U.S. Natural Gas Pipeline
Network, 2009, *available at*
https://www.eia.gov/pub/oil_gas/natural_gas/analysis_publications/
ngpipeline/ngpipelines_map.html

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>/s/ Richard D. Klingler</u>
Richard D. Klingler (D.C. Bar No. 438908)

# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DELAWARE RIVERKEEPER NETWORK, *et al.*,<br><br>              Plaintiffs,<br><br>        v.<br><br>FEDERAL ENERGY REGULATORY COMMISSION, *et al.*,<br><br><br><br>              Defendants. | **)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**    Civil Action No. 1:16-cv-416-TSC<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)** |

**[PROPOSED] ORDER GRANTING MOTION OF THE INTERSTATE**
**NATURAL GAS ASSOCIATION OF AMERICA FOR LEAVE TO FILE**
***AMICUS CURIAE* BRIEF IN SUPPORT OF DEFENDANTS**

      It is hereby ORDERED that the motion of the Interstate Natural Gas Association of America for leave to file an *amicus curiae* brief in support of the defendants, filed with this Court on May 27, 2016, is GRANTED; and it is further

      ORDERED that the Brief of *Amicus Curiae* the Interstate Natural Gas Association of America in Support of Defendants is deemed filed in the above-captioned proceeding.

      IT IS SO ORDERED.

Dated:

                           _____
                           The Honorable Tanya S. Chutkan
                           United States District Judge