# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

DELAWARE RIVERKEEPER )
NETWORK, et al., )
    Plaintiffs, )
     )
    v. )      Civil Action No. 1:16-cv-00416-TSC
     )
FEDERAL ENERGY REGULATORY )
COMMISSION, et al. )
    Defendants, )
     )
    and )
     )
PENNEAST PIPELINE COMPANY )
    Defendant-Intervenor. )

---

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' AND DEFENDANT-INTERVENOR'S MOTIONS TO DISMISS

Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19007
215-369-1188 (tel)
215-369-1181 (fax)
aaron@delawareriverkeeper.org

Jordan B. Yeager
Curtin & Heefner LLP
2005 S. Easton Road, Suite 100
Doylestown, PA 18901
jby@curtinheefner.com

Michael T. Kirkpatrick
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
michael.kirkpatrick@law.georgetown.edu

Counsel for: *Plaintiffs Delaware
Riverkeeper Network, and the Delaware
Riverkeeper*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iv

I.     FACTUAL AND PROCEDURAL BACKGROUND .......................................... 1

II.    SUMMARY OF ARGUMENT .................................................................. 2

III.   ARGUMENT ................................................................................... 4

     A.     This Court has Jurisdiction Over Plaintiffs' Complaint ....................... 4

          1.     This Court has Subject Matter Jurisdiction Because
                  Plaintiffs Raise a Constitutional Challenge Arising from the
                  Budget Act .................................................................. 5

          2.     Plaintiffs Do Not Need to Wait for Final Agency Action to
                  Bring Their Claims ......................................................... 6

     B.     Plaintiffs have Standing to Bring Their Claims ................................ 9

          1.     Plaintiffs are Subject to a Fatally Biased Decisionmaking Process,
                  or the Appearance of a Biased Process, Which is a Cognizable
                  Constitutional Injury Sufficient to Satisfy Standing Requirements .......... 10

          2.     Plaintiffs' Members' Property Interests are Sufficient to Confer
                  Standing ...................................................................... 12

               i.     Plaintiffs are injured via destruction of their real
                      property interests ................................................... 12

               ii.    Plaintiffs are injured via the increased risk of bodily
                      harm and through eminent domain ................................ 15

          3.     The Pennsylvania Constitution Provides a Property Right
                  that Sustains Plaintiffs' Standing ....................................... 17

          4.     Plaintiffs' Members' Environmental, Aesthetic, and Recreational
                  Interests are a Liberty Interest Sufficient to Confer Standing ............ 20

          5.     Plaintiffs' Harms are Redressable by the Relief Sought .................. 21

     C.     Plaintiffs State a Claim Upon Which Relief can be Granted ................. 25

          1.     The Structure of Defendants' Funding Mechanism Violates the
                  Possible Temptation Doctrine ........................................... 26

2. The Commission's Funding Mechanism is Unbound by Congress, and Unconstitutionally Incentivizes Decisionmaker Bias ........................28

 i. The Funding Mechanism Encourages an Unchecked Expansion of the Commission's Budget........................................28

 ii. Congress Does Not Set Meaningful Expense Limits on the Commission ............................................................................30

 iii. The Commission's Funding Mechanism Increases the Funds Available to the Commission ...............................................32

 iv. Defendants' Naturally Rising Fixed Costs Require Defendants to Approve Pipeline Projects .....................................35

 v. Defendants' Ability to Approve "Pass-through" Authority does not Cure the Constitutional Defect ........................................36

3. Defendants' Budget for the Natural Gas Regulatory Program Comprises a Substantial Portion of the Commission's Overall Budget Thereby Providing an Impermissible Temptation to be Biased ....36

D. Plaintiffs' Examples of Prior Actual Bias Collectively Show the Commission's Unconstitutional Appearance of Bias ..................................................39

E. Defendants' Use of Tolling Orders Deprives Plaintiffs' Constitutional Due Process Rights By Preventing Timely Judicial Review of Contested Agency Actions.....................................................................................................42

IV. CONCLUSION..............................................................................................45

# TABLE OF AUTHORITIES

**Cases**

*Alpha Epsilon Phi Tau Chapter Housing Authority v. City of Berkley*,
114 F.3d 840 (9th Cir. 1997) ........................................................................... 27, 36, 38

*Ass'n of Am. Phys. & Surgeons v. HHS*,
2006 WL 2882707 (D.D.C. Oct. 6, 2006) ........................................................... 24, 25

*B & J Oil and Gas v. FERC*,
353 F.3d 71 (D.C. Cir. 2004) ............................................................................... 12, 16

*Bangura v. Hansen*,
434 F.3d 487 (6th Cir. 2006) ...................................................................................... 7

*Barr v. Clinton*,
370 F.3d 1196 (D.C. Cir. 2004) .................................................................................. 4

*Baur v. Veneman*,
352 F.3d 625 (2nd Cir. 2003) ................................................................................... 15

*Bell Atl. Corp.v. Twombly*,
550 U.S. 544 (2007) .................................................................................................. 26

*Board of Regents v. Roth*,
408 U.S. 564 (1972) .................................................................................................. 17

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) .................................................................................................... 14

*Clark v. Rameker*,
134 S. Ct. 2242 (2014) .............................................................................................. 44

*Clinton v. City of New York*,
524 U.S. 417 (1998) .................................................................................................. 12

*Columbia Basin Land Protection Assoc. v. Schlesinger*,
643 F.2d 585 (9th Cir. 1981) .................................................................................... 14

*DeBlasio v. Zoning Board Of Adjustment*,
53 F. 3d 592 (3d Cir.) ............................................................................................... 12

*Domiano v. River Grove*,
904 F.2d 1142 (7th Cir. 1990) .................................................................................. 18

*Doolin Sec. Sav. Bank, F.S.B. v. FDIC,*
   53 F.3d 1395 (4th Cir. 1995) ................................................................ 32

*Earth Island Institute v. United States Forest Service,*
   351 F.3d 1291 (9th Cir. 2003) ............................................... 35-36, 37, 39

*Fed. Hous. Fin. Agency v. UBS Ams. Inc.,*
   712 F.3d 136 (2d Cir. 2013) ................................................................ 44

*Gen. Elec. Co. v. Jackson,*
   610 F.3d 110 (D.C. Cir. 2010) ............................................................ 17

*Gibson v. Berryhill,*
   411 U.S. 564 (1973) ............................................................... 7, 10, 27

*Goodman v. Laborers' Int'l Union of NA,*
   742 F.2d 780 (3d Cir.1984) ................................................................ 45

*Gunpowder Riverkeeper v. FERC,*
   807 F.3d 267 (D.C. Cir. 2015) ....................................................... 16-17

*Haase v. Sessions,*
   835 F.2d 902 (D.C. Cir. 1987) .............................................................. 4

*Hammond v. Baldwin,*
   866 F.2d 172 (6th Cir. 1989) ...................................................... 9, 10, 11

*Herbert v. Nat'l Acad. of Sciences,*
   974 F.2d 192 (D.C. Cir. 1992) ............................................................ 25

*In Re Murchison,*
   349 U.S. 133 (1955) ................................................................... 10, 26

*In re Papandreou,*
   139 F.3d 247 (D.C. Cir. 1998) ............................................................ 44

*Jackson v. Indiana,*
   406 U.S. 1845 (1972) ....................................................................... 32

*Jerome Stevens Pharmaceuticals, Inc. v. Food and Drug Administration,*
   403 F.3d 1249 (D.C. Cir. 2005) .......................................................... 25

*Kingman Park Civic Ass'n v. Williams,*
   348 F.3d 1033 (D.C. Cir. 2003) .......................................................... 26

*Kreschollek v. S. Stevedoring Co.,*

78 F.3d 868 (3d Cir. 1996) ...................................................................................... 7

*Lingle v. Chevron U.S.A. Inc.*,
   544 U.S. 528 (2005) .......................................................................................... 12

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................... 4, 24

*MCS Health Mgt. Options, Inc. v. Mellado Lopez*,
   2015 WL 1212215 (D. Puerto Rico, March 17, 2015) ........................................ 11

*Metcalf v. Nat'l Petroleum Council*,
   553 F.2d 176 (D.C. Cir. 1977) ..................................................................... 24, 25

*Meyer v. Niles Township*,
   477 F.Supp. 357 (N.D. Ill.1979) .......................................................................... 27

*Middle S. Energy Inc. v. Ark. Pub. Serv. Comm'n*,
   772 F.2d 404 (8th Cir.1985). ........................................................................... 7-8

*Mobile Baykeeper, Inc. v. U.S. Army Corps of Engineers*,
   2014 WL 5307850 (S.D. Ala. Oct. 16, 2014) ..................................................... 14

*Mohamed v. Holder*,
   995 F.Supp.2d 520 (E.D. Va. 2014) ...................................................................... 7

*Mountain States Legal Found. v. Glickman*,
   92 F.3d 1228 (D.C. Cir. 1996) ............................................................................ 15

*Mullen vs. Thompson*,
   155 F.Supp.2d 488 (W.D. Pa. 2001) .............................................................. 17-18

*N. Mariana Islands v. Kaipat*,
   94 F.3d 574 (9th Cir. 1996) ........................................................................... 38, 39

*Nat'l Treasury Employees Union v. Chertoff*,
   452 F.3d 839 (D.C. Cir. 2006) ............................................................................ 12

*NB ex rel. Peacock v. D.C.*,
   794 F.3d 31 (D.C. Cir. 2015) ................................................................................ 9

*NO Gas Pipeline v. FERC*,
   756 F.3d 764 (D.C. Cir. 2014) .......................................................................... 5, 6

*Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc.*,
   2009 WL 2390851 (S.D. Ga. Aug. 4, 2009) ....................................................... 14

*Robinson Township, Delaware Riverkeeper Network, et. al v. Commonwealth,*
    83 A.3d 901 (2013) ........................................................................................................ 18

*Schweiker v. McClure,*
    456 U.S. 188 (1982) ................................................................................................. 10, 23

*Sierra Club v. U.S. Dep't. of Agriculture,*
    777 F. Supp. 2d 44 (D. D.C. 2011) .............................................................................. 14

*Shain v. Veneman,*
    376 F.3d 815 (8th Cir. 2004) ....................................................................................... 15

*Thomas v. Union Carbide Agric. Prods. Co.,*
    473 U.S. 568 (1985) ........................................................................................................ 7

*Town of Dedham v. Federal Energy Regulatory Commission et al.,*
    2015 WL 427488 (D.C. Cir. July 15, 2015) ............................................................... 8-9

*Tumey v. State Of Ohio,*
    273 U.S. 510 (1927) ................................................................................................. 10, 27

*United Church of the Medical Center v. Medical Center Comm'n,*
    689 F.2d 693 (7th Cir. 1982) ............................................................................. 11, 23, 27

*United Retail and Wholesale Employees Teamsters Union Local 115 Pension Plan v. Yahn and
    McDonnell, Inc.,* 787 F.2d 128 (3rd Cir. 1986) ........................................................... 10

*United States v. Gaubert,*
    499 U.S. 315 (1991) ....................................................................................................... 25

*Van Harken v. City of Chicago,*
    103 F.3d 1346 (7th Cir. 1997) .................................................................................. 37-38

*Ward v. Village of Monroeville,*
    409 U.S. 57 (1972) ................................................................................... 10, 24, 26, 37

*Warth v. Sedin,*
    422 U.S. 490 (1975) ................................................................................................... 9, 22

*Watts v. SEC,*
    482 F.3d 501 (D.C. Cir. 2007) ........................................................................................ 5

*Wilson v. District of Columbia,*
    269 F.R.D. 8 (D.D.C. 2010) ............................................................................................ 4

**Federal Statutes**

15 U.S.C. § 717f(h) ................................................................................................ 16

15 U.S.C. § 717r(a) ........................................................................................... 43, 44

28 U.S.C. § 1331 ...................................................................................................... 5

28 U.S.C. §§ 2201-2202 ........................................................................................... 1

42 U.S.C. § 7178(a)(1) .................................................................................. 1, 21, 30

42 U.S.C. § 7178(b) ................................................................................................ 34

**Federal Regulations**

18 C.F.R. §§ 382.201-03 ........................................................................................ 34

18 C.F.R. § 385.214 ............................................................................................... 11

**Commission Orders**

*Columbia Gas Transmission Corp*. (1985) FERC, Op No. 232 CCH FERC P 61185 ................ 13

*FERC Order No.472*, 52 FR 21263-01 .......................................................... 29, 36

*Jordan Cove Energy Project, L.P.*, 154 FERC ¶ 61,190 ........................................... 40

*Magnolia LNG LLC, et al.*, 155 FERC ¶ 61,033 .................................................... 16

*Ozark Gas Transmission Sys.*, 43 FERC ¶ 61,443 .................................................. 40

*Turtle Bayou Gas Storage Co.*, 135 FERC ¶ 61,233 ............................................... 40

**Constitutional Provisions**

Pa. Const. Art. I, § 27 ...................................................................................... 17, 18

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Delaware Riverkeeper Network and Maya van Rossum, the Delaware Riverkeeper (hereinafter, "Plaintiffs" and "Delaware Riverkeeper") filed the Complaint in this matter on March 2, 2016, to vindicate their due process rights under the Fifth Amendment. Defendants are the Federal Energy Regulatory Commission and its Commissioners (hereinafter, "Commission" and "Defendants"). PennEast Pipeline Company appears as an Intervenor-Defendant (hereinafter, "Intervenor" and "PennEast"). Plaintiffs seek a declaratory judgment under the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202, and appropriate injunctive relief. *See* Compl. at ¶ 20.

The Complaint alleges, inter alia, that the Commission's unique funding mechanism creates an impermissible incentive for the Commission to approve natural gas pipeline projects, depriving Plaintiffs of their constitutionally guaranteed due process rights during the Commission's review of pipeline project applications. *Id*. at ¶¶ 1-8. The funding mechanism for the Commission's natural gas pipeline program is codified in the Omnibus Budget Reconciliation Act of 1986 (the "Budget Act"), and requires that "the Federal Energy Regulatory Commission shall . . . assess and collect fees and annual charges in any fiscal year in amounts equal to all of the costs incurred by the Commission in that fiscal year." 42 U.S.C. § 7178(a)(1) (the "Funding Mechanism"). For the natural gas pipeline program, the Commission annually compares the amount of gas each pipeline company transports to the total amount transported by all jurisdictional gas pipeline companies, then calculates and imposes a proportional volumetric charge on each company. *See* Compl. at ¶ 5. This structure provides an impermissible possible temptation, or the appearance of impermissible temptation, for the Commission to be biased in favor of the companies it regulates.

1

Plaintiffs also contend that the Commission's use of "tolling orders" violates constitutional due process. *Id.* at ¶ 209. Parties opposing a project approval by the Commission must submit rehearing requests to the Commission, and the Commission must deny or grant the request before the aggrieved party may appeal the Commission's decision to the appropriate Circuit Court. *Id.* at ¶¶ 192-193. However, the Commission routinely issues "tolling orders" in response to rehearing requests, and then takes no action on the rehearing requests for months or longer while simultaneously issuing letter orders authorizing all types of construction activity. *Id.* at ¶¶194-196. Such unconstitutional action prevents aggrieved parties from obtaining timely and effective judicial review prior to irreparable harm to the environment taking place. *Id.* at ¶ 209.

The Commission and PennEast have moved to dismiss the Complaint by challenging this Court's jurisdiction, Plaintiffs' standing, and the legal sufficiency of Plaintiffs' claims. The United States has submitted a Statement of Interests responding to the Complaint.  Plaintiffs oppose those motions for the reasons discussed further below.

## II.  <u>SUMMARY OF ARGUMENT</u>

Plaintiffs respectfully submit that the Motions to Dismiss should be denied, as this Court has jurisdiction over Plaintiffs' claims, Plaintiffs have standing to bring their claims, and Plaintiffs sufficiently state a claim upon which relief can be granted.

It is axiomatic that this Court has jurisdiction to hear challenges to the constitutionality of federal statutes. Indeed, the U.S. Court of Appeals for the D.C. Circuit has already explicitly rejected the Commission's argument that Plaintiffs must wait for final agency action and then utilize the appeals mechanism of the Natural Gas Act ("NGA") to vindicate their rights. Parties alleging a violation of constitutional due process do not need to exhaust administrative remedies prior to bringing their claims. As such, this Court has jurisdiction over Plaintiffs' claims.

Plaintiffs have standing because they allege injuries that meet constitutional requirements. The standards governing standing for due process violations resulting from a biased adjudicator differ from those of other types of due process challenges. For example, as Plaintiffs allege, being subject to a biased adjudication is itself a constitutional injury sufficient to confer standing. However, even if Plaintiffs are required to show a property or liberty interest to establish standing, Plaintiffs have done so because Plaintiffs have real property interests impacted by the Commission's bias. Indeed, the right of way for the PennEast pipeline project directly crosses several of Plaintiffs' members' properties. Plaintiffs' environmental interests are also property interests pursuant to rights conferred to Pennsylvania citizens by the Environmental Rights Amendment of the Pennsylvania Constitution. Additionally, Plaintiffs' recreational and aesthetic interests are recognized liberty interests protected by constitutional due process.

The Commission's and PennEast's arguments that Plaintiffs fail to state a claim upon which relief can be granted largely hinge on contested factual allegations that are not properly challenged in a motion under Rule 12(b)(6), and therefore lack merit. For example, the Commission and PennEast primarily contest whether the Commission has an impermissible temptation to approve projects, arguing that "increasing the number of pipelines only changes the number of pipelines that divide the Commission's expenses . . . it does not increase the pie [i.e. the budget] – it only changes how the pie is divided." Def. Br. at 3. Notwithstanding the fact that this argument involves contested factual issues, the dispositive issue here is not "how the pie is divided," but the fact that the Commission itself has the unchecked discretion to determine the "size of the pie." Not only does the Funding Mechanism statutorily and practically fail to set limits on the Commission's ever increasing budget, but its design actually encourages this unimpeded growth. Furthermore, Plaintiffs' examples of actual bias in a wide array of

proceedings provide direct evidence supporting Plaintiffs' claim of institutional bias, or at a minimum the appearance of bias. For example, the Commission, PennEast, the United States, and Amici collectively cannot cite a single instance in the last thirty years that refutes Plaintiffs' allegation that the Commission has a 100 percent voting record for approving natural gas pipeline projects, that the Commission has never issued an Environmental Assessment recommending further environmental review, or that the Commission has never granted a rehearing request of a non-industry party. Lastly, while Intervenor contends that Defendants' use of "tolling orders" has been condoned in prior litigation, the constitutionality of the Commission's use of "tolling orders" has never been examined in the context of a due process challenge wherein irreparable environmental harm results from the alleged due process violation.

## III.   <u>ARGUMENT</u>

### A.   **This Court has Jurisdiction Over Plaintiffs' Complaint**

Plaintiffs' claims are properly before this Court. Rule 12(b)(1) motions present a threshold challenge to a court's jurisdiction. *See Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). On a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of establishing that the court has jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). In evaluating such a motion, the Court must "accept as true all of the factual allegations contained in the complaint." *Wilson v. District of Columbia*, 269 F.R.D. 8, 11 (D.D.C. 2010) (citing *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993)), and should review the complaint liberally while accepting all inferences favorable to the plaintiff. *See Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004).

Plaintiffs have challenged the Commission's Funding Mechanism as violating constitutional due process. The D.C. Circuit Court of Appeals has previously stated that such a

claim against the Commission must be brought before a Federal District Court, and that the appeals mechanism of the Natural Gas Act is not the appropriate vehicle for such an action. Additionally, Plaintiffs who allege a due process violation as a result of a biased decisionmaker do not need to exhaust their administrative remedies prior to bringing their claims. This Court's jurisdiction is therefore appropriate.

### 1.   This Court has Subject Matter Jurisdiction Because Plaintiffs Raise a Constitutional Challenge Arising from the Budget Act

While Defendants and Intervenor argue that the Natural Gas Act places jurisdiction for the present action in the Court of Appeals, the D.C. Circuit has already considered and explicitly rejected Defendants' and Intervenor's argument.  Because Plaintiffs bring a constitutional due process challenge to the portion of the Budget Act that establishes the way in which the Commission is funded, the appeals mechanism of the Natural Gas Act is entirely irrelevant. The D.C. Circuit has already determined that the Budget Act does not specify "the court in which judicial review . . . initially may be had," and that jurisdiction in this Court is appropriate. *NO Gas Pipeline v. FERC*, 756 F.3d 764, 768-9 (D.C. Cir. 2014).

Defendants contend that because the NGA prescribes a specific method for agency rehearing and judicial review of agency decisions, Plaintiffs' "complaint can only be understood as a preemptive attempt to avoid D.C. Circuit precedent that actual bias claims with 'no foundation' lack standing." Def. Br. at 16-20, 42-43; Int. Br. at 5. However, the D.C. Circuit has held that "[b]ecause district courts have general federal question jurisdiction under 28 U.S.C. § 1331, the 'normal default rule' is that 'persons seeking review of agency action go first to district court rather than to a court of appeals.'" *Watts v. SEC*, 482 F.3d 501, 505 (D.C. Cir. 2007) (quoting *Int'l Bhd. of Teamsters v. Pena*, 17 F.3d 1478, 1481 (D.C. Cir. 1994)).

In *No Gas Pipeline*, the petitioners brought a similar challenge alleging Commission bias pursuant to the Natural Gas Act's appeal mechanism, and while the D.C. Circuit did not reach the merits of the case, the court found that jurisdiction belonged in the District Court, not the Court of Appeals.  The court noted that petitioners' claims alleged:

> a statutory quarrel, its complaint is against the Budget Act and the financial structure that it creates. It is that provision that sets forth the funding of the Commission by assessments, **not the Natural Gas Act**, and certainly not the order which Jersey City purports to bring before us. [Petitioner's] claims do not come within the jurisdictional grant of § 717r(b). **We do not have original jurisdiction over claims arising from the Budget Act**…The NGA gives us jurisdiction to review orders in proceedings under that Act, **not claims unanchored in pipeline proceedings but arising under the Budget Act**. We have no jurisdiction.

*No Gas Pipeline*, 756 F.3d at 769 (emphasis added). The court explained that the:

> nature of . . . a constitutional challenge to FERC's funding structure . . . potentially implicates factual issues not explored in the record . . . **because the claim is so tangential to the substance of the order**. This prospect further counsels against reading 15 U.S.C. § 717r(b) as granting us jurisdiction over [petitioners'] claim because, as Congress must surely be aware, this court, unlike the district court, **is not well equipped to make factual determinations**.

*Id.* (emphasis added).

### 2.     Plaintiffs Do Not Need to Wait for Final Agency Action to Bring Their Claims

Plaintiffs mounting a due process challenge to the bias of the decisionmaker do not need to wait for final agency action prior to bringing a legal challenge. Defendants attempt to argue that "[c]ourts routinely find that a party lacks standing to seek judicial redress when Commission proceedings are ongoing and the Commission has not reached a final decision." Def. Br at 16. None of the cases that Defendants cite involve a direct due process challenge to the Commission proceedings themselves.  It is well settled that because "administrative remedies are almost always inadequate to address procedural due process challenges to those remedies, such

6

challenges are particularly immune from administrative exhaustion requirements." *Mohamed v. Holder*, 995 F.Supp.2d 520 (E.D. Va. 2014); *see also Bangura v. Hansen*, 434 F.3d 487, 494 (6th Cir. 2006) ("Exhaustion of administrative remedies may not be required in cases of non-frivolous constitutional challenges to an agency's procedures."); *Gibson v. Berryhill*, 411 U.S. 564, 575 (1973) (appellee was not required to exhaust state administrative remedies where "the question of the adequacy of the administrative remedy . . . was for all practical purposes identical with the merits of appellees' lawsuit"); *Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868, 875 (3d Cir. 1996) (exhaustion of administrative remedies under the Longshore and Harbor Workers' Compensation Act was not required where the administrative process was inadequate to address the Longshoreman's claim that the Act unconstitutionally deprived him of a hearing prior to the deprivation of benefits); *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (challenge to a statutory system of arbitration was appropriate because the plaintiffs' "injury [was] not a function of whether the [arbitration] tribunal awards reasonable compensation but of the tribunal's authority to adjudicate the dispute"). Here, Plaintiffs have challenged the Defendants' administrative process as being infected by bias, or the appearance of bias, and Plaintiffs therefore do not need to wait for Defendants to take final agency action to bring the lawsuit.

PennEast parrots Defendants' argument, contending that the issues "would not be ripe for review" because "if the Commission were to deny PennEast's certificate application, that would presumably moot Plaintiffs' need to bring any actual-bias claim as to the PennEast proceeding." Int. Br. at 6-7. However, the legal principle that administrative exhaustion is not required in the context of procedural due process claims naturally also applies with equal force to ripeness requirements. For example, in *Middle S. Energy Inc. v. Ark. Pub. Serv. Comm'n*, the plaintiff's

challenge to a state agency's ongoing proceeding was "ripe" because the plaintiff "challenge[d] not the state's ultimate substantive decision but its authority to even conduct the contemplated proceeding." *Middle S. Energy Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 410 (8th Cir.1985).  Likewise here, Plaintiffs challenge the Commission's ability to conduct the contemplated proceeding; the challenge is thus ripe.

Furthermore, PennEast attempts to conflate the analysis by arguing that to show "actual-bias" the analysis will "turn on specific events and characteristics of the Commission's ongoing PennEast certificate proceeding." Int. Br. at 6-7. However, Plaintiffs have not asserted an argument with regard to the sufficiency of the substance of PennEast's application materials that it submitted; rather, Plaintiffs contend that Defendants' review process itself is constitutionally infirm. The Commission's specific actions with regard to the PennEast Project are not what is at issue here.  What Plaintiffs ask the Court to ultimately decide is whether Defendants operate under an impermissible temptation of bias, or the appearance of bias, as a result of the Funding Mechanism. While the Complaint contains allegations of "actual bias" these facts constitute evidence of the Commission's inherent bias under the Funding Mechanism. As such, Intervenor's argument should be rejected.

Defendants cite *Town of Dedham v. Federal Energy Regulatory Commission et al.*, for the proposition that Plaintiffs must wait for final agency action to bring their Complaint. Def. Br. at 20. However, similar to the other cases Defendants cite, *Town of Dedham* did not involve any allegations of Commission bias and so lends no support to the Commission's argument. Rather, the facts of *Town of Dedham* actually provide an illustration of how the Commission's biased actions force aggrieved parties into taking hopeless legal positions to combat the Commission's bias. *See* Compl. ¶¶ 191-209. Indeed, the untenable predicament faced by the Town of Dedham

is identical to the one Plaintiffs have faced, whereby the Commission refuses to take final agency action on a rehearing request, thus preventing judicial review, while simultaneously approving various forms of construction activity. *See Town of Dedham v. Federal Energy Regulatory Commission et al.*, 2015 WL 427488, at *1 (D.C. Cir. July 15, 2015). The Commission's actions force aggrieved parties to look for other non-traditional means to get their day in court often using appeal mechanisms ill-suited for the relief sought, such as section 717*u* of the Natural Gas Act or Writs of Mandamus. This systemic abuse of power is itself a due process violation, a contention that Defendants never address in their Motion to Dismiss, and which is further discussed below in Section III.E. *See* Comp. ¶¶ 197-198, 270.

**B.      Plaintiffs Have Standing to Bring Their Claims**

Plaintiffs have associational standing because "one or more of its members are injured." *Warth v. Sedin*, 422 U.S. 490, 515 (1975). Plaintiffs' members' declarations show that multiple members of the Delaware Riverkeeper Network, including the Delaware Riverkeeper, have suffered an injury sufficient to establish standing. As described further below, the standards governing due process challenges resulting from biased decisionmakers are different from those governing other types of due process challenges. The due process analysis "hinges on what type of injury is alleged." *See Hammond v. Baldwin*, 866 F.2d 172, 177 (6th Cir. 1989). Because Plaintiffs' members are directly subject to a biased decisionmaking process, or the appearance of a biased process, they have suffered a constitutional injury sufficient to satisfy standing. However, even if Plaintiffs must demonstrate a "deprivation of a protected liberty or property interest" pursuant to the standard articulated by the Commission and PennEast, Plaintiffs still prevail. *NB ex rel. Peacock v. D.C.*, 794 F.3d 31, 41 (D.C. Cir. 2015). For example, Plaintiffs have interests in real property that are threatened or harmed by the Commission's actions as the

9

PennEast project literally crosses several declarants' properties. Plaintiffs also have property interests in the environment as conferred by the Pennsylvania Constitution. Lastly, Plaintiffs have a liberty interest in the recreational and aesthetic values of the environment.

> **1.      Plaintiffs are subject to a Fatally Biased Decisionmaking Process, or the Appearance of a Biased Process, Which is a Cognizable Constitutional Injury Sufficient to Satisfy Standing Requirements**

Plaintiffs allege that Defendants, as adjudicators of natural gas pipeline projects including the PennEast project and others, violate procedural due process because they are inherently biased, or appear biased. This allegation is sufficient to establish an injury-in-fact to confer standing. *See* Compl. at ¶¶ 1-18, 263-266.

A procedural due process challenge concerns the adequacy and fairness of an agency's mandated procedures. *See Schweiker v. McClure*, 456 U.S. 188 (1982). There are two different classes of "procedural due process" violations: 1) those that arise from insufficient "procedural safeguards" from error; and 2) those that arise from "decisionmaker bias." *See United Retail and Wholesale Employees Teamsters Union Local 115 Pension Plan v. Yahn and McDonnell, Inc.*, 787 F.2d 128,137-138 (3rd Cir. 1986) (overruled on other grounds); *see also Hammond*, 866 F.2d at 176-177. The standards for evaluating a due process challenge are different depending on which class the due process challenge falls into. Therefore, citations to cases that do not involve allegations of biased decisionmaking– which encompass nearly the entirety of cases Defendants and Intervenors cite in this context – are inapposite. *Id*.

The type of violation alleged here involves an examination of "impartiality on the part of those who function in judicial or quasi-judicial capacities." *McClure*, 456 U.S. at 195; *see also Gibson*, 411 U.S. 564; *Ward v. Village of Monroeville*, 409 U.S. 57 (1972); *In Re Murchison*, 349 U.S. 133 (1955); *Tumey v. State Of Ohio*, 273 U.S. 510 (1927). Therefore, the

Court must base its analysis on the line of cases that specifically analyze standing where the impartiality of the adjudicator is challenged. In such cases, the "[s]ubmission to a fatally biased decisionmaking process is **in itself a constitutional injury sufficient to warrant injunctive relief** . . . [T]he precise violation . . . is the subjection to an unconstitutionally constituted decisionmaker. That injury has already occurred, and is therefore sufficiently 'immediate' to warrant injunctive relief." *United Church of the Medical Center v. Medical Center Comm'n,* 689 F.2d 693, 701 (7th Cir. 1982) (emphasis added), *see also MCS Health Mgt. Options, Inc. v. Mellado Lopez*, 2015 WL 1212215, at *18 (D. Puerto Rico, March 17, 2015) (finding that "[t]o require plaintiff to continue before a biased adjudicator would effectively deprive it of its property without due process of law and irreparable injury will thus follow"). The injury is the "submission" to the Defendants' bias itself, and while the "biased (or potentially biased) decision may also result in injury," that injury is a "separate, distinct one." *Hammond*, 866 F.2d at 177.

Plaintiffs have challenged Defendants' "review and approval process" for the PennEast pipeline project and others as being biased, or at least subject to the appearance of bias in violation of constitutional guarantees of due process. Compl. at 117. In the context of Defendants' biased review process, members of the public may gain "intervenor" status in Commission proceedings by meeting the specific requirements of 18 C.F.R. 385.214 (which includes a satisfactory demonstration of an "interest which may be directly affected by the outcome of the proceeding"). "Intervenors" are official participants in the Commission's review process, and are conferred legal rights including the right to request rehearing of Commission orders and seek relief of final agency actions in the U.S. Circuit Courts of Appeal. *See* 18 C.F.R. § 385.214. Here, several of Plaintiffs' members have met the requirements to be "intervenors" in the Commission's review process for the PennEast pipeline project, and neither the Commission

11

nor PennEast opposed their Motions to Intervene. *See e.g.,* van Rossum Declaration at ¶ 25, Heindel Declaration at ¶ 27, Kelly-Mackey Declaration at ¶ 39. Because Plaintiffs have alleged a specific procedural due process violation resulting from a biased decisionmaker, and have shown that Plaintiffs' members are subject to the biased Commission processes, Plaintiffs have satisfied the Article III requirements of standing.

### 2. Plaintiffs' Members' Property Interests are Sufficient to Confer Standing

Plaintiffs also show an injury-in-fact that demonstrates a deprivation of a property interest that is both concrete and particularized. The Commission's biased adjudicatory process injures Plaintiffs' members' real property interests and increases the risk of bodily injury or even death stemming from pipeline accidents or explosions.

### i. Plaintiffs are injured via destruction or harm to their real property interests

The D.C. Circuit has previously found that diminution or destruction of a property interest that is or can be subject to an eminent domain proceeding satisfies the injury-in-fact requirement. *B & J Oil and Gas v. FERC*, 353 F.3d 71, 75 (D.C. Cir. 2004). Land ownership is protected by due process where a governmental decision restricts the landowner's use of its property. *DeBlasio v. Zoning Board Of Adjustment*, 53 F. 3d 592, 601 (3d Cir.) (abrogated on other grounds); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) ("A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property-perhaps the most fundamental of all property interests"). A reduced bargaining position is also a well-established injury. *See, e.g.*, *Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 853-54 (D.C. Cir. 2006); *Clinton v. City of New York*, 524 U.S. 417, 433 n. 22 (1998).

12

The unconstitutional Funding Mechanism exposes these members to a plethora of injuries to their real property, including having: their property directly damaged (*see* Rader Declaration at ¶ 18, Kelly-Mackey Declaration at ¶¶ 17-21, 26-28; Farrell Declaration at ¶ 17, *see* Nelson Declaration at ¶¶ 29-30); their property values and the likelihood of home resale reduced (*see* Rader Declaration at ¶19; Kelly-Mackey Declaration at ¶¶ 29, 32; Heindel Declaration at ¶¶ 8-11, Nelson Declaration at ¶¶ 29-30); a reduced bargaining position; the loss of the productive use of their land (*see* Kelly-Mackey Declaration at ¶¶ 19-21, 28, Farrell Declaration at ¶ 17); and the loss or reduction of economic development potential of land (Heindel Declaration at ¶ 8-10). Indeed, the PennEast project will directly crossover a number of Plaintiffs' members' properties who oppose the pipeline. *See, e.g.*, Kelly-Mackey Declaration at ¶¶ 17-21; Heindel Declaration at ¶ 7. As such, these declarants could not have a more direct property interest subject to the outcome of the approval process of the PennEast pipeline. Additionally, the Commission implied the inevitability of an approval of the PennEast project that will cause many of these injuries, by explaining that pipeline companies "are unlikely to pursue" Commission certifications that are "hopeless." Def. Br. at 19.

Defendants contend that none of Plaintiffs' members' "alleged past injuries" can confer standing. Def. Br. at 22. However, Defendants misunderstand the nature of the injuries Plaintiffs allege, as all of the harms asserted are either as a result of the PennEast pipeline directly, or ongoing harms from previous projects. For example, the Commission retains jurisdiction over the maintenance and operation of existing pipelines, including those pipeline projects that have resulted in harms described in the standing declarations. *See Columbia Gas Transmission Corp*. (1985) FERC, Op No. 232, 31 CCH FERC P 61185 ("once a gas transmission pipeline has received certificate authority to operate in interstate commerce, it remains subject to

[Commission] jurisdiction until such time as we approve an abandonment under section 7(b) of the NGA"). Therefore, even the injuries alleged in the Complaint regarding physical damage to real property that have already occurred represent ongoing harms that are redressable by the Court. *See* Nelson Declaration at ¶¶ 16, 20, 29-36; Farrell Declaration at ¶ 17.

If Plaintiffs prevail, and the administrative process by which the pipeline was authorized is found to be unconstitutionally infected by bias and therefore invalid, the injury could be addressed by the Court requiring the pipeline to be removed, or requiring the Commission to reconsider the certificate approval once the due process violation is remedied. *See Mobile Baykeeper, Inc. v. U.S. Army Corps of Engineers*, No. CIV.A. 14-0032-WS-M, 2014 WL 5307850, at *6 (S.D. Ala. Oct. 16, 2014) ("[t]hat the Alabama portion of the pipeline has been completed and is now operational does not render Baykeeper's alleged injury incapable of redress. . . . [S]ome form of effective relief could be fashioned … to reduce aesthetic injuries to Baykeeper members, to mitigate risk of leakage, and so on"); *Ogeechee-Canoochee Riverkeeper, Inc. v. T.C. Logging, Inc.*, No. 608CV064, 2009 WL 2390851, at *8 (S.D. Ga. Aug. 4, 2009) (noting that the Riverkeeper's decision not to seek removal of a road did "not affect the ability of the Court to provide the remedies of remediation and mitigation"); *Sierra Club v. U.S. Dep't. of Agriculture*, 777 F. Supp. 2d 44, 52-53 (D. D.C. 2011); *Columbia Basin Land Protection Assoc. v. Schlesinger*, 643 F.2d 585, 591 n. 1 (9th Cir. 1981). Furthermore, even if the Court views Declarant Nelson and Declarant Farrell's harms as prior harms, these "[p]ast wrongs" may serve as "evidence bearing on whether there is a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (alteration and internal quotation marks omitted). Therefore, the prior harms, if nothing else, provide further certainty of the alleged harms resulting from the PennEast project.

ii.     <u>Plaintiffs are injured via the increased risk of bodily harm, and
        through eminent domain</u>

The increased risk of bodily harm and harm to property faced by Plaintiffs' members who are affected by currently-operating pipelines or the PennEast project is also enough to support standing. Several members' households or other real property are well within the blast zones of current or proposed pipelines (*see* Kelly-Mackey Declaration at ¶ 22 and Nelson Declaration at ¶ 25, Rader Declaration at ¶ 9). The injuries resulting from a pipeline explosion include death and serious injury, and pipeline accidents resulting in gas leaks have significant negative health impacts.

It is well established that all that is needed to demonstrate standing for an increased risk of harm from a challenged agency action is evidence taking it out of the realm of the hypothetical. *See Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1235 (D.C. Cir. 1996); *Baur v. Veneman*, 352 F.3d 625, 637 (2nd Cir. 2003); *Shain v. Veneman*, 376 F.3d 815, 818 (8th Cir. 2004). "Where the threatened injury is 'severe,' 'relatively modest increments in risk should qualify for standing.'" *Beaty v. FDA*, 853 F. Supp. 2d 30, 36 (D.D.C. 2012) (quoting *Mountain States Legal Found.*, 92 F.3d at 1235, and citing *Baur*, 352 F.3d at 637). Here, Plaintiffs' members' previously had no threat of harm from pipeline explosions or accidents, and now will be living with the very real threat of such harm every day for as long as they own the property. The threshold is therefore met, as, unfortunately, pipeline explosions and accidents are occurring in Pennsylvania with increased frequency; the state has had at least three pipeline explosions in the last year alone, at least two of which resulted in death or serious injury, and one of which involved a natural gas pipeline very similar to the one PennEast proposes. *See* https://stateimpact.npr.org/pennsylvania/ 2016/05/04/pa-pipeline-explosion-evidence-of-corrosion-found/.

Additionally, the claim that Plaintiffs' members have not been injured because eminent domain proceedings would provide compensation does not hold water, and Intervenor's repeated claims that Plaintiff DRN and its members are only entitled to eminent domain proceedings pursuant to 15 U.S.C. § 717 f(h) similarly fails. *See* Int. Br. at12-15. The court in *B & J Oil and Gas*, directly addressed these assertions, finding that compensation "does nothing to erase [a] legally cognizable injury… in fact, if [Respondents'] theory were correct, homeowners would be unable to challenge construction of a road through their homes, no matter how arbitrary or unjust the decision." *B &J Oil and Gas*, 353 F.3d at 75. Even if landowners are "fairly" compensated, which is unlikely because of their reduced bargaining position, Plaintiffs' members still suffer an injury-in-fact as a result of Defendants' biased process.

The aforementioned injuries are directly traceable to Defendants' actions. Once Defendants grant a certificate, the recipient pipeline company instantly receives the ability to use eminent domain, and often uses the threat of eminent domain to attempt to strong arm landowners into giving up their property rights. *See, e.g.*, Nelson Declaration ¶¶ 20-23. In fact, courts are essentially bound by the parameters of the certificate order when presiding over such eminent domain cases. *See, e.g.*, *Magnolia LNG LLC, et al.*, 155 FERC ¶ 61,033, at App. P. 5. For these reasons, the injuries that Plaintiffs' members have already suffered or will imminently suffer stem directly from the Commission's certificate process.

Contrary to Intervenor's assertions that the injuries suffered are attributable to the pipeline company's activities and not the Commission, the D.C. Circuit recently held in *Gunpowder Riverkeeper v. Federal Energy Regulatory Commission*, that the "threat of eminent domain derives from the conditional certificate," and therefore the injuries alleged would be redressed by ruling in favor of Riverkeeper, resulting in vacatur of the order granting the

certificate. *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 272 (D.C. Cir. 2015). The circumstances are the same here; Defendants' issuance of the certificate immediately allows a pipeline company to begin eminent domain proceedings. Following Intervenor's logic, a government agency would rarely, if ever, be held liable for biased approvals resulting in the destruction of property. If, for example, a biased agency approved the construction of a highway through the middle of a citizen's home, she would be required to take up her grievances with the highway paving company and not the biased agency that approved the project. Because Plaintiffs face losing an inherent right through a biased adjudication, the **only** way to properly redress their injuries is through the relief sought herein.

### 3. The Pennsylvania Constitution Provides a Property Right that Sustains Plaintiffs' Standing

The Environmental Rights Amendment of the Pennsylvania Constitution also confers a cognizable property interest to Plaintiffs' members, which is afforded due process protection. *See* Pa. Const. Art. I, Sec. 27.

*Board of Regents v. Roth*, supports the due process "property interest" Maya van Rossum and Plaintiffs' members have in the environment. *Board of Regents v. Roth*, 408 U.S. 564 (1972). In *Roth*, the Court explained that the "property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Id.* at 571-72. Indeed, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, *see also Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 119 (D.C. Cir. 2010). Due process protection attaches for rights the Pennsylvania Constitution confers on residents of Pennsylvania. *See Mullen vs. Thompson*, 155 F.Supp.2d 488 (W.D. Pa. 2001). ("Pennsylvania indeed has created a

right to a free public education under its Constitution. . . Thus, plaintiffs cannot be denied a free public education without being afforded due process protection"); *see also Domiano v. River Grove*, 904 F.2d 1142, 1148 (7th Cir. 1990) (a "constitutional provision, may create a protectable property interest").    Maya van Rossum and other members of the Delaware Riverkeeper Network, as citizens of Pennsylvania, have a "property interest" in the parks, state game lands, and other public areas and waterways in Pennsylvania that Commission jurisdictional pipelines impact and degrade. *See e.g.,* Maya van Rossum Declaration at ¶¶ 10-18. Specifically, Section 27 of the Declaration of Rights in the Pennsylvania Constitution provides that Pennsylvania citizens have a property interest in public lands and natural resources. *See* Pa. Const. Art. I, § 27 (the "Environmental Rights Amendment") ("[t]he people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people"). In *Robinson Township, Delaware Riverkeeper Network, et. al v. Commonwealth*, Chief Justice Castille, writing for a plurality of the Pennsylvania Supreme Court, held that "several core provisions of Act 13 violate the Commonwealth's duties as *trustee* of Pennsylvania's public natural resources under the Environmental Rights Amendment." *Robinson*, 83 A.3d 901, 913 (2013) (emphasis added). The opinion continued, "[t]he corollary of the people's Section 27 reservation of right to an environment of quality is an obligation on the government's behalf to refrain from unduly infringing upon or violating the right, including by legislative enactment or executive action." *Id.* at 952.

18

As to the public trust clause of the Environmental Rights Amendment, Chief Justice Castille explained that "the concept of public natural resources includes not only state-owned lands, waterways, and mineral reserves, but also resources that implicate the public interest, such as ambient air, surface and ground water, wild flora, and fauna (including fish) that are outside the scope of purely private property." *Id.* at 955. Given that the people of Pennsylvania are the "named beneficiaries" of Pennsylvania's natural resources and the "environmental public trust was created by the people of Pennsylvania, as the common owners of the Commonwealth's public natural resources," the people themselves have a property interest in those resources. *Id.* at 956. "Under either the United States or Pennsylvania Constitutions, 'once a party is determined to have a property interest or interest in the outcome of the litigation, that person has standing to challenge the governmental action and is entitled to a due process hearing.'" *Muscarella v. Com.*, 87 A.3d 966, 973 (Pa. Commw. Ct. 2014) (quoting *City of Philadelphia v. Pennsylvania Ins. Dep't*, 889 A.2d 664, 670 (Pa. Commw. Ct. 2005)).

Here, Plaintiffs aver a number of environmental harms in the Complaint that the Pennsylvania Environmental Rights Amendment protects and that the attached standing declarations support.  For example, various standing declarants, who are residents of Pennsylvania, cite environmental harms including: the destruction of wildlife and habitat on private and public property (*see* Heindel Declaration at ¶¶ 11-14; Farrell Declaration at ¶ 4; Maya van Rossum Declaration at ¶¶ 10-18); the destruction of historic historically significant property (*see* Heindel Declaration at ¶¶ 22-24); harm to aesthetic values and beauty of natural areas (*see* Heindel Declaration at ¶¶ 11-14, 19-20; Farrell Declaration at ¶ 4); and reduced recreational opportunities on private and public lands (*see* Heindel, Nelson, Farrell, Maya van Rossum Declaration at ¶¶ 10-11, Heindel Declaration at ¶ 19). Because Plaintiffs' standing

declarants have identified specific harms that the Pennsylvania Environmental Rights Amendment expressly protects, they have a property interest that is afforded due process protection.

The Commission cites *Summers v. Earth Island Institute*, 555 U.S. 488 (2009). *See* Def. Br. at 21. *Summers* involved a challenge to a U.S. Forest Service regulation exempting certain projects in National Forests from notice and comment procedures. The Court noted that the plaintiff's member's affidavit stated only that he "ha[d] visited many National Forests and plan[ned] to visit several unnamed National Forests in the future." *Id*. at 495. Here, unlike in *Summers*, Plaintiffs' declarations demonstrate that they use and enjoy the areas affected by the proposed PennEast project, and specifically aver that they plan to revisit those areas in the future. *See e.g.,* Maya van Rossum Declaration at ¶¶ 9-10.

### 4.    Plaintiffs' Members' Environmental, Aesthetic, and Recreational Interests are a Liberty Interest Sufficient to Confer Standing

Even if the Court finds that Plaintiffs need to establish a liberty or property interest to establish standing, and even if the Court disagrees that the Pennsylvania Constitution or Plaintiffs' other property interests are sufficient to confer standing, Plaintiffs still have standing because Plaintiffs' members' environmental, aesthetic, and recreational interests  are liberty interests protected by constitutional due process guarantees. *See supra* Section III.B.3; *see also* Kelly-Mackey Declaration at ¶¶ 12-13, 30-32; Rader Declaration at ¶¶ 15-17.

Judge Noonan's concurring opinion in *Sierra Forest Legacy v. Rey*, provides the seminal analysis for evaluating the sufficiency of an environmental organizations' members' standing in the context of a due process violation as a result of agency bias. *See Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1026 (9th Cir. 2009) (John T. Noonan, J., concurring). Judge Noonan reasoned that:

> [u]ndisputed is the standing of [plaintiff] . . . to assert the interest of those
> individual members affected by the destruction of the environment and its species.
> Aesthetic and environmental well-being, like economic well-being, are important
> ingredients of the quality of life in our society, important enough to confer
> standing under the Administrative Procedure Act . . . to redress an injury in fact . .
> . **These are elements of the liberty enjoyed by a citizen**. An injury in fact
> inflicted by a decision of the [United States Forest Service] must necessarily be
> the denial of a result to which the plaintiffs were legally entitled. **If the plaintiffs
> were entitled to the result, were the plaintiffs not entitled to an unbiased
> decision-maker**?

*Id*. at 1025 (internal quotations omitted) (emphasis added). Here, Plaintiffs' members'

environmental, recreational, and aesthetic interests are precisely the "elements of liberty" that

Judge Noonan found sufficient to provide standing in nearly identical factual scenario.

Intervenor attempts to argue that Plaintiffs have no liberty interest, but fails to cite to any case

law in which liberty interests were evaluated in the context of a violation of due process as a

result of a biased decisionmaker. Int. Br. at 11-12. As such, the analysis in *Sierra Forest Legacy*,

is the only evaluation of this issue in the appropriate context, and shows that Plaintiffs have

standing.

### 5.    Plaintiffs' Harms are Redressable by the Relief Sought

Declaring Section 7178(a)(1) of the Budget Act unconstitutional will eliminate the

mechanism that directly causes the impermissible temptation for bias, or appearance of bias that

violates Plaintiffs constitutional due process rights.  In response to Plaintiffs' claims, Defendants,

Intervenor, and the United States attack the evidentiary underpinnings of Plaintiffs' allegations.

*See* Def. Br. at 27-31; Int. Br. at 8-12; U.S. Br. at 5-14. These arguments, however, go to the

merits of Plaintiffs' claims, not their standing to bring them. In the context of standing analysis,

"the Court is to assume that plaintiffs will prevail on the merits of their claims." *Chaplaincy of

Full Gospel Churches v. U.S. Navy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). It is impermissible to

"'bootstrap standing analysis to issues that are controverted on the merits.'" *Id.* (quoting *Public Citizen v. FTC,* 869 F.2d 1541, 1549 (D.C. Cir. 1989); *see also Delaware Department of Natural Resources and Environmental Control v. Federal Energy Regulatory Commission*, 558 F.3d 575, (D.C. Cir. 2009) ("In considering standing, we must assume the validity of [plaintiff's] merits argument, *i.e.,* that FERC violated the statutory scheme by going ahead and issuing a conditional order, because Delaware had a statutory right to go first"); *Warth*, 422 U.S. at 500; *Emergency Coalition to Defend Educational Travel v. Dep't of Treas.*, 545 F.3d 4, 10 (2008); *Parker v. Dist. of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007); *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003); *Am. Fed'n of Gov't Employees, AFL-CIO v. Pierce*, 697 F.2d 303, 305 (D.C. Cir. 1982). Here, the Commission and PennEast continually attempt to "bootstrap" arguments to issues that are "controverted on the merits" in order to challenge Plaintiffs' standing. These standing arguments are unavailing.

Furthermore, Defendants, Intervenor, and the United States fail to identify to the Court the appropriate standard for evaluating the redressability and immediacy requirements for a constitutional due process challenge. When applying the standing framework to procedural due process claims this Circuit has relaxed the redressability and immediacy requirements. *See, e.g., McManus v. Dist. of Columbia*, 530 F.Supp.2d 46, 73 n. 24 (D. D.C. 2007) (citing *Carey v. Piphus*, 435 U.S. 247, 266 (1978) (noting that a failure to indicate specific injuries does not mean that a plaintiff lacks standing to assert a procedural due process claim)); *see also Electric Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1262 (D.C. Cir. 2004) ("The person ... accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy") (citing *Lujan*, 504 U.S. at 575 n. 7); *Moreau v. FERC*, 982 F.2d 556, 566 (D.C. Cir. 1993). This

relaxed standard, combined with the fact that Plaintiffs must be considered to prevail on the merits of their arguments, shows that the bar that Plaintiffs must meet to achieve standing is far lower than what Defendants and Intervenor would lead the Court to believe.

Defendants begin by making the broad and unsupported statement that Plaintiffs "cannot show that any alleged structural bias is the cause of its purported injuries, nor that such a declaration would have any impact on the future operation of the Commission." Def. Br. at 28. Defendants support their argument by stating that "there is no reason to presume that declaring the Budget Act provision unconstitutional would eliminate funding for the Commission." *Id.* at 28. However, this is nothing more than a strawman argument.  The issue is not **whether** the Commission is funded, but **how** the Commission is funded. *See* Compl. at ¶ 117.  Defendants conflate or otherwise misunderstand what Plaintiffs must prove to prevail, as procedural due process "requires the appearance of fairness and the absence of a probability of outside influences on the adjudicator; **it does not require proof of actual partiality**." *Utica Packing Co. v. Block,* 781 F.2d 71, 77 (6th Cir.1986) (emphasis added); *see also United Church*, 689 F.2d at 701. Plaintiffs here have sufficiently alleged an unlawful "conflict of interest" showing that the Commission's funding sources subject it to an impermissible temptation to be biased in favor of the companies that ultimately fund its budget. *See* Compl. at ¶¶ 265-267; *McClure*, 456 U.S. at 195. The Court may remedy the impermissible possible temptation of bias, or appearance of bias, that violates Plaintiffs' due process rights by declaring the Funding Mechanism unconstitutional, thereby preventing the companies that the Commission regulates from supplying the funding for the Commission's budget. *See* Compl. at ¶¶ 254-261.

Additionally, Defendants misstate the law when they argue that Plaintiffs must show that the "Commission would reach a different natural gas pipeline decision" for Plaintiffs to prevail.

Def. Br. at 28. The Court of Appeals for the D.C. Circuit has found that a "plaintiff who alleges a deprivation of a procedural protection to which he is entitled **never has to prove that if he had received the procedure the substantive result [of the agency action] would have been altered**." *Sugar Cane Growers Coop. of Fla. v. Veneman,* 289 F.3d 89, 94-95 (D.C. Cir. 2002) (emphasis added); *see also City of Waukesha*, 320 F.3d at 234; *Lujan*, 504 U.S. at 573 n.7 ("[U]nder our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure [to follow the prescribed process], even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered . . ."). All that Plaintiffs need to show is that the temptation of decisionmaker bias is beyond what is constitutionally tolerable.

Defendants and Intervenor also mistakenly infer that because the Commission's decisions are later subject to judicial review pursuant to a deferential "arbitrary and capricious" standard, this may cure the constitutional defect. *See* Def. Br. at 29; Int. Br. at 37-38. However, in *Gibson*, the Supreme Court specifically noted that judicial review of biased state administrative proceedings, even if on a *de novo* basis, did not obviate the need for the relief plaintiffs sought. *Gibson*, 411 U.S. at 577; *see also Ward*, 409 U.S. at 61-62 ("Nor ... may the State's ... procedure be deemed constitutionally acceptable simply because the State eventually offers a defendant an impartial adjudication. Petitioner is entitled to a neutral and detached judge in the first instance").

Defendants next cite two cases for the proposition that Plaintiffs' allegations of structural bias, or appearance of bias, are "conjectural in the purest sense," and therefore cannot satisfy the requirements for standing. Def. Br. at 24-26. However, the cases Defendants cite, *Ass'n of Am. Phys. & Surgeons v. HHS* and *Metcalf v. Nat'l Petroleum Council*, are unavailing as neither case

involved allegations of due process violations. What is more, Defendants entirely overstate the holdings of these tangentially relevant cases, as in both cases the federal entities at issue were merely "advisory" committees that did not have any federal decisionmaking authority. *See Ass'n of Am. Phys. & Surgeons v. HHS*, 2006 WL 2882707 at *5 (D.D.C. Oct. 6, 2006); *Metcalf v. Nat'l Petroleum Council*, 553 F.2d 176, 177 (D.C. Cir. 1977). Because these advisory entities had no decisionmaking capacity, the courts found that any potential bias was too far removed from the actual decisionmaker to be problematic.  This is a far cry from the instant situation, in which the biased agency is also the decisionmaker.

Lastly, the courts have never been presented with a challenge – like Plaintiffs' here – to the constitutionality of the Commission's eminent domain and preemptive powers in the context of the Funding Mechanism's due process infirmities. As such, the D.C. Circuit's prior recognition of those powers is irrelevant. Def. Br. at 29-30.

Defendants' and Intervenor's arguments challenging Plaintiffs' standing are meritless. Plaintiffs more than meet the standards for redressability and immediacy for the purposes of achieving standing.

### C.      Plaintiffs State a Claim Upon Which Relief can be Granted

At the pleading stage, the issue before the court is not whether Plaintiffs have established sufficient proof of its harms, but whether Plaintiffs have adequately pled their claims. *See Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 403 F.3d 1249, 1253 (D.C. Cir. 2005). While the court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss, *see Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992), the court must "accept all of the factual allegations in [the] complaint as true."  *United States v. Gaubert*, 499 U.S. 315, 327 (1991) (internal quotation marks omitted). Indeed, the court must

treat the complaint's factual allegations as true, "even if doubtful in fact." *Bell Atl. Corp.v.*
*Twombly*, 550 U.S. 544, 555 (2007).

Many of Defendants' and Intervenors' arguments attempt to rely on disputing the
Complaints' factual averments, even though these facts must be presumed true in the context of
12(b)(6) motions. Because Defendants and Intervenors rely on contested material facts in
arguing that Plaintiffs have failed to state a claim upon which relief can be granted, the motions
to dismiss should be denied. *See Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1041
(D.C. Cir. 2003).

Indeed, the Complaint's factual allegations, which at this stage must be presumed true,
support a claim upon which relief can be granted.   Plaintiffs allege facts showing that the
structure of the Funding Mechanism violates the possible temptation doctrine, the Funding
Mechanism is unconstrained by Congress thereby incentivizing bias, and the proportion of the
budget at stake is substantial enough to confer a "possible temptation."

### 1.    The Structure of Defendants' Funding Mechanism Violates the Possible Temptation Doctrine

With their entire natural gas program budget reliant upon both the willingness and ability
of energy companies to build, operate and pay fees on jurisdictional pipeline projects,
Defendants face an unconstitutional "possible temptation" to use their adjudicative powers in
their own self-interest. *See* Compl. at ¶¶ 116-140. Constitutional due process requires fair
adjudicative proceedings before neutral and detached decision-makers. *See Ward*, 409 U.S. at
59-60. While the Constitution clearly mandates that adjudicative proceedings be free of actual
bias, *see In re Murchison*, 349 U.S. at 136, the Constitution also forbids the mere appearance of
bias in adjudications. ("[O]ur system of law has always endeavored to prevent even the
probability of unfairness"). In this context, due process stands violated when a decision-maker

faces "a possible temptation to the average man as a judge . . . which might lead him not to hold the balance nice, clear and true." *Tumey*, 273 U.S. at 532. When an agency adjudicates, due process is offended when "the decision-maker, because of [its] institutional responsibilities, would have so strong a motive to rule in a way that would aid the institution." *Alpha Epsilon Phi Tau Chapter Housing Authority v. City of Berkley*, 114 F.3d 840, 844 (9th Cir. 1997) (internal quotation omitted). Agencies may not operate pursuant to a "dual status as judge and a party interested in the outcome of the proceedings." *United Church*, 689 F.2d at 699.

The adjudicator's stake in the relevant proceedings need not be "direct or positive" to violate due process guarantees. *See Gibson*, 411 U.S. at 579 (holding unconstitutional the "possible temptation" to rule based on the possible*, attenuated elimination of economic competition); *see also Meyer v. Niles Township*, 477 F.Supp. 357, 362 (N.D. Ill.1979) (township supervisors cannot impartially adjudicate claims for benefits and supervise funds out of which benefits are paid). When an agency may use its adjudicative powers to supply more than *de minimus* funds for its budget, it cannot afford due process. *United Church*, 689 F.2d at 699.

As alleged in the Complaint, Defendants must perform a delicate "balancing test" to determine whether or not to issue a certificate to a pipeline company based on weighing the "public benefits" of a project against any "adverse effects." Compl. at ¶¶ 119-120. At this stage these facts must be presumed true. Likewise, the Complaint alleges that the natural gas regulatory program at the Commission is entirely secured from funds ultimately derived from the companies that the Commission regulates. *See* Compl. at ¶¶ 266. As Plaintiffs further aver, the natural gas regulatory program comprises roughly twenty percent of the Defendants' overall budget. *See* Compl. at ¶ 7. These facts, which must be assumed true, form the basis of Plaintiffs'

claim that the structure of the Funding Mechanism results in impermissible bias, or the appearance of such bias, in violation of due process.

### 2. The Commission's Funding Mechanism is Unbound by Congress and Unconstitutionally Incentivizes Decisionmaker Bias

The arguments that Defendants, Intervenor, and the United States' primarily rely upon to attempt to show that Plaintiffs have not asserted a claim upon which relief can be granted can each be boiled down to one core statement, which is that: because the Funding Mechanism does not allow Defendants to increase its annual revenues beyond the amount appropriated by Congress, the Budget Act therefore cannot offer Defendants a possible temptation to approve pipeline applications. *See* Def. Br. at 34; Int. Br. at 19; U.S. Br. at 8. However, this argument relies on contested issues of fact and is therefore beyond the scope of a proper 12(b)(6) motion. Furthermore the argument misapprehends the operative issue, which is that the Funding Mechanism, by law and in practice, allows the Commission to determine the size of its natural gas program budget, which is entirely reliant on the continued approval of pipeline projects.

#### i. The Funding Mechanism Encourages an Unchecked Expansion of the Commission's Budget

Plaintiffs aver in the Complaint that the constitutionally flawed design of the Funding Mechanism encourages an unconstrained expansion of the Commission's budget. *See* Compl. at ¶ 158-162. In contrast, Defendants contend that "[t]he annual charges . . . do not constitute a 'blank check' to the Commission but merely serve . . . to reimburse the [Treasury] for the Commission's expenses approved by Congress." Def. Br. at 35. However, Defendants' claim that the Commission's annual expenditures are limited by Congress is **patently false** – both statutorily and practically. Indeed, the Commission here is reduced to citing to itself as the

source of authority for the idea that the Funding Mechanism does not provide a "blank check" to the Commission. *Id*.

The idea that the design of the Funding Mechanism would result in exponential unchecked increases in the Commission's budget was obvious even to those concerned about the issue back in 1986.  For example, during the rulemaking process for the Commission's implementation of the Funding Mechanism, four companies repeatedly expressed serious "concern that the annual charges regulations could **lead to an unwarranted increase in the Commission's expenditures**, and recommend[ed] various means of capping such costs." FERC Order No. 472 at 30,620 (emphasis added). With no evidentiary support or further explanation, the Commission's limited response was that because "Congress will continue to approve the Commission's budget through annual and supplemental appropriations" the commenters' concerns were "unnecessary." *Id*. However, the Commission's abrupt answer never addressed the crux of the four companies' concerns, which was that the incentive for Congress to constrain agency costs is entirely eliminated by a unique and unprecedented funding apparatus that fully eliminates any and all public funds from the agency's budget.

The Commission's response to this problem is as unpersuasive today as it was in 1986. Indeed, the historical record bears out the concerns of those four industry parties, as the design of the Funding Mechanism has resulted in the Commission's budget exploding by double the rate of its parent agency. *See* Compl. at ¶ 158. This has occurred precisely because Congress has no effective incentive or means for capping the Commission's costs. *Id*. at. ¶ 160. Therefore, the Commission's self-serving statement above is clearly betrayed by the historical financial records of the Commission itself.  Defendants, Intervenor, and the United States point to no other

similarly situated federal agency with such consistent comparable growth whose adjudications also impact its bottom-line.

Additionally, the Funding Mechanism requires Defendants to "collect fees and annual charges...equal to all **costs** incurred by the Commission in [a relevant] fiscal year." 42 U.S.C. § 7178(a)(1) (emphasis added). The Funding Mechanism does **not** state that Defendants are required to recover only its "annual Congressional appropriation." Defendants are therefore theoretically free to collect monies beyond what was appropriated by Congress, and simply request access to those funds in the following year's budget request. Indeed, the Commission has collected **more** than its annual appropriation on, at least, several occasions. *See e.g.,* http://www.ferc.gov/about/strat-docs/2016/FY17-Budget-Request.pdf (2017 Budget Request); http://www.ferc.gov/about/strat-docs/fy14-budg.pdf (2014 Budget Request); http://www.ferc.gov/about/stratdocs/FY09-budg.pdf (2009 Budget Request).

ii.    Congress does not Set Meaningful Expense Limits on the Commission

Defendants, Intervenor, and the United States heavily rely on their factually disputed contention that "Congress can and does set expense limits" to support their theory that the Commission's Funding Mechanism cannot result in bias. *See* Def. Br. at 35; Int. Br. at 20-21, U.S. Br. at 9,13. However, this argument is meritless. In thirty years of Commission budget requests, the Commission, Intervenor, and the United States collectively point to two instances where the Commission received less funding than what was requested. *See* Def. Br. at 35; Int. Br. at 20-21; U.S. Br. at 13. However, the funds involved in these two instances, when combined, total well less than one percent of all the funds that the Commission has requested over that time. In other words, over a thirty year time period, which included varying instances of congressional dysfunction, the Commission still managed to secure over ninety-nine percent

30

of the monies it requested in each of its ever swelling budget requests. Therefore, the historical averments in the Complaint evince that the design and function of the Funding Mechanism encourages the Commission to set its own budget at whatever increasing amount it deems appropriate, and then receives exactly that amount from Congress because Congress has no incentive to limit the request.

Furthermore, even the two instances that Defendants, Intervenor, and the United States identify as examples of situations where Congress "set expense limits" for the Commission are disputed issues of fact. For example, Defendants and the United States cite to the Commission budget request of 2015, where the Commission requested a budget of $327,277,000, and received a corresponding appropriation of $304,389,000 – a difference of roughly $22,888,000. Def. Br. at 35, U.S. Br. at 13. However, what both parties fail to disclose is that in the following year's budget request the Commission expressly stated that it "anticipates spending **$327,277,000** in FY 2015 through the use of available prior year budget authority." *See* http://www.ferc.gov/about/strat-docs/2015/FY16-Budget-Request.pdf (2016 Budget Request) (emphasis added). In other words, Congress' "limit" was not actually a limit at all, as the Commission planned to and did spend more than the Congressional appropriation.

Intervenor and the United States' second example is even more off-base than that of Defendants. Intervenor and the United States point to the Commission's budget request of 2003, where the Commission requested a budget of $199,928,000 and received a corresponding appropriation of $192,000,000 – a difference of $7,928,000. *See* Int. Br. at 20-21, U.S. Br. at 13. However, again, both parties fail to disclose a crucial fact, which is that the

> [o]riginal budget request of 199,928,000 included **$7,928,000** to fund proposed legislation to require the agency to pay the full government share of the accruing cost of retirement for certain Federal employees. [But] [s]ince this legislation

31

[was] not [] enacted, the budget request and corresponding revenues . . . [were] reduced by this amount.

*See* https://www.gpo.gov/fdsys/pkg/CRPT-107hrpt681/html/CRPT-107hrpt681.htm (Energy and Water Development Appropriations Bill, 2003) (emphasis added). Therefore, the only money that the Commission did not receive in 2003 was funding that was requested in anticipation of legislation that was never passed. In reality, the Commission got every penny it asked for in its budget request to fund its regulatory programs, including the natural gas program. As such, these two dubious factual arguments are very much in dispute and lend no support whatsoever to Defendants, Intervenor, or the United States' arguments.

Even if Defendants' argument only stands for the limited proposition that it is theoretically possible for Congress to set limits, the argument still fails because it does not address how the Funding Mechanism has actually operated over the last thirty years. *See Jackson v. Indiana*, 406 U.S. 1845 (1972) (finding a violation of due process where the "practical effect" of a statute differentiated from its stated purpose). Indeed, the design of the Funding Mechanism provides no statutory incentives or safeguards to insure that the Commission does not get everything it asks for because Congress knows that the money provided will be repaid in full. As such, this matter is fundamentally different from the situation in *Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, where the court found that a statutory safeguard prevented violation of due process. *See Doolin Sec. Sav. Bank, F.S.B. v. FDIC*, 53 F.3d 1395, 1406 (4th Cir. 1995). As established above, no such statutory limitation exists either as a matter of law or by the practical operation of the Funding Mechanism.

       iii.    The Commission's Funding Mechanism Increases the Funds Available to the Commission

Every dollar that flows into Defendants' natural gas program budget is the byproduct of gas that flows through a Commission-approved pipeline project. *See* Compl. at ¶ 6. Therefore, in the context of the natural gas program, Defendants answer to **only** the gas companies they allegedly regulate. *Id*. at ¶ 165. The Commission states that "[i]n all of the cases finding institutional or structural bias, the adjudicator, as a result of the adjudication, increased, in some way, monies available to it." Def. Br. at 33. To some extent, Plaintiffs agree with Defendants' assertion here. There can be no doubt that – at least on the facts alleged in the Complaint – for each and every approval of a natural gas pipeline project the Commission necessarily increases the "monies available to it." There is not a single natural gas pipeline company that operates a Commission-jurisdictional project that does not pay user fees that ultimately fund the Commission's budget. Indeed, the companies by statutory mandate have no choice but to do so. *Id*. at ¶ 4. It is also indisputable on the facts alleged in the Complaint that the more pipeline projects that the Commission approves, the larger the pool of resources is for the agency to access via its annual charges. *Id*. at ¶¶ 125-127.

Under the facts as alleged in the Complaint, Defendants therefore have a near-unilateral ability to spend what they want, as long as they recover all of their costs from the pipeline companies they regulate.  As such, an impermissible "possible temptation" develops. For at least two reasons the instant situation represents an even greater "temptation" than was present in *Ward*. First, Defendants' entire natural gas regulatory program – which includes lawyers, engineers, scientists, and support staff – is reliant on the collection of annual charges. In other words, the salaries of each of these employees primarily depend on the adequate collection of fees from the companies they regulate. This is especially true here because while the Commission collects funds for its budget from three other industries, the regulations dictate that

the Commission may not divert funds from other regulatory programs to fund the natural gas regulatory program. *See* 18 C.F.R. §§ 382.201-03. Indeed, such a diversion would essentially require the other industries to subsidize the regulatory program for natural gas, an action that would run afoul of the Funding Mechanism's "fair and equitable" requirement. 42 U.S.C. § 7178(b). Unlike in *Ward*, where the city could at least shift money in the budget to protect employees in the event of a shortfall, the Commission can do no such thing.

Second, the temptation of bias here is also greater than *Ward* because each pipeline approval represents a stable long-term revenue source, as opposed to the single one-time payoff present in *Ward*. This difference is not only significant because it provides long-term financial security for the agency, but also because such predictable long-term commitments of funds confers a unique benefit on the agency by allowing it to engage in long-term strategic thinking and budget planning with a degree of certitude that few, if any, other agencies are capable of.

It is beyond serious dispute that Defendants take full advantage of this benefit, as Defendants make financial plans well beyond merely the immediate fiscal year. In fact, Defendants plan at least five years ahead. For example, in its "FY2009-2014 Strategic Plan," Defendants advance several long-term initiatives, like its desires to "recruit, hire, train, motivate and retain qualified staff," and "continue to upgrade its own infrastructure in order to achieve its strategic goals." *See* http://www.ferc.gov/about/strat-docs/FY-09-14-strat-plan-print.pdf (Commission FY2009-2014 Strategic Plan). The agency's implementation of its long-term initiatives is also costly, and demands that Defendants engage in long-term financial planning. For instance, in 2008 Defendants spent roughly $168,000,000 in compensation, benefits, and training for personnel, while in 2014, Defendants projected they would spend $226,177,000 on the same. This represents a staggering thirty-five percent increase on only this one piece of the

budget during Defendants' five year plan. *Compare* http://www.ferc.gov/about/strat-docs/FY10-budg.pdf (Commission 2010 Budget Request at 55), *and* http://www.ferc.gov/about/strat-docs/fy14-budg.pdf (Commission 2014 Budget Request at 4). The ability to approve projects, and then forecast with great accuracy its annual charges provides a unique and valuable benefit to the Commission.

> iv.   <u>Defendants' Naturally Rising Fixed Costs Require Defendants to Approve Pipeline Projects</u>

As the Complaint alleges, over the last thirty years the Commission's naturally rising fixed costs have increased dramatically.   *See* Compl. at ¶¶144-152.   Further, natural gas pipelines, like any other type of infrastructure, have finite lifespans that require eventual replacement, removal, or abandonment. *Id.* at ¶ 143. Therefore, it is, under the alleged facts, inevitable that unless the Commission continues to approve new pipeline projects, Defendants will be reduced to an ever-shrinking pool of funds from which they can secure their budget. Indeed, if the Commission stopped approving new projects, it would not be able to comply with the Funding Mechanism's requirements. Defendants contend that they can simply "continue to fully recover its costs from those pipelines that are already in service." Def. Br. at 34. Notwithstanding the fact that Defendants cannot shift funds from one regulatory program to cover shortfalls in other programs, this statement also ignores the plain reality that pipelines will not be "in service" in perpetuity. *See* Compl. at ¶¶ 143-145. As alleged in the Complaint, Defendants have an undeniable institutional interest in preserving, and indeed growing, the agency in both size and influence, which is evinced by the fact that the Commission's budget requests have grown from roughly $100 million in 1988 to nearly $350 million in 2017. *See Earth Island Institute v. United States Forest Service*, 351 F.3d 1291, 1309 (9th Cir. 2003) (Federal agency has an interest in preserving the "extent of its empire"); *Alpha Epsilon*, 114 F.3d

at 844 ("It is reasonable to assume that institutions generally desire to meet their budgets, even

self-imposed ones").

> v.      Defendants' Ability to Approve "Pass-through" Authority does not
>         Cure the Constitutional Defect

The fact the Commission can authorize a "pass-through" of its charges to gas consumers

is inapposite, if not harmful, to Defendants' case. *See* U.S. Br. at 12-13. By allowing companies

to pass through charges to consumers because it could otherwise "reduce the net income … of

the gas pipeline industry by 2.5 percent," *FERC Order No.472*, 52 FR 21263-01 at 21,

Defendants implicitly concede that they prioritize the insulation of private gas company profits

over the best interests of the public. This serves as yet another example of how the

Commission's bias protects both its own, and its partner industry's bottom-lines.

> **3.      Defendants' Budget for the Natural Gas Regulatory Program
> Comprises a Substantial Portion of the Commission's Overall Budget
> Thereby Providing an Impermissible Temptation to be Biased**

Defendants contend that "there is no financial incentive for the Commission to grant or

deny an application for a gas project" because the outcome will have no more than "a *de

minimus* impact" on the Commission's total budget. Def. Br. at 37. However, this argument

again rests on disputed facts and misapprehends the *de minimus* exception to the possible

temptation doctrine.

The Commission misconstrues the *de mimimis* exception to the possible temptation

doctrine by attempting to isolate the *de minimus* analysis to each single individual project

approval. *Id*. at 37. In *Ward*, the Supreme Court found that while the fines the Mayor adjudicated

were only fifty dollars each, because the fines collectively comprised roughly one third of the

city's budget there was an impermissible temptation of bias in violation of due process. *See

Ward*, 409 U.S. at 58; *see also Earth Island Institute*, 351 F.3d 1310 ("The relevant amounts to

36

be considered are not the sums involved in a single sale, but the annual total sum derived from the sales and the percentage of the Forest Service sales budget constituted by that amount").

What the Court must examine in this context is the amount of the overall budget that is derived from the totality of the user fees or fines at issue. Unlike the cases Defendants cite in which courts relied on the fact that the proportionally small revenues at stake were insufficient to confer an impermissible temptation of bias, here, twenty percent of the Commission's overall budget – and one hundred percent of the gas program budget – relies upon the collection of charges from the private natural gas pipeline companies that the Commission regulates. *See* Compl. at ¶ 7.

Additionally, contrary to Defendants' suggestion, *see* Def. Br. at 31-32, Plaintiffs do not broadly argue that any government agency that collects any modicum of user fee funding from regulated parties would necessarily violate due process. Rather, Plaintiffs narrowly contend that where an entire agency program exclusively relies on fees collected from the companies it regulates to ultimately fund its budget, and where the agency also has adjudicatory powers directly relating to those fees, there is an impermissible temptation of bias, or appearance of bias, in violation of constitutional due process guarantees. *See* Compl. at ¶ 95. In all the cases cited by Defendants, Intervenor, and the United States, opposing parties have failed to identify a single case that involved a factual scenario where an entire agency program solely relies on fees secured from the private companies it is tasked with regulating as the foundation of its budget.

For example, in support of its position that Plaintiffs do not state a claim, Defendants overstate and misrepresent the holding in *Van Harken v. City of Chicago*. *See* Def. Br. at 31-32. There, the plaintiff objected to the adjudicative reliability of hearing officers whom the City's Director of Revenue hired for deciding parking ticket infractions. *See Van Harken v. City of*

*Chicago*, 103 F.3d 1346, 1352-53 (7th Cir. 1997). Importantly, the court noted that the case was **unlike** the factual situation in *Ward*, where "a third and a half" of the budget relied on revenues from fines, but "**[n]othing like that is suggested here.**" *Id.* at 1353 (emphasis added). The amount of the Commission's budget at stake here is far greater than that in *Van Harken*, and more like what was at stake in *Ward*.

Defendants' and Intervenor's citation to, and reliance upon, *Alpha Epsilon Phi Tau Chpater Housing Association*, is similarly misplaced, as that court again placed great weight on the fact that only a very small amount of the agency's budget was at issue. *See* Def. Br. at 33-34; Int. Br. at 18, 21. Identical to the analysis in *Van Harken*, the court in *Alpha Epsilon* held that because only a maximum of "five percent" of the defendant's budget was derived from fines, the "institutional incentive" was too "small" to violate due process. *Alpha Epsilon*, 114 F.3d at 847. Furthermore, as noted in *Alpha Epsilon,* the courts in *Marshal v. Jerrico Inc.*, and *N. Mariana Islands v. Kaipat*, also relied on the fact that because an insubstantial proportion of the budgets were at stake, there was no due process violation. *Id.* However, in the instant matter, Plaintiffs allege that the percentage of the Commission's budget reliant on user fees is significantly higher than those present in *Van Harken*, *Alpha Epsilon*, *Jerrico*, and *Kaipat*, by at least a magnitude of four. Therefore, Defendants' and Intervenor's reliance on these cases is misplaced.

The Commission cites *N. Mariana Islands v. Kaipat*, to support its argument that agencies that "submit[] budget requests" do not provide biased motive sufficient to establish a possible temptation in violation of Due Process. Def. Br. at 35-36. However, notwithstanding the fact that only small a amount of budget was at stake in *Kaipat*, the court's holding was particularly narrow, as it found that it was not reasonable to assume that a "judge might be tempted to impose a fine, or to impose a higher fine, to enhance the prospects of building a

38

building or building a building sooner rather than later." *N. Mariana Islands v. Kaipat*, 94 F.3d 574, 581-82 (9th Cir. 1996). The court found that this type of "interest is too contingent and speculative and insubstantial" to be constitutionally suspect. *Id*. at 581.

This is unlike the instant matter, where the monies collected from private parties fully fund an entire regulatory program, which includes: employee salaries, pensions, benefits, travel expenses, supplies, materials, equipment, insurance claims, and maintenance. *See* http://www.ferc.gov/about/strat-docs/2016/FY17-Budget-Request.pdf. Because Defendants, and **specifically the Commissioners themselves**, have an inherent interest in "protecting its turf and cherishing the number of its employees and the extent of its empire" it can have a "lively" bias "towards its budget." *Earth Island Inst.*, 351 F.3d at 1309 (Noonan, J., concurring). As such, Defendants' financial interests in their adjudications are beyond those at stake in the cases Defendants and Intervenors rely upon, rendering those arguments meritless.

**D.     Plaintiffs' Examples of Prior Actual Bias Collectively Show the Commission's Unconstitutional Appearance of Bias**

The outcomes described below provide evidence of bias which supports Plaintiffs' claim of institutional bias, or the appearance of bias. Specifically, Plaintiffs allege that the Commission's possible temptations "frequently manifest themselves in impermissible actual bias in agency adjudications – or, at least, in highly questionable and irregular agency behavior indicative of structural bias." Compl. at ¶ 175. Plaintiffs' averments of the Commission's biased actions supports Plaintiffs' claim that there is an appearance of Commission bias with regard to the Funding Mechanism. Neither Defendants nor the United States can, at least at this stage, dispute the existence of the examples of bias Plaintiffs cite. *Id.* at ¶¶ 175-240.

Intervenor misapprehends these allegations.  Intervenor states that Plaintiffs' claim about the Commission's 100 percent approval rate is "flatly contradicted by the public record." Int. Br.

at 28. Intervenor then cites three examples that it claims support its argument: *Jordan Cove Energy Project, L.P.*, 154 FERC ¶ 61,190; *Turtle Bayou Gas Storage Co.*, 135 FERC ¶ 61,233; and *Ozark Gas Transmission Sys.*, 43 FERC ¶ 61,443. However, none of these proceedings defeats Plaintiffs' factual averment that Defendants have a perfect approval record for pipeline projects that come before the Commission for a vote.

Indeed, *Jordan Cove* was not a dedicated pipeline. Instead, it was a Liquefied Natural Gas export facility with an appurtenant feeder pipeline that was rejected because no binding contracts had been obtained by the project applicant. *See Jordan Cove*, 154 FERC ¶ 61,190 (noting that environmental groups' concerns were not considered and "dismissed as moot"). Additionally, that denial only came **after** Plaintiffs' Complaint was filed. Furthermore, the Commission provided the project applicant the opportunity to later submit binding contracts supporting the application, at which point the project will likely be approved. *Id*. at ¶ 48.

*Turtle Bayou* was also not a dedicated natural gas pipeline project, but rather a storage facility. *See Turtle Bayou*, 135 FERC ¶ 61,233. Again this project was denied because no sufficient contracts showing demand were submitted. *Id*. at ¶¶ 32-33. Likewise, *Ozark* involved the construction and operation of "taps and measuring facilities," not the construction of a pipeline. *Ozark Gas Transmission Sys.*, 43 FERC ¶ 61,443. The other examples Intervenor provides were not project denials, and thus of no moment. *See* Int. Br. at 29-30. As such, Plaintiffs' allegation that the Commission has a 100 percent approval rate for natural gas pipeline projects that come before it for a vote is accurate, and must be accepted as accurate at this stage of the proceeding.

Intervenor next contends that the public record "directly contradicts" Plaintiffs' assertion that the Commission has never issued a civil penalty for a failure to comply with certificate

conditions. Int. Br. at 33. However, all of the examples Intervenor cites were of various forms of settlements with the industry, not civil penalty fines. This actually provides further evidence that Defendants would rather be a business partner with the private companies it oversees than an effective regulator. Even if these actions could be classified as civil penalty fines, the fact that this enforcement tool has not been used on any of the hundreds of projects that have been approved in the last thirteen years shows how reluctant Defendants are to take meaningful action against their business partners.

Intervenor's response to Plaintiffs' assertion that Defendants unlawfully pre-judge their environmental reviews of projects is entirely non-responsive. Int. Br. at 38-39. Plaintiffs assert that despite the fact that the primary function of an Environmental Assessment is to determine if further environmental review is necessary, "the Commission has never issued an Environmental Assessment that found possible significant impacts, or even unknown impacts, which would then require a full Environmental Impact Statement." Compl. at ¶ 215. Intervenor would have the Court believe that Defendants have simply developed an uncanny ability to pre-determine how much environmental analysis is necessary for each project before the project is reviewed. However, Intervenor does not contend, nor can it, that the Commission has ever even issued an Environmental Assessment that recommends further review. So, not only does the Commission have a 100 percent approval rate for projects that come before it for a vote, it also has a 100 percent success rate in pre-determining that a project will need only an Environmental Assessment and nothing more. *See* Compl. at ¶ 218.

With regard to the Commission's public policy for its review and approval of jurisdictional projects, Intervenor contends that the policy statement "stresses the obligation to consider . . . 'the environmental impacts of a project.'" Int. Br. at 41 (emphasis added). However,

the Commission has "stressed" no such directive; rather, the statement quoted by Intervenor merely reads, in full, "Traditionally, the interests of the landowners and the surrounding community have been considered synonymous with the environmental impacts of a project; however, these interests can be distinct." 88 FERC ¶ 61,747. The truth of the matter is that the Commission has never denied any natural gas pipeline project for the sole reason of its environmental impacts.

Lastly, Plaintiffs contend that the Commission has shown actual bias in favor of industry by never requesting funding for, or allocating funds to, the Office of Public Participation, an office designed to help participants in Commission jurisdictional matters navigate the process and compensate them for their litigation costs under certain circumstances. *See* Compl. at ¶¶ 224-29. Intervenor contends that there are "many legitimate reasons why the Commission could view its regulatory goals as better served by prioritizing other portions of the agency when making budgetary requests." Int. Br. at 41-42. However, this response rings hollow considering, as established above, that Defendants have gotten over ninety-nine percent of every cent they have asked for in their budget requests. If past practice is accepted as precedent, had the Commission wanted to fund the office, requesting and receiving funds would have been nothing more than a formality.

### E.   Defendants' Use of Tolling Orders Deprives Plaintiffs' Constitutional Due Process Rights By Preventing Timely Judicial Review of Contested Agency Actions

As Plaintiffs allege in the Complaint, Defendants' bias is further animated by its regular use of "tolling orders" to block timely judicial review of agency actions, Compl. at ¶¶ 191-209, and this separately violates Plaintiffs' due process rights. *Id*. at ¶¶ 270-271. Defendants and the United States do not offer any legal argument against this claim. The D.C. Circuit has found

standing for due process violations where "plaintiffs have identified concrete and consistently implemented policies claimed to produce [] injury," and where plaintiffs "assert that [the] policies exacerbate" the due process violation. *Navy Chaplaincy*, 697 F.3d at 1177. Here, Plaintiffs have made such a claim. *See* Compl. at ¶¶ 191-209.

The Delaware Riverkeeper Network submitted a rehearing request to the Commission in January of 2015 citing several ways in which the Commission violated the Clean Water Act and NEPA when it issued a Certificate for Transcontinental Pipeline Company's Leidy Southeastern Pipeline Project. *Id*. at ¶ 200. Defendants sat on the rehearing request for over a year, and during that time issued at least twenty different Letter Orders allowing Transcontinental to proceed with various forms of construction activity. *Id*. at ¶ 201. Because Defendants did not act on Plaintiffs' rehearing request, Defendants effectively blocked any effective judicial review of the project. *Id*. at ¶ 203. Plaintiffs' aesthetic and recreational interests were harmed by the construction activities, which included tree-felling, grading, trenching, wetland conversions, and blasting activities. *Id*. at ¶ 202; *see also* van Rossum Declaration at ¶¶ 19-24.

In the NGA, Congress plainly sought to balance the laudatory goal of allowing Defendants an opportunity to correct erroneous orders prior to judicial review, against the competing goal of allowing aggrieved parties to obtain timely judicial review of such orders. The balance that Congress struck was to prohibit judicial review of a Commission order unless a party first seeks rehearing of such order within thirty days, 15 U.S.C. § 717r(a), while also prohibiting the Commission from taking more than thirty days "to grant or deny rehearing or to abrogate or modify its order." 15 U.S.C. § 717r(a). Defendants failed to comply with section 717r(a) because they did not take any of these actions, and instead simply granted themselves more time, which is plainly not one of the "acts" Congress authorized the Commission to take in

section 717r(a). *See Fed. Hous. Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136, 141 (2d Cir. 2013) ("In construing a statute, we begin with the plain language, giving all undefined terms their ordinary meaning").

As alleged in the Complaint, Defendants' issuance of tolling orders has clearly thwarted Congress' goal of allowing for timely judicial review of Commission orders within thirty days of the issuance of a certificate. To find otherwise and allow Defendants to extend the thirty-day statutory timeframe for an **indefinite** and **unlimited** period would render Congress' drafting a complete nullity. *See Clark v. Rameker*, 134 S. Ct. 2242, 2248 (2014) ("It therefore flouts the rule that 'a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous'" (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

The Commission's use and abuse of its tolling order powers have never been reviewed or ruled upon by any court in the context of an institutional bias due process challenge, and thus present a factual and legal question of first impression.

Intervenor contends that Plaintiffs have an available remedy here by the submission of a Writ of Mandamus. *See* Int. Br. at 37. However, this argument is unavailing for two reasons. First, the same argument could be made for **any** challenge to a due process failure where timely judicial review was blocked by an administrative agency. The Writ of Mandamus is a "drastic remedy" that was simply not designed to be a get out-of-jail-free-card for agencies that violate due process requirements. *See In re Papandreou*, 139 F.3d 247, 250 (D.C. Cir. 1998).  Second, courts have rejected the argument that, in the context of a due process challenge, the availability of later judicial review pursuant to a deferential standard cures the constitutional defect. *See Goodman v. Laborers' Int'l Union of NA*, 742 F.2d 780, 785 (3d Cir.1984) (finding that where

the tainted decision was later to be "reviewed under a deferential standard … the subsequent hearing did not cure the defect").

Finally, it is worth noting that a rehearing request is only that, a request that the Commission take a second look at the issues that have already been identified and presented to the Commission in prior comments by an aggrieved party. Nothing new is, or should be, presented to the Commission for consideration in a rehearing request. The scope and depth of the Commission's inquiry is therefore extremely limited, as the Commission has already considered the issues presented. In this context, it becomes clear that the thirty days was designed by Congress to allow the agency to merely determine whether or not the issues presented should be reconsidered by the Commission; it was not designed for the purpose of allowing the Commission to craft a comprehensive decisional document so that it could be better positioned to fend-off appeals. As a practical tool, Plaintiffs are unaware of a single instance where the Commission granted a non-industry party a rehearing request. *See* Compl. at ¶ 205.

Plaintiffs thereby have standing to bring the claim challenging the Commission's unconstitutional use of "tolling orders" in violation of due process, and have sufficiently stated a claim upon which relief may be granted.

V.     **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions to dismiss.

Respectfully submitted this 7th day of June, 2016,

*/s/ Aaron Stemplewicz*
Aaron Stemplewicz
Delaware Riverkeeper Network
925 Canal Street, Suite 3701
Bristol, PA 19107
Phone: 215.369.1188
Fax: 215.369.1181

aaron@delawareriverkeeper.org

Jordan B. Yeager
Curtin & Heefner LLP
2005 S. Easton Road, Suite 100
Doylestown, PA 18901
jby@curtinheefner.com

Michael T. Kirkpatrick
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue NW, Suite 312
Washington, DC 20001
michael.kirkpatrick@law.georgetown.edu

Counsel for: *Plaintiffs Delaware Riverkeeper Network and the Delaware Riverkeeper*